**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 49A: MASTER INDEX OF EXHIBITS/Partial: THE BECKSTROM ENTERPRISE FILING**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

•United States House Committee on the Judiciary Intake 'D': Washington, D.C., Friday, May 16, 2026.
•US Atty General Intake 'C': April 27, 2026 (SF)
•FBI Intake 'B': Friday, April 17, 2026 (Ref: Agent Strubler-SF),
•FBI Intake 'A': Previous Submission: Saturday, April 11, 2026 (Ref: Agent Tomeno-SF)

•Exhibit 0: Notice of Irreconciliable Conflict & Attempted Legal Infiltration
•Exhibit 00: Historical Pedigree & The National Security Nexus
•Exhibit 000: High-Value Target (HVT) Index
•Exhibit 0000: Psychological Profile of the Asset (Catherine/Maylynn)
•Exhibit 1: Subject Profile – Rod Allen Beckstrom (The Technical Hub)
•Exhibit 2: Death Report: Iris Mari Beckstrom(C21-3610: Documented Suppression & Evidence Recovery
•Exhibit 3: The 2030 East Cliff Drive Transaction
•Exhibit 4: The Visionary Network Exhibit (The Silicon Valley Nexus)
•Exhibit 5: Tactical Proximity & Surveillance Analysis (Santa Cruz/Capitola)
•Exhibit 6: Forensic Chain of Custody & Persistent Cyber-Physical Tracking
•Exhibit 7: Witness & Subject Identification (Operational Context)
•Exhibit 7B: 'Witness' Protection & 'Subject/Tool' ProtectionProtection Photos
•Exhibit 8: 'Witness' Protection & 'Subject/Tool' ProtectionProtection Photos
•Exhibit 9: Counter-Surveillance & Neutralization of State Assets
•Exhibit 10: Documented Deception & Social Engineering
•Exhibit 11: Documented Tactical Coordination & Physical Surveillance
•Exhibit 12: Charitable Fraud & International Infiltration
•Exhibit 12B: Eric Beckstrom's Charitable Work – Manila
•Exhibit 13: Professional Breach & The "Spiritual" Guard Network
•Exhibit 14: Strategic Displacement & Familial Destruction
•Exhibit 15: International Asset Grooming & IP Extraction
•Exhibit 16: Strategic Infiltration & The Stanford/CNNIC Nexus
•Exhibit 17: The Swiss Re / Stanford Funding Maneuver
•Exhibit 18: The Brunnshög Masterplan & Municipal Exploita
•Exhibit 19: Beckstrom Family Design Work & Architectural Fiduciary

- Exhibit 20: The Manila Slum Redevelopment & Policy Influence
- Exhibit 21: Camden, Maine – Witness Isolation & Enforcement Map
- Exhibit 22: OSU Campus Fire Station Proposal (The Salvage Operation)
- Exhibit 22B: (Addendum): The Extraction Interface & Copyright Evasion
- Exhibit 23: The Los Gatos Operational Hub & "The Club" Nexus
- Exhibit 24: Judicial & Digital Engineering (Systemic Obstruction)
- Exhibit 24B: Professional Sabotage & The "Institutional Shield"
- Exhibit 25: The Saratoga/Los Gatos "Silo" & Command & Control (C2)
- Exhibit 26: The Palo Alto Origins & High-Level State Infiltration
- Exhibit 27: (Addendum): The "Midas List" Fiduciary
- Exhibit 27B: The Gast Architects Network & Elite Extractio
- Exhibit 28: NOTICE OF ESCALATION – PHYSICAL INFILTRATION THREAT
- Exhibit 29: Financial Coercion & Social Engineering(the 'Managed Asset' Framework)
- Exhibit 30: Forensic Point of Origin – the September 2011 Berlin Intercept
- Exhibit 31: The Casualty List and Psycholgical Attrition
- Exhibit 32: Chain of Custody & Forensic Integrity Log
- Exhibit 33: Forensic Point of Origin – The September 2011 Berlin Intercept
- Exhibit 34: Primary Partner/Forensic Reconstruction of the Mexico City Staging (Nov. 2025)
- Exhibit 35: Predatory Financing & The Holiday Party Felony
- Exhibit 36: "Pattern of Practice" Summary of Professional Code Violations & Coordinated Messaging
- Exhibit 36B: Timeline of Coordinated Surveillance & Professional Breach (2011–2026)
- Exhibit 37: Social Engineering & Surveillance Assets (The "Baiting" Protocol)
- Exhibit 38: INTELLECTUAL CAPITAL & GLOBAL INTERFACE (THE "GORILLA" ROLE)
- 
- Exhibit 40: Institutional Compromise & Mobile Operations
- Exhibit 41: THE MAINE NEXUS & ADOLESCENT COMPROMISE
- Exhibit 42: Supplemental - The Parental Enforcement Nodes
- Exhibit 43: Tactical Use of Defamation as a Social Air-Gap
- Exhibit 44: TACTICAL PROXIMITY & SURVEILLANCE INFRASTRUCTURE

  THE "500-FOOT MESH": COMMAND & CONTROL ARCHITECTURE
- Exhibit 45: Ghost User-2
- Exhibit 47: FORMAL NOTICE OF LIABILITY – FACILITATING A NATIONAL SECURITY BREACH
- Exhibit 48: ERIC BECKSTROM RESUME

**COMPILATION**

- Exhibit 49: CA PENAL CODE SECTION 285, CATHERINE DUBRIDGE - INCEST, COMPREHENSIVE STATUTORY REFERENCE MATRIX & MASTER PROPERTY DIRECTORY
- Exhibit 50: DEATH/SUICIDE THEMATIC TIMELINE AND REVENUE-DRIVEN PATTERN MATRIX PART I: CONSOLIDATED DATA CHRONOLOGY
- Exhibit 51: FORENSIC RECORD OF ERIC BECKSTROM'S PARENTAL CUSTODY, PRIMARY CAREGIVING, AND CHARACTER REFUTATION

•Exhibit 52: IRIS BECKSTROM - FORENSIC NARRATIVE RECONSTRUCTION OF TARGET ISOLATION & TORTURE
•Exhibit 53: IRIS-SAN JOSE MEDICAL HOLDING & MAINE TRIAL TIMELINE
•CHRONOLOGICAL SPECIFICATION OF JUDICIAL INTERFERENCE & TARGET ISOLATION
•Exhibit 54: CATHERINE DUBRIDGE - OPERATIONAL ANALYSIS OF BEHAVIORAL MANIPULATION & SYNDICATE SHAME DYNAMICS, HYPER SEXUALITY AS A DESTABILIZATION TOOL
•Exhibit 55: OPERATIONAL ANALYSIS OF ERIC BECKSTROM'S BEHAVIORAL MANIPULATION, SYNDICATE SHAME DYNAMICS AND TARGET RESILIENCE
•Exhibit 56: FORENSIC CHRONOLOGY OF MULTI-DECADAL GENETIC TARGETING & INFRASTRUCTURE PREPARATION OF ERIC BECKSTROM
•Exhibit 57: MASTER MATRIX: ROD BECKSTROM SYNDICATE SYSTEMIC NETWORK OPERATIONS
•Exhibit 58: MASTER SERVICE ROUTING PROTOCOL & EXPANDED SERVICE REGISTER
•ASSOCIATED FILE
•Exhibit 59: TECHNICAL AIRTAG SPECIFICATION & TRACKING BEACON EVIDENCE
•PHYSICAL RECOVERY AND TELEMETRY LOG OF CONCEALED ELECTRONIC LOCATOR
•PHYSICAL RECOVERY AND TELEMETRY LOG OF CONCEALED ELECTRONIC LOCATOR
•Exhibit 60: FORENSIC ASSET LOCATION & FINANCIAL ENTRY MATRIX AGAINST IRIS BECKSTROM
•Exhibit 61: FORMAL NOTICE OF PENDING LITIGATION & EVIDENCE PRESERVATION MANDATE
•ASSOCIATED FILE
•Exhibit 62: REGIONAL DESIGN PROCUREMENT NODE
•Exhibit 63: TWIN LAKES CHURCH INSTITUTIONAL DISCLOSURE & CONTAINMENT LOG OF ERIC BECKSTROM'S DONATONS
•Exhibit 64: DEFENSE INTERROGATION SIMULATION & VULNERABILITY ASSESSMENT
•Exhibit 65: OPERATIONAL ANALYSIS OF COMPARTMENTALIZATION AND SYSTEMIC SECRECY
•Exhibit 66: FORENSIC STATEMENT OF DAMAGE MATRICES & HUMAN IMPACT ANALYSIS-ERIC BECKSTROM'S POEM FOR IRIS BECKSTROM (DECEASED BY HANGING 8/8/2021)
•Exhibit 67:CHRONOLOGICAL TIMELINE OF OUTSIDE INTERFERENCE AND LEGAL ANOMALIES (2011 –2026) [AMENDMENT TO SECTION I & II: FINANCIAL IMPACT ANALYSIS]
•Exhibit 68:DOCUMENTATION OF DESTRUCTIVE INTERPERSONAL PROTOCOLS AND ERIC BECKSTROM'S CUSTODIAL ATTEMPTS
•Exhibit 69:DOCUMENTATION OF ASSET DIVERSION AND BEHAVIORAL DEFLECTION
•Exhibit 70:INTERSECTING SOCIAL VECTORS AND TARGETED SOCIAL PLACEMENTS IN ERIC BECKSTROM'S LIFE
•Exhibit 71:CATHERINE DUBRIDGE - BEHAVIORAL PATTERN ANALYSIS AND ECOSYSTEM IMPACT BASES
•Exhibit 72:ROD BECKSTROM, CLINICAL BEHAVIORAL PROFILE - THE ARCHITECTURAL MECHANISMS OF MALIGNANT CONTROL CONTROL
•Exhibit 73:INVESTIGATION OF ADVANCED SOCIAL AND PROFESSIONAL INTERCEPTIONS IN ERIC BECKSTROM'S LIFE
•Exhibit 74:STRUCTURED OPERATIONAL STATES AND ASSET GENERATION PROTOCOLS

•Exhibit 75: DOCUMENTATION OF NETWORK REACTION AND COORDINATED EVASION TO ERIC BECKSTROM FOLLOWING MATERIAL SEPARATION
•Exhibit 76:DOCUMENTATION OF IDENTITY SPOOFING AND UNAUTHORIZED ACCOUNT INTERCEPTION (FEBRUARY–MARCH 2026)
•Exhibit 77:CATHERINE DUBRIDGE - CLINICAL FRAMEWORK AND EPIDEMIOLOGY OF COMPULSIVE SEXUAL BEHAVIOR DISORDER
•Exhibit 78:MASTER TIME-SERIES MATRIX: LONG-TERM BEHAVIORAL AND CYBER-PHYSICAL INTERDICTIONS
•Exhibit 79:THE MECHANICS OF THE TRAPS DEPLOYED BY CATHERINE DUBRIDGE
•Exhibit 80:ROD BECKSTROM - THE PSYCHOLOGICAL PROFILE OF THE BECKSTROM SYNDICATE PRIMARY ARCHITECT
•Exhibit 81:THE ARCHITECTURE OF COORDINATED EXPLOITATION BY ROD BECKSTROM SYNDICATE
•Exhibit 82:UPDATED CONSOLIDATED MASTER LIST (PARTIAL) OF CATHERINE DUBRIDGE'S COMPROMISED TARGETS

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 49B: CA PENAL CODE SECTION 285, CATHERINE DUBRIDGE INCEST, COMPREHENSIVE COMPILATION**
**STATUTORY REFERENCE MATRIX & MASTER PROPERTY DIRECTORY**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠️ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. EXECUTIVE SUMMARY OF MATERIAL ALLEGATIONS**
This document serves to compile the specific state statutory baselines, federal racketeering predicates, and associated property coordinates referenced throughout the primary pleadings to establish the legal framework for the reported events.
**1. Asserted Pattern of Domestic and Familial Conduct**
The Plaintiff outlines allegations concerning a pattern of non-boundaried domestic behavior and personal conduct involving immediate family members, extended relatives, and associated domestic partners. The text asserts that these interactions are structured across a multi-node family network rather than functioning as isolated events.
**2. Asserted Border Violations and Target Interactions**
The narrative specification logs claims regarding specific personal interactions and alleged boundary violations involving vulnerable individuals, family members, and dependents within the designated residential perimeters. The Plaintiff asserts these occurrences were executed to establish behavioral authority and maintain control over the immediate environment.
**3. Asserted Joint Utilization of Residential Real Estate Assets**
The document highlights a series of multi-day residential gatherings hosted at shared family properties. The Plaintiff notes these timelines to assert that the real estate assets were utilized to host coordinated, multi-person events involving the present participants to distribute shared legal liabilities and ensure absolute non-disclosure.

**II. STATUTORY COMPLIANCE & REFERENCES INDEX**
**1. California Penal Code Section 285 (Incest)**

- **Statutory Definition:** Felonious conduct involving marriage or sexual acts between individuals within defined degrees of consanguinity.

- **Degrees of Relationship:** Direct blood lineages, including parents and children, siblings (whole or half), grandparents and grandchildren, and aunts or uncles with nieces or nephews.
- **Consent Thresholds:** Non-applicable as a defense; the documented biological relationship establishes the statutory violation regardless of mutual consent.
- **Age Parameters:** Applies to individuals 14 years of age or older, with heightened child protection and mandatory reporting statutes activated if a minor under 18 is involved.

**2. 18 U.S. Code § 1591 (Sex Trafficking)**

- **Statutory Definition:** The recruitment, harboring, transportation, provision, obtaining, patronizing, soliciting, or maintaining of a person for the purpose of a commercial sex act, or where force, fraud, or coercion is utilized to cause any person to engage in such acts.
- **Minor Thresholds:** If the individual has not attained 18 years of age, the statutory element of force, fraud, or coercion is not required to establish the federal violation.

**3. 18 U.S. Code § 1962 (RICO - Prohibited Activities)**

- **Statutory Definition:** Outlines unlawful activities involving the operation, control, or investment of income derived from a pattern of racketeering activity into any enterprise engaged in, or the activities of which affect, interstate or foreign commerce.
- **Pattern Requirement:** Requires at least two distinct acts of racketeering activity within a ten-year period, utilizing established state or federal felony violations as specific legal predicates.

## III. THEMATIC EVIDENCE OVERVIEW & ASSET NEXUS

The Plaintiff explicitly links the chronological timelines and behavioral patterns described above to the physical boundaries, parcel**1. Master Real Property Directory** registries, and chains of title of the following real estate assets:

- **Asset Node 1:** 102 Alta Heights Court, Los Gatos, CA (2022-shared home)
- **Asset Node 2:** 249 San Mateo Ave., Los Gatos, CA (2016-shared home)
- **Asset Node 3:** 224 4th Avenue, Santa Cruz, CA (1993-Managed Asset's family beach house)
- **Asset Node 4:** 2030 East Cliff Drive, Santa Cruz, CA (1998-Rod Beckstrom beach house)
- **Asset Node 5:** 19956 Charters Ave., Saratoga, CA (1985?Managed Asset's ancestral home)

**2. The Institutional Containment Framework**
The Plaintiff asserts that the high number of involved external entities, local commercial vendors, and neighborhood participants results in a self-enforcing wall of silence. This framework is driven by a collective effort to minimize disclosure, avoid state board audits, and suppress public exposure of the underlying activities.

**3. Shared Liability Distribution Models**
The text integrates structural distribution analogies to demonstrate how legal and financial liabilities are systematically allocated across multiple commercial and social nodes within the regional ecosystem to lock in compliance and prevent disclosure.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 50: DEATH/SUICIDE THEMATIC TIMELINE AND REVENUE-DRIVEN PATTERN MATRIX**
**PART I: CONSOLIDATED DATA CHRONOLOGY**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

| Year | Subject | Relationship | Context | Noted Methodologies | Event/ Outcome | Asserted Operational Driver / Incentives |
|---|---|---|---|---|---|---|
| 2012 | Jack Wilson | Son of Catherine | Residential | Digital tracking | Medication related | Disruption of resistance to tracking |
| 2013 | Jack Wilson | Son of Catherine | Residential | Digital tracking | Medication related | Continuation of prior residential constraints |
| 2014 | Robert Kamin | Attorney | Unknown | Digital tracking | Sudden event | Collusion assertions; moral distress regarding network |
| 2019 | Susan Berry | Parent figure | Proximity | Targeted tracking | Medical (Stroke) | Material asset containment; financial reallocation |
| 2021 | Iris Beckstrom | Daughter | Proximity | Isolation protocols | Fatal event | Primary wrongful death assertion; containment |
| 2022 | Phil Cohen | Attorney | Residential | Digital tracking | Sudden event | Realization of network scope; minor isolation protocols |
| 2023 | Tom Lutjens | Protector | Unknown | Addiction induction | Medical (Oxy/Cancer) | Elimination of protector; capital disbursement metrics |
| 2024 | Jeff Siegel | Associate | Proximity | "Scorched Earth" | Medical (Aneurysm) | Chemical or substance induction by network medical nodes |
| 2024 | Leola Beckstrom | Elderly Mother | Residential | Isolation/Digital | 1-day delay | Structural shutdown; information flow containment |

PART II: MATERIAL SYSTEMIC INVESTIGATION FIELDS

**1. Asset Isolation and Financial Extraction Patterns**

- **The Susan Berry Node (2019):** Documentation suggests a direct transfer of capital following the 2019 medical event, involving nodes previously identified as asset-poor to maintain operational compliance.
- **The Tom Lutjens Node (2023):** Records identify a significant capital disbursement synchronized with the removal of the primary familial protector asset.
- **The Leola Beckstrom Node (2024):** Financial indices connect localized estate remediation and debt settlement payouts to the deliberate delay in post-incident medical response.

**2. Network Coordination of Medical and Chemical Elements**

- **Predicate Medical Node:** The matrix identifies a recurring, coordinated intervention pattern linked directly to specific medical practitioners (e.g., Dr. Bernard Bierman).
- **Chemical Ingress Methods:** Categorizes the systematic utilization of targeted pharmaceuticals, unverified substance induction, and synthetic medical scenarios to simulate natural health failures (Strokes, Aneurysms, accelerated dependencies).

**NOTE:** THERE ARE OTHER SUDDEN DEATHS UNACCOUNTED FOR: Ed Mitchell, Geoff Nuttal, etc. all friends of the Plaintiff. This list is preliminary only.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

•

### 3. Digital Surveillance and Forensic Tracking Under RICO

- **Continuous Interception:** Every recorded timeline entry identifies the active deployment of the cyber-intelligence architecture to track targets in real time.
- **The "Scorched Earth" Protocol:** Defines the systematic execution of digital manipulation to block external communication, eliminate alternative support networks, and induce intense pressure among secondary participants.

### 4. Inter-Statutory Claims Corroboration

- **Federal Predicate Mapping:** Connects the chronological outcomes documented above directly to the pattern requirements of 18 U.S.C. §§ 1961-1968 (RICO).
- **Coerced Containment Nexus:** Aligns the isolation and tracking methods with the statutory definitions under 18 U.S.C. § 1591 (Sex Trafficking) to demonstrate how target autonomy was restricted across multiple nodes.

## PART III: MASTER TIMELINE CLASSIFICATION

### 1. The Early-Stage Recorded Timeline (2012 – 2014)

- **2012 – 2013 | Node: Jack Wilson:** Targeted tracking logs and residential constraints located at the primary household footprint.
- **2014 | Node: Robert S. Kamin:** Interception metrics and subsequent familial communication anomalies recorded within the legal representation framework.

### 2. The Intermediate Transition Patterns (2019 – 2023)

- **2019 | Node: Susan Berry:** Spatial proximity tracking across the immediate residential perimeter, interfacing with direct asset reallocation records.
- **2021 | Node: Iris Beckstrom:** Core wrongful death timeline entry, establishing localized communication containment and immediate property tracking.
- **2022 | Node: Philip Cohen:** Recording the structural alignment of family and minor isolation protocols within active court representation files.
- **2023 | Node: Tom Lutjens:** Quantitative tracking data mapping substantial capital disbursements alongside the removal of primary protector nodes.**3. The Concluding Remediation Records (2024)**

- **2024 | Node: Jeff Siegel:** Tracking metrics detailing localized medical and chemical elements within a four-block geographic radius.
- **2024 | Node: Leola Beckstrom:** Coordinated tracking of elder abuse metrics, estate remediation delays, and direct information flow containment within the family network.**IV. INTEGRATED DISCLOSURE: THE SCRIPTING & TELEMETRY NETWORK**

The forensic documentation incorporates recent behavioral observations establishing the precise relationship between physical tracking perimeters and remote support networks:

- **The Technical Support Vector (Sergei Node):** The Plaintiff logs the involvement of Sergei within active fitness environments to maintain close-range behavioral monitoring. This node functioned to connect local tracking footprints with remote technical support teams (specifically identified via the Belarus back-office network).
- **The Scripted Persona Protocol:** This remote infrastructure was engineered to generate precise, pre-scripted linguistic prompts and emotional scripts delivered via the primary operator, Catherine

DuBridge. This mechanism allowed her to deploy tailored psychological messaging to manipulate a target network of over 1,000 individuals, using physical access primarily to establish proximity and ensure they felt heard, while masking the underlying tracking objectives.

•**The Kauai Operational Shutdown:** During an unscripted transition window in Kauai during active COVID-19 travel restrictions, the vehicle tracking and communication feed experienced a temporary logistical block. When forced to navigate immediate, unscripted protocol adjustments independently, the primary operator experienced an immediate cognitive shutdown, proving a complete reliance on the remote network feed to guide interpersonal interactions and maintain narrative structure.

•**Asymmetrical Memory Retention Metrics:** This structural reliance explains a severe pattern of asymmetrical memory retention. While the primary operator demonstrates the capacity to recall complex pre-scripted verbal prompts, her baseline memory does not retain standard historical facts or real-world events, completely failing to log that the Plaintiff personally provided $10,000 in custom architectural design works and executed physical support visits to her son one year prior.

**V. INTER-AGENCY JURISDICTION NEXUS**

The Plaintiff requests an immediate administrative and corporate review of the financial, medical, and cyber-surveillance patterns detailed in this matrix. This filing is submitted concurrently with federal question complaints filed under 18 U.S. Code § 1962 (RICO) and 18 U.S. Code § 1591 (Sex Trafficking) to ensure all regulatory oversight bodies, compliance offices, and federal investigators are fully apprised of the multi-state pattern requirements.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or frequently in groups focused on her alone for complete environmental saturation and corporate compromise.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs an infiltration vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 51: FORENSIC RECORD OF ERIC BECKSTROM'S PARENTAL CUSTODY, PRIMARY CAREGIVING, AND CHARACTER REFUTATION**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. PRIMARY CAREGIVER STATUS & DOMESTIC OPERATIONAL HISTORY**
This exhibit serves to document and establish the Claimant's history as the primary physical, operational, and emotional caregiver for his children—Sonia, Iris, and Soren—effectively refuting systematic character smears designed to manufacture a narrative of paternal non-involvement.

- **Structural Business Alignment (2000–Present):** The Claimant deliberately structured his professional architectural practice [EXHIBIT 48] as a home-based business specifically to maintain 24/7 domestic proximity and ensure continuous, direct oversight of his children's daily upbringing.
- **Operational Allocation of Labor (90% Metric):** Independent witness testimony (documented via the Claimant's primary bookkeeping personnel in Maine) verifies that the Claimant executed approximately 90% of all primary domestic and parenting duties. This operational load included daily meal preparation (breakfast and lunches), school transportation logistics, residential maintenance, and early childhood care (including full utilization of cloth diapering systems).
- **Medical & Midwifery Verification (Vermont, Birth of Sonia):** During the delivery of Sonia at a Vermont birthing center, the attending medical staff and primary midwife formally recorded that the Claimant demonstrated absolute, uninterrupted physical and emotional support, explicitly characterizing him to the mother as the most involved father they had witnessed in their professional practice. This clinical observation directly refutes initial maternal anxiety projections.

**II. GEOGRAPHIC TRANSITIONS & STRUCTURAL FAMILY SUPPORT**
The Claimant systematically rebuilt high-revenue architectural firms [EXHIBIT 48] across multiple jurisdictions solely to accommodate family transitions, while simultaneously expanding his direct involvement in his children's developmental frameworks:

1. **Vermont Transition (1995):** Relocated from San Francisco to a rural 10-acre perimeter in Stowe, Vermont. Developed a commercial architecture firm from 2 personnel to 12 within a 36-month window, securing dedicated commercial real estate assets while remaining the primary domestic anchor.

2.**Maine Transition & Educational Leadership (2002–2010):** Relocated to Rockport, Maine. Established an independent home-office studio positioned 15 feet from the primary residence to maintain 90% parenting continuity. To directly support the children's educational framework, the Claimant completed a formal 2-year Waldorf Pedagogical Foundation Teacher Training program, served as Board President for the Ashwood Waldorf School, executed the complete structural and architectural design of the school campus, and stepped in as the active, full-time administrative director for a 6-month crisis period.

3.**Sweden Transition & Advanced Global Tracking (2010–2013):** Relocated the family to Lund, Sweden, to facilitate enrollment in regional educational systems. To secure legal residency, the Claimant entered Lund University as a Master's Student in Sustainable Urban Design [EXHIBIT 48] while concurrently managing his active commercial operations in Maine via remote networks, maintaining a 90% primary caregiving ratio abroad.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

## III. DOCUMENTED ABANDONMENT AND LEGAL PRETEXT MANEUVERS

•**The November 2013 Evacuation:** Minor dependent Soren explicitly identified an imminent risk vector and directed the Claimant, Iris, and Sonia to execute an emergency return flight to the United States three weeks ahead of schedule to disrupt a coordinated attempt by the mother (Michele) to trigger an unauthorized international arrest warrant in Sweden under false pretenses.
•**The December 3, 2013 Abandonment Matrix:** Upon arrival at the United States port of entry, the mother (positioned two rows away on the aircraft) completely severed contact and abandoned minor dependents Sonia and Iris 100%. Concurrently, federal customs officials intercepted the Claimant based on a fraudulent international kidnapping warrant coordinated via enterprise nodes. This legal manipulation mirrors the exact behavioral scripts subsequently deployed by Subject Catherine DuBridge to neutralize the Claimant's parental standing and clear the domestic perimeter for illicit operations.

## IV. PRIMARY CUSTODY RESIDENCY & EXTENDED FAMILY CARE MATRIX (2013–2020)

•**100% Sole Physical Custody (December 2013 – April 2020):** Following the December 2013 abandonment event, minor dependents Sonia and Iris resided 100% exclusively with the Claimant. The Claimant provided all structural, financial, and emotional support throughout this multi-year duration, including anchoring Sonia through two full years of local community college enrollment. The biological mother (Michele) contributed zero operational support, domestic labor, or material maintenance.
•**Domestic Care Inversion and Asset Management (Subject DuBridge):** Throughout the 11-year engagement, Subject Catherine DuBridge performed less than 1% of standard domestic or parental labor, utilizing a curated public persona to mask absolute passivity. Conversely, the Claimant directed over 80% to 90% of his daily energy toward stabilizing her dependents, implementing structural routines that directly improved the health and behavioral patterns of her children. The extensive out-of-pocket funding provided by the Claimant directly masked a deliberate financial isolation structure orchestrated by central enterprise nodes, who intentionally restricted Subject DuBridge's independent liquidity to maintain absolute control over her operational deployment.
•**Uncompensated Labor and Structural Restitution for the DuBridge Family:** To preserve the stability of the relationship perimeter, the Claimant executed hundreds of hours of uncompensated professional architectural services [EXHIBIT 48], physical construction, and material support for Subject DuBridge's extended family, including composing the architectural redesign for her parents' retirement property, providing zero-cost property management for her parents' primary estate (preserving an $8,000 monthly rental stream), executing development labor on the family's Santa Cruz beach house, and fully funding all major holiday assemblies.

## V. FORENSIC BEHAVIORAL ANALYSIS & TERMINATION METRICS (MARCH 2026)

•**The March 2026 Disruption Event:** During a formal separation interaction in March 2026, the Claimant executed an absolute psychological detachment protocol, explicitly communicating a final termination statement ("good luck") and presenting a concise summary of his multi-year parental contributions, including the long-term stabilization of her sons, maternal care for her parents, and structural support for her nieces.
•**Cognitive Processing Collapse:** Upon the delivery of this unscripted statement, Subject Catherine DuBridge experienced an immediate collapse of her standard behavioral mirroring persona. She demonstrated complete physical fixation (staring directly at the floor) and acute cognitive latency,

rendering her unable to formulate a coherent verbal response. This marked the first documented instance of total behavioral shutdown observed by the Claimant during the 11-year timeline.

•**Real-Time Scripting and Telemetry Ingress:** This structural collapse provides forensic evidence that Subject DuBridge lacks autonomous cognitive processing or independent narrative formulations during conflict phases. Her standard operational efficiency is heavily reliant on real-time external communications, telemetry notes, and pre-scripted linguistic prompts routed via the central enterprise cyber-intelligence architecture to guide her interpersonal interactions and maintain systematic control across all designated targets.

## VI. EXPLOITATION OF FINANCIAL VULNERABILITY AND NETWORK COERCION

•**Institutional Deception of Social Networks:** The structural documentation indicates that Subject Catherine DuBridge's surrounding social and professional peers actively exploited this cognitive dependency, operating under the manufactured assumption that her high-frequency behavioral compliance was entirely autonomous and consensual.

•**Systemic Financial Coercion:** This network-wide utilization was heavily driven by acute financial desperation. Central enterprise coordinators deliberately restricted her independent liquidity and access to capital, forcing her into absolute financial dependency. This engineered poverty ensured her continuous availability to the syndicate, transforming her into a leveraged asset deployed to secure proximity and execute tracking operations across all designated commercial and neighborhood nodes.

## VII. HISTORICAL TRAINING PIPELINE AND COMMERCIAL DEPLOYMENT

•**Multi-Generational Conditioning:** The structural pattern indicates that Subject Catherine DuBridge's behavioral compliance was established through long-term, multi-generational domestic conditioning initiated by her father and brother. This systematic training dismantled her personal autonomy, preparing her for deployment as an operational asset within high-stakes corporate environments.

•**Weaponization in Commercial Negotiations:** Senior enterprise coordinators—including Rod Beckstrom, Bill McKiernan, and other high-level corporate actors—systematically deployed Subject DuBridge within their professional networks. She was utilized as a tactical mechanism to gain leverage, infiltrate target perimeters, and secure advantageous terms during major Silicon Valley financial transactions and commercial negotiations.

•**Linguistic Dissonance:** The repetitive complaints voiced by Subject DuBridge regarding external control represented a core psychological script. While completely detached from the reality of her supportive domestic relationship with the Claimant, this pre-scripted narrative reflected the structural control exerted over her by the corporate operators directing her movements.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs an infiltration vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 52: IRIS BECKSTROM - FORENSIC NARRATIVE RECONSTRUCTION OF TARGET ISOLATION & TORTURE**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

⚠️ NOTICE OF HEIGHTENED CIVIL LIABILITY & WRONGFUL DEATH NEXUS
**TO LEGAL COUNSEL OF RECORD & REGULATORY COMPLIANCE OFFICERS:**
Please be advised that the claims asserted in Beckstrom v. Beckstrom, et al. (Case No. 6:26-cv-00920-AA) in the U.S. District Court for the District of Oregon extend far beyond standard commercial disputes or domestic torts [1.2]. The Plaintiff has integrated specific, chronological evidence documenting the wrongful death of his minor daughter, Iris Beckstrom, directly linking the event to the systematic isolation and "Scorched Earth" protocols executed by the enterprise nodes.
Any attempt by corporate counsel, compliance personnel, or state regulatory executives to minimize these disclosures, or to treat the utilization of company assets and licensed premises as an ordinary contractual variance, places the respective entities under heightened civil exposure.
This document serves as formal notice that all corporate records, facility logs, site dispatch registries, project billing statements, procurement files, and internal communications regarding the named licensees are subject to immediate federal preservation mandates under active Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962) and Sex Trafficking (18 U.S.C. § 1591) framework.

**I. EXECUTIVE STATEMENT ON MATERIAL ALLEGATIONS**
The Plaintiff submits this formal narrative specification to document the systematic, long-term breakdown of the emotional, psychological, and social stability of his late minor daughter, Iris Beckstrom. From 2011 until her passing, Iris was systematically isolated from her father by her uncle, who utilized targeted domestic and psychological pressure to break her down.
This was not standard family estrangement or social isolation. Iris was subjected to a calculated, 24/7 protocol of domestic stress engineered to destroy her autonomy, shatter her trust in her father, and silence her from exposing Catherine DuBridge's sexual assaults on her in her own bedroom. Iris had no other "real" mother, as Michele Beckstrom abandoned her in 2013. Catherine DuBridge, her stepmother, trampled on Iris's vulnerability and destroyed her voice and safety.
Rod then pivoted to an extreme cover-up of his managed asset felony actions and destroyed his niece to keep his syndicate going. Hundreds of complicit people then furthered this situation by joining the cover-up as if Iris never lived or deserved to live.

## II. SPECIFIC INFRASTRUCTURE AND ACCESS NODES

1. The Communication Interdiction Vector (2011–2022)

Rod Beckstrom and Catherine DuBridge ran persistent, unauthorized surveillance on Iris's personal digital devices, email accounts, and bedrooms. They used this digital intercept infrastructure to read her private correspondence, alter her outgoing messages, and systematically destroy the baseline of mutual trust between a father and his daughter.

**2. The 2016 Residential Boundary Pivot (249 San Mateo Ave, Los Gatos, CA)**

The moment the family relocated to the San Mateo Avenue property in 2016, Catherine DuBridge dropped all superficial family pretenses. She turned the home into a physical containment zone, using severe, constant psychological pressure to break Iris down within the walls of her own house.

**3. Multi-Node Institutional Support and Legal Restraints**

The syndicate weaponized neighbors, local contacts, out-of-state relatives, and false legal actions, including slapping Iris with high-level trespass warnings while she was still a defenseless minor. They deliberately used these perverted legal tactics to trap her physically, freeze her in total geographic isolation, and choke off any possible escape route to a safe support network.

**4. Historical Systemic Law Enforcement Exploitation**

Since 2014, the biological mother frequently utilized bad-faith emergency service calls in both Maine and California as a primary containment tactic against minor dependents Iris and Sonia. This weaponization of local enforcement frameworks placed the dependents under constant, unauthorized stress, systematically dismantling their legal standing, creating an absolute lack of alternative protections, and mirroring the exact operational protocols later deployed against associates like Taylor Ungaro.

## III. THE BOUNDARY-LESS EXPLOITATION MODEL

The syndicate operates through relentless psychological manipulation and the deliberate destruction of basic human boundaries. Anyone who maintains their personal integrity and refuses to conform to the hyper-sexualized, corrupt environment of the enterprise is targeted for brutal emotional abuse, non-stop gaslighting, and calculated character assassination.

- **The Distribution of Shared Liability:** A massive network of local accomplices, neighbors, and institutional contacts establishes a self-enforcing wall of silence. By involving dozens of local entities in the operation, the syndicate distributes the guilt. This shared liability ensures that everyone stays quiet, ensuring the profound trauma inflicted on vulnerable targets is systematically ignored, normalized, and buried away from public and legal scrutiny.
- **The Financial Interdiction Vector:** Central enterprise nodes utilize executive banking access, including structural relationships within Star One Credit Union under leadership lines to run real-time asset blocking. When the Plaintiff attempted an immediate emergency capital transfer to stabilize Taylor Ungaro, corporate banking protocols were engineered to freeze the transaction, isolate the recipient, and maintain absolute financial leverage over the perimeter.

## IV. DIGITAL SURVEILLANCE OF FAMILY MEMBERS AND DEPENDENTS

**1. Surveillance Infrastructure Targeting Dependents**

Rod Beckstrom's electronic surveillance framework does not stop with external targets; it extends directly to Catherine DuBridge's own children and family members.

**Systemic Target Monitoring:** Catherine DuBridge's son, Jack, was subjected to a relentless, 24/7 digital tracking and environmental monitoring protocol. The extreme psychological pressure of this constant invasion of privacy directly caused two life-threatening crisis events, where Jack attempted self-harm to escape the tracking matrix.

•**Intra-Family Asset Surveillance:** Electronic logs and operational evidence show that Catherine DuBridge maintains active, real-time tracking on an associate named Rick through dedicated mobile spyware and tracking interfaces.

•**Financial Data Interception:** DuBridge maintains direct, unauthorized access to the private banking records and financial instruments of her son, Brent. She uses this structural visibility to maintain absolute leverage and control over his financial autonomy.

**2. The Multi-Generational Containment Profile**

These tracking details prove that the syndicate does not limit its surveillance tools to outsiders. The enterprise systematically deploys these exact same digital stalking tools internally against its own family members to enforce absolute obedience, police their daily behavior, and prevent anyone from exposing the operational log.

## V. CHRONOLOGICAL LOG OF PUBLIC OUTREACH (MAY 2016)

•**May 15, 2016 – Preliminary Congressional Intake:** The Plaintiff executed an unannounced physical walk-in at legislative offices on Capitol Hill to hand over the core forensic dossier. The initial office performed a rapid assessment and immediately provided official federal whistleblower protection guidelines and institutional compliance manuals.

•**May 15, 2016 – Immediate Committee Review:** A secondary legislative office immediately bypassed standard wait times, initiating an expedited intake protocol. Within twenty minutes of receiving the document, they routed the Plaintiff straight into a formal briefing session to evaluate the multi-jurisdictional reach of the surveillance network.

•**May 18, 2016 – Follow-Up Briefing Mandate:** The Plaintiff is maintaining a scheduled follow-up session with congressional compliance staff. This session is locked in to map out the federal oversight response regarding the illegal, unauthorized deployment of high-level surveillance assets against American citizens.

## VI. INTER-AGENCY JURISDICTION NEXUS

The Plaintiff requests an immediate administrative review of the corporate standing, procurement transparency, and trade execution metrics of the named licensees by state licensing investigators. This filing is submitted concurrently with federal question complaints filed under 18 U.S. Code § 1962 (RICO) and 18 U.S. Code § 1591 (Sex Trafficking) to ensure regulatory boards are fully apprised of the active federal actions involving these commercial entities and their intersection with structural communication perimeters.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 53: IRIS-SAN JOSE MEDICAL HOLDING & MAINE TRIAL TIMELINE**
**CHRONOLOGICAL SPECIFICATION OF JUDICIAL INTERFERENCE & TARGET ISOLATION**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C
**JURISDICTIONAL NODES:** Palo Alto, CA (Ingress); San Jose, CA (Medical Node); Portland/Cumberland County, ME (Judicial Node)
**SUBJECTS OF LOG:** Defendant Rod Beckstrom, Ken Altshuler (Opposing Counsel), Judge Susan Sparaco

**⚠️ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. EXECUTED CHRONOLOGICAL TIMELINE (LATE SEPTEMBER 2014 – JANUARY 2015)**
Phase 1: The Late September 2014 Collusive Deposition

- **The Shared Room Grilling:** In late September 2014, the Plaintiff's own legal counsel conducted a deposition of the Plaintiff alongside opposing counsel, Ken Altshuler. Both attorneys operated out of the same physical room in Maine while grilling the Plaintiff via telephone.
- **The Real Estate Extortion Vector:** Both attorneys displayed immediate hostility when the Plaintiff refused to submit to highly irregular, leading questions. The Plaintiff asserts that this high-pressure deposition was structured to force the immediate surrender and legal abandonment of the Plaintiff's Maine residential property.
- **The Legal Abandonment:** Following the Plaintiff's refusal to capitulate during the deposition, his primary legal counsel abruptly terminated representation three weeks prior to the scheduled trial date.

**Phase 2: The October 2014 San Jose Involuntary Holding Vector**

- **The Ingress & Drugging:** In October 2014, one week prior to the rescheduled divorce proceedings, Iris Beckstrom was targeted, drugged, and assaulted at a Palo Alto rooftop gathering engineered through a neighborhood contact (Otto). The Palo Alto Police and Fire Departments responded to her emergency distress call, treating the Plaintiff and target with baseline professional protocol.

•**The San Jose Psych Ward Routing:** The emergency timeline was immediately intercepted. Iris was routed past standard medical units directly into a secure psychiatric facility in San Jose, CA.

•**The Fabricated Suicide Threat:** The Plaintiff discovered that Defendant Rod Beckstrom initiated high-level telephonic interventions with San Jose facility administrators. Beckstrom falsely characterized Iris as an immediate "suicide threat" to legally compel an involuntary overnight holding window in the psych ward.

•**The Facility Apology:** Upon the Plaintiff's overnight arrival and hours of mandatory waiting, San Jose facility staff presented Iris and issued a formal apology to the Plaintiff, certifying that a severe "mistake" had been made and that Iris was completely stable, rational, and clear of psychiatric risk.

**Phase 3: The Telephonic Trial Provocation (One Week Later)**

•**The Telephonic Mandate:** Exactly one week post-assault, the Maine court and opposing counsel attempted to force the trial to proceed via telephone. Bypassing clear child-welfare standards, the court forced the traumatized minor target (Iris) onto a speakerphone line to explain her sexual assault to an adversarial room.

•**The Institutional Denial:** The court and opposing counsel openly refused to believe her testimony. Opposing counsel Ken Altshuler falsely asserted that the Palo Alto Police had no record of the event, intentionally exploiting the automatic statutory confidentiality restrictions placed on minor sexual assault records to manufacture a fraudulent perception of perjury.

**Phase 4: The January 2015 Maine Trial & Forced Separation**

•**The 1-Hour Supervised Visit Constraint:** In January 2015, the Plaintiff and his daughters traveled to Maine for three weeks to attend the delayed trial. The court enforced an unprecedented, meritless restriction: the sisters were permitted to see their brother, Soren, for only one (1) single hour under strict supervision during the entire three-week window.

•**The Unprecedented In-Chamber Interrogation:** In an absolute breach of standard judicial precedent, Judge Susan Sparaco forced all of the Plaintiff's children into an isolated, closed-door chamber interrogation with the judge and attorneys, completely removed from parental presence.

•**The Destruction of the Witness:** Inside the chambers, attorneys aggressively dismantled Iris, calling her a liar and treating her survival of a physical assault as a manufactured fabrication. Iris emerged from the chamber completely destabilized and emotionally torn apart.

•**The Judicial Contradiction:** Upon returning to the open courtroom, Judge Susan Sparaco made an explicit statement on the record, stating: "I have to say something—those were the most intelligent, emotionally stable kids I have ever seen." The Plaintiff highlights the catastrophic contradiction of a judge publicly praising the children's emotional stability immediately after allowing her court to systematically rip them apart.

•**The Arbitrary Family Severance:** While the children's powerful testimony was the exclusive variable that forced the judge to award the Plaintiff 50% equity in the Maine estate, the final decree ordered the absolute separation of the siblings, legally restricting their physical time together to a maximum of three (3) weeks per calendar year.

## II. THE OPERATIONAL OBJECTIVES ELUCIDATED

1. **Perception Over Fact:** The enterprise operated on the calculation that "legal matters are decided on perceptions only." By staging a psychiatric hold in San Jose one week before trial, the syndicate attempted to create a permanent paper trail of mental instability to neutralize Iris as a credible witness.
2. **The Straw Man Trap & Behavioral Pretext Vector:** The intensive interrogation by both attorneys in September 2014 was structured to provoke an angry, defensive outburst from the Plaintiff on tape. This maneuver was designed to provide the state court with the necessary behavioral pretext to award 100% of the real estate assets to the opposing party and completely isolate the dependents.

## III. INTER-AGENCY JURISDICTION NEXUS

The Plaintiff requests an immediate, formal administrative review of the judicial and legal misconduct detailed in this timeline [1.2]. This disclosure is filed concurrently with active federal filings under 18 U.S. Code § 1962 (RICO) and 18 U.S. Code § 1591 (Sex Trafficking) to ensure all regulatory oversight bodies, circuit executives, and public integrity units are fully apprised of the multi-jurisdictional network operations intersecting with past state dockets.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 54: CATHERINE DUBRIDGE - OPERATIONAL ANALYSIS OF BEHAVIORAL MANIPULATION & SYNDICATE SHAME DYNAMICS, HYPER SEXUALITY AS A DESTABILIZATION TOOL**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C.

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. PSYCHOLOGICAL FRAMEWORKS IN HIGH-VOLUME COMPROMISE OPERATIONS**
**1. Hypersexuality as a Destabilization Tool**

- **Operational Indicator:** Utilizing an individual with severe compulsive behavioral patterns or hypersexuality within a targeted social or professional environment.
- **Mechanism:** Generating a high volume of rapid, compromising interactions across a broad network of participants to create immediate, unrecorded liabilities.
- **Result:** Systematic fragmentation of the target's surrounding network. The sheer volume of encounters ensures that a vast majority of local contacts become personally compromised.

**2. The Mechanics of Collective Shame (The Wall of Silence)**

- **Operational Indicator:** Absolute passivity, non-disclosure, and unified avoidance among hundreds of individual participants within a local ecosystem.
- **Mechanism:** Relying on the natural human drive to protect personal reputation, marital stability, and professional standing after engaging in a compromising event.
- **Result:** A self-enforcing protective barrier. The network does not require explicit coordination to maintain silence; individual self-interest and the fear of public exposure automatically force absolute non-disclosure.

**3. Exploitation of Personality Vulnerabilities (The NPD/Sociopathic Nexus)**

- **Operational Indicator:** Coordinated deployment of a managed asset displaying severe narcissistic or vulnerable personality traits, directed by a secondary coordinator.
- **Mechanism:** Leveraging the asset's deep insecurities, financial dependency, or need for control to drive high-velocity compliance operations.
- **Result:** The primary coordinator remains completely insulated from the physical operation, using the asset's behavioral patterns as a shield against direct exposure.

## II. SYSTEMS ANALYSIS: THE REPEATABLE STRATEGY

### 4. Velocity-Based Compliance

- **Definition:** Executing interactions with extreme speed to prevent participants from analyzing the broader context.
- **Mechanism:** Utilizing brief, high-impact situational traps that leave participants instantly compromised before they can evaluate the legal or personal consequences.
- **Result:** Immediate lock-in of compliance across a wide geographic or professional perimeter.

### 5. Environmental Neutralization

- **Definition:** Conditioning the physical or digital environment to ensure no forensic trail remains.
- **Mechanism:** Employing aggressive cleanliness routines, standardized spaces, and off-the-grid logistics (cash, burner devices).
- **Result:** Forces any subsequent legal review to rely heavily on circumstantial timelines, which the network's legal counsel will attempt to minimize as statistically impossible.

## III. DOMESTIC ENVIRONMENTAL IMPACT MATRIX

### 6. Intergenerational Infiltration Dynamics

- **Definition:** Expanding behavioral compromise operations beyond external target nodes into the immediate multi-generational family infrastructure.
- **Mechanism:** Eliminating standard familial boundaries to enforce shared liabilities among cohabitating dependents, immediate relatives, and incoming domestic guests.
- **Result:** Total systemic insularity. Interpersonal trust within the domestic unit is neutralized, creating complete reliance on the primary operational node.

### 7. Sibling Group Behavioral Divergence (The Sibling Baseline Check)

- **Definition:** Documenting visible, contrasting developmental adjustments between distinct sibling cohorts within the perimeter.
- **Mechanism:** Comparing children exposed to highly un-boundaried, flattened domestic environments against an external, normalized baseline group.
- **Result:** Identification of hyper-insular developmental markers. The targeted cohort adapts through intense withdrawal, extreme compliance patterns, and social flattening, while the external baseline cohort exhibits standard milestone progression.

## IV. MULTIGENERATIONAL LINEAGE DYNAMICS & TRAUMA ANOMALIES

### 8. Generational Cycle Replication (The Lineage Silo)

- **Operational Indicator:** Coordinated or repetitive behavioral boundary violations extending across multiple generations within a family lineage.
- **Mechanism:** Utilizing inherited family dynamics, historical trauma loops, or undisclosed personal histories to establish insular control and enforce institutional silence.
- **Result:** Secures total protective isolation, ensuring that internal family operations and ancestral histories remain shielded from outside investigation or exposure.

**9. The Behavioral Exit Impulse (The Transition Vector)**

- **Operational Indicator:** Expressed interest in intensive trauma recovery frameworks, specialized clinical programs, or alternative therapeutic interventions (e.g., specialized psychedelic or PTSD protocols).
- **Mechanism:** A sudden or developing desire by a participant to break away from systemic network constraints and seek external, objective psychological grounding.
- **Result:** Indicates an operational fracture point where an individual attempts to navigate out of a long-term double life, creating potential opportunities for independent disclosure.

**V. PERIMETER VIOLATION DETECTION & VISITOR REACTION ANOMALIES**
**10. Somatic and Behavioral Stress Responses in Visiting Network Nodes**

- **Operational Indicator:** Sudden, acute physiological or behavioral distress (e.g., severe nausea, inability to remain inside the perimeter) exhibited by external professional actors during initial unannounced domestic visits.
- **Mechanism:** Confronting the physical reality of an active environmental staging venue that directly contradicts the actor's prior, isolated understanding of the participant's lifestyle.
- **Result:** Immediate behavioral fracture. The visitor's physical distress reveals a breakdown in their individual compartmentalization, exposing the tension between their private interaction and the high-volume, multi-person operational reality of the venue.

**11. Coercive Restraint and Non-Consensual Environmental Saturation**

- **Operational Indicator:** Incidents within the residential perimeter involving physical coordination, external containment handlers (e.g., multi-person restraint or staging protocols), and states of physical or conscious compromise.
- **Mechanism:** Utilizing specific network nodes to enforce physical immobilization or manage a participant during high-density compromise events, maintaining the operational timeline regardless of the asset's active consent or consciousness.
- **Result:** Complete neutralization of the venue's domestic boundaries, converting a private residence into a functional asset-trapping node that locked in the compliance of any observing or participating witness.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 55: OPERATIONAL ANALYSIS OF ERIC BECKSTROM'S BEHAVIORAL MANIPULATION, SYNDICATE SHAME DYNAMICS AND TARGET RESILIENCE**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

1. **The Counter-Strategy of Forced Instability:** Defendants systematically attempt to characterize the Plaintiff's grief and pursuit of legal accountability as emotional instability. Plaintiff asserts that experiencing profound grief following the death of his daughter, Iris, on August 8, 2021, is the standard, rational human response. A complete absence of emotion or accountability regarding these events represents the true behavioral anomaly

2. **The Mechanism of Syndicate Influence:** Defendant Rod Beckstrom utilizes managed assets and specific compromised individuals to infect targeted groups. The primary operational mechanism relies on exploiting personal and group pride. By engaging targets in compromised actions, the syndicate converts pride into unmanaged internal shame, effectively silencing participants and neutralizing their internal moral compass

3. **Observed Physical and Alertness Declines:** Over a multi-year period, Plaintiff observed a distinct pattern of physical decline, unexplained weight changes, decreased mobility, and reduced alertness among individuals interacting closely within the Defendant's network. This decline correlates directly with the psychological burden of unaddressed shame and compliance with the syndicate's hidden activities.

4. **The Duality of Pride and Shame:** The operational model relies on the fact that when individuals perform actions that violate basic social norms or legal boundaries, the resulting shame creates a progressive internal decline. To avoid the destruction of their public pride, participants rely on internal escape dialogues, allowing serious misdeeds—up to and including actions contributing to the death of Iris—to go unaddressed

5.**The Role of Secrecy and Shadows:** The scale of time, capital, and surveillance invested by Defendant Rod Beckstrom to isolate Iris, the Plaintiff, and other family members demonstrates that the underlying activities are illegitimate. Legitimate enterprises operate openly; the reliance on hidden secrets, electronic tracking, and isolation confirms an operational need to conceal unlawful conduct.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**6.Exploitation of Empathy and Resilience:** Defendants mischaracterized Plaintiff's capacity to identify and navigate the emotional states of others as a vulnerability. Plaintiff's professional history including managing complex cyber boards, coordinating with international entities, and working in high-risk environments—demonstrates that this capacity is a source of resilience and analytical strength, which allowed for the eventual identification of the Defendants' tracking methods.

**7. Asymmetry of the Tracking Dynamic:** Plaintiff asserts that the ongoing surveillance and tracking are driven entirely by the Defendants' internal vulnerabilities and fear of exposure. The defensive nature of the Defendants' heavy investment in surveillance proves that the Plaintiff is the independent party, while the Defendants remain reactive.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs an infiltration vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused

## THE CORE ENGINE

"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

## EXHIBIT 56: FORENSIC CHRONOLOGY OF MULTI-DECADAL GENETIC TARGETING & INFRASTRUCTURE PREPARATION OF ERIC BECKSTROM

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

## SUBJECT: SYSTEMIC INTERVERSION, GEOGRAPHIC ROUTING, AND COMPROMISE INTERDICTIONS TARGETING MINOR LINEAGE (2011–2022)

## ⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION

The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

## I. EXECUTIVE STATEMENT ON THE PREMEDITATED CAPTURE VECTOR

The Plaintiff submits this formal administrative disclosure to record the assertion that the multi-decade tracking, digital surveillance, and geographic isolation protocols managed by Defendant Rod Beckstrom were fundamentally engineered around a long-term strategy of predatory interpersonal compromise targeting the Plaintiff's daughters, Iris and Sonia Beckstrom.

The Plaintiff asserts that this strategy did not consist of spontaneous or localized events. Rather, it operated as a highly coordinated, multi-decade structural preparation wherein the minors' schools, living arrangements, domestic environments, and immediate social circles were systematically manipulated by Beckstrom to position them as **long-term sexual targets** for the primary operator, Catherine Lee DuBridge.

## II. CHRONOLOGICAL ANALYSIS OF THE ARCHITECTURAL PREPARATION

### 1. The July 2012 Florence Italy Tracking Blueprint

- **The Spatial Overlap:** The Plaintiff records that during a family relocation transit from Sweden in July 2012, his family and the family of Catherine DuBridge were simultaneously routed into identical geographic coordinates and lodging assets in Florence, Italy.
- **Operational Objective:** The Plaintiff reframes this event from an accidental coincidence, asserting instead that Defendant Rod Beckstrom utilized real-time cellular data tracking and email interception to establish a definitive visual baseline of the minor targets for DuBridge years before her physical deployment into the Plaintiff's domestic perimeter.

**2. The 2013 International Isolation Proposals**

- **The Zoom Interception:** The Plaintiff documents a 2013 tripartite telephonic/digital conference involving himself, Defendant Rod Beckstrom, and an associate (Patrice). During this session, Beckstrom proposed an irregular domestic structure mandating that the Plaintiff's minor son remain isolated in Sweden while the daughters were systematically routed back to specific California jurisdictions.
- **Operational Objective:** The Plaintiff asserts that this proposal was designed to fracture the unified family custody infrastructure, establishing the necessary geographic vulnerability required to execute localized, low-monitoring access vectors against the female targets.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

### 3. The 2014 Palo Alto / San Jose Involuntary Holding Nexus

•**The Drugging Event:** In October 2014, exactly one week prior to a critical family asset trial in Maine, the minor target (Iris) was routed onto a rooftop location in Palo Alto, CA, via an engineered neighborhood contact (Otto) and subjected to a chemical/narcotic assault.
•**The Administrative Interdiction:** Following an emergency response by local police and fire services, the target was routed past standard medical units directly into a secure psychiatric facility in San Jose, CA. The Plaintiff documents that Rod Beckstrom executed high-level telephonic interventions with facility managers, deploying a fraudulent "suicide risk" narrative to enforce a secure, involuntary holding window designed to legally dismantle the target's credibility as an active witness prior to trial testimony.

### 4. The 2016 Residential Pivot (249 San Mateo Ave, Los Gatos, CA)

•**The Boundary Collapse:** The Plaintiff documents an immediate, absolute behavioral shift occurring the exact day the family took occupancy of the San Mateo Avenue residential asset in 2016. Prior to this date, the minor targets maintained standard, casual interactions with Catherine DuBridge.
•**Operational Objective:** Upon occupancy, DuBridge immediately inverted the domestic environment, shifting from a superficial step-parent persona to a highly aggressive protocol of emotional abuse, severe psychological pressure, and continuous boundary intrusions. The Plaintiff asserts this environment was calculated to force total behavioral submission and compel compliance with the syndicate's hyper-sexualized local network.

## III. THE STRUCTURAL INVERSION OF RELATIONAL INGRESS

The Plaintiff records a critical operational realization regarding the fundamental nature of the 11-year relationship architecture maintained by the primary managed asset, Catherine Lee DuBridge.

•**The Ingress Path Objective:** The Plaintiff asserts that the primary operator's long-term placement within his domestic perimeter was never structured around conventional marital, romantic, or cohabitating intentions toward the Plaintiff. The Plaintiff was systematically utilized by Defendant Rod Beckstrom as the exclusive legal, financial, and physical path of ingress to secure persistent, unmonitored access to his daughters, Sonia and Iris Beckstrom.
•**The Mask of Domestic Stability:** By maintaining a demure fiancé persona and presenting an outward image of a stable, suburban stepmother, DuBridge secured a highly effective social shield [1]. This curated baseline of domestic respectability insulated her from external suspicion while she executed the long-term, multi-decade targeting, psychological breakdown, and grooming protocols directed at the Plaintiff's family lineage.

## V. THE COMMERCIAL EXTRACTION & RELATIONSHIP TERMINATION TIMELINE (FEBRUARY 2026)

The Plaintiff records a specific, verbal exit consultation initiated by the primary managed asset, Catherine Lee DuBridge, on February 20, 2026. This interaction documents the formal commercial criteria used by the enterprise to evaluate relationship viability and real estate equity extractions:

•**The Ingress Interview Admission:** DuBridge explicitly admitted that the initial relationship genesis was structured exclusively as a professional interview vector to secure an interior design procurement channel. The romantic framework was utilized strictly as a placeholder to mask a commercial asset-infiltration operation.

•**The Financial Compensation Threshold:** DuBridge stated that the relationship termination was executed because the Plaintiff was not delivering a high enough volume of capital through his professional network. When the Plaintiff identified a $400,000.00 liquidity injection that DuBridge claimed to have received from her father's trust fund in January 2020, she stated: "Then I have enough money to break up with you."

•**The Fabricated Trust Fund Source:** The Plaintiff records that DuBridge's father had completely severed ties and expelled her from his life in November 2019. The Plaintiff asserts that the $400,000.00 capital injection was not an inheritance, but was rather a direct operational payout funded by Defendant Rod Beckstrom to capitalize the relationship transition.

•**The Systematic Capital Deprivation Protocol:** The Plaintiff logs that despite these high-value payouts, the central command architecture systematically kept the primary operator in a state of artificial poverty. This capital deprivation protocol was maintained to force her ongoing dependence on the syndicate, ensuring her continued compliance as a human asset for corporate and sexual espionage.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs an infiltration vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 57: MASTER MATRIX: ROD BECKSTROM SYNDICATE SYSTEMIC NETWORK OPERATIONS**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**SUBJECT: REVENUE & INFORMATION FLOWS (OPERATIONAL PILLARS)**

**1. Compartmentalization (The Need-to-Know Rule)**
Definition: Blind-spotting participants by cutting off the bigger picture.
Mechanism: Restricting each person to a single, isolated point of contact.
Result: Total operational insulation. A break at one link cannot expose the broader system.

**2. Coercive Control (The Trap)**
Definition: Forcing absolute alignment by removing the ability to walk away.
Mechanism: Manufacturing deep personal liabilities, financial hooks, or compromising secrets.
Result: Enforced compliance. Participants obey because the cost of exit is completely ruinous.

**3. Exploitation of Proximity (Targeting the Inner Circle)**
Definition: Converting baseline human trust into an operational entry point.
Mechanism: Concentrating activities within immediate domestic, familial, or professional circles.
Result: Fast-tracked access. Built-in trust bypasses standard defenses to compromise assets from within.

**4. Front Operations (The Fake Front)**
Definition: Hiding highly predatory mechanics in plain public view.
Mechanism: Routing transactions through legitimate professions, everyday jobs, or standard real estate deals.
Result: Perfect social camouflage. The underlying agenda looks like routine, boring commerce to observers.

**5. Digital Countermeasures (Going Dark)**
Definition: Active, aggressive erasure of the organization's digital footprint.
Mechanism: Relying on untraceable burner devices, cash networks, encrypted pipelines, and buried archives.
Result: Total data blackouts. The entire operational reality stays completely off the standard grid.

## II. PHYSICAL ENVIRONMENTAL MAINTENANCE (SPATIAL SECURITY)

**6. Tactical Spatial Minimalism**
Definition: Keeping personal belongings and daily items to an absolute minimum within the residence.
Mechanism: Restricting visible footprint to prevent the accumulation of clutter or documentation.
Result: Eliminates the risk of inadvertently leaving behind sensitive papers, digital notes, or operational evidence.

**7. Continuous Sanitation Protocols**
Definition: Maintaining a non-stop, aggressive cleaning and sanitizing routine in common areas.
Mechanism: Immediate, systematic cleaning of furniture, surfaces, and common rooms after any presence.
Result: Total environmental erasure. Physical markers, biological traces, and situational evidence are removed in real time.

**8. Environmental Standardization (The Hotel Model)**
Definition: Staging residential bedrooms and spaces to mirror a uniform, completely neutral aesthetic.
Mechanism: Removing personal photographs, unique identifiers, and subjective decor to create interchangeable rooms.
Result: Universal accessibility. The space functions as a sterile, non-descript environment that leaves no personal trail for visitors.

## III. MOBILE LOGISTICS & TRACE CONCEALMENT

**9. Real-Time Room Rotation**
Definition: Initiating abrupt changes to pre-booked physical accommodations immediately prior to target arrival.
Mechanism: Shifting occupants from an established space to an alternative layout (e.g., dual-bed configuration).
Result: Prevents the discovery of physical indicators, environmental traces, or forensic markers left by prior occupants.

**10. Compartmentalization of Travel Companions**
Definition: Structuring travel timelines so that different network participants operate in sequential blocks.
Mechanism: Utilizing a buffer period or an immediate relocation to separate individuals who are not meant to overlap.
Result: Insulates individual network contacts from direct interaction or discovery, maintaining strict informational silos.

## IV. RESOURCE LOGISTICS & FOOTPRINT SUPPRESSION

**11. Resource Restriction**
Definition: Auditing and regulating the intake and consumption of standard domestic supplies within the perimeter.
Mechanism: Minimizing incoming food, groceries, and household goods to maintain a highly controlled baseline.
Result: Suppresses the standard volume of incoming deliveries and structural movement associated with a residence.

**12. Footprint Management**
Definition: Intentional suppression of household operational metrics.
Mechanism: Regulating consumption patterns to keep utility usage, trash volume, and visible resource accumulation at an absolute minimum.
Result: Ensures that public and external metrics do not reflect the actual volume of internal traffic or occupancy.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**

"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 58: MASTER SERVICE ROUTING PROTOCOL & EXPANDED SERVICE REGISTER ASSOCIATED FILE**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C
**SUBJECT:** SPECIAL SERVICE REGISTER FOR FEDERAL, CORPORATE, MUNICIPAL, AND ATHLETIC NODES

**TAKE NOTICE THAT** the attached federal court filings and administrative disciplinary complaints are formally served upon you as a designated node, material witness, or repository of evidence under active federal preservation mandates.

Pursuant to active investigations under **18 U.S.C. § 1962 (RICO)**, **18 U.S.C. § 1591 (Sex Trafficking)**, and **18 U.S.C. § 2384 (Seditious Conspiracy)**, you are hereby directed to maintain immediate preservation protocols over all facility logs, communications, electronic data streams, and internal records related to the subjects named within this transmittal package.

These materials have been concurrently lodged with the United States District Court, the House Oversight Committee, and state regulatory enforcement boards.

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**

The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. MANDATORY SERVICE DIRECTIONS AND TRANSMITTAL COMPLIANCE**

To execute a comprehensive service matrix and bind all individuals, corporate officers, and agency directors to immediate legal awareness of these filings, copies of the Notice of Systemic National Security Breach (18 U.S.C. § 2384)—alongside your regulatory complaints—must be dispatched simultaneously.

Filing this consolidated transmittal pack strips away any defense of plausible deniability, establishing an unalterable public record across federal, corporate, and municipal dockets.

**II. MASTER DISTRIBUTION LIST AND ADDRESS REGISTRY**

**1. Primary Corporate, Venture Capital, and Technology Nodes**

- **Nvidia Corporation**
  Attn: Chris Malachowsky, Co-Founder / Corporate Counsel
  2788 San Tomas Expressway, Santa Clara, CA 95051
- **Kleiner Perkins**
  Attn: John Doerr, Chairman / Risk Management Division
  2750 Sand Hill Road, Menlo Park, CA 94025

**•Intuit Inc.**
Attn: Scott Cook, Co-Founder / Legal Department
2700 Coast Avenue, Mountain View, CA 94043
**•Gensler Architecture & Design**
Attn: Corporate Executive Office / Bill Boucher Desk
500 S. Figueroa Street, Los Angeles, CA 90071
**•The Wonderful Company**
Attn: Stewart Resnick, Chairman and CEO
11444 W. Olympic Boulevard, Los Angeles, CA 90064

**2. National Security, Judicial, and Public Executive Nodes**

**•The Panetta Institute for Public Policy**
Attn: Secretary Leon Panetta (Former SecDef / Director CIA)
100 Campus Center, Building 86E, Seaside, CA 93955
**•The Office of the Mayor — City of Los Angeles**
Attn: Mayor Karen Bass / City Attorney's Office
200 N. Spring Street, Room 303, Los Angeles, CA 90012
**•Stanford University — Freeman Spogli Institute**
Attn: Amy Zegart / Cyber Security Board Policy Review
616 Jane Stanford Way, Stanford, CA 94305
**•Los Alamos National Laboratory**
Attn: Dr. Siegfried S. Hecker / Directorate Security Office
P.O. Box 1663, Los Alamos, NM 87545

**3. Regional Athletic and Facility Infrastructure Nodes**

**•San Francisco 49ers Headquarters**
Attn: Fred Warner
4949 Marie P. DeBartolo Way, Santa Clara, CA 95054
**•San Francisco 49ers Headquarters**
Attn: George Kittle
4949 Marie P. DeBartolo Way, Santa Clara, CA 95054
**•Denver Broncos Headquarters**
Attn: Mike McGlinchey
13655 Broncos Pkwy, Englewood, CO 80112

**III. STRUCTURAL TRANSMITTAL COVER SHEET FOR RECIPIENTS**
Directions: Duplicate and attach this sheet to the front of each physical packet sent to the organizations listed above.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 59: TECHNICAL AIRTAG SPECIFICATION & TRACKING BEACON EVIDENCE**
**PHYSICAL RECOVERY AND TELEMETRY LOG OF CONCEALED ELECTRONIC LOCATOR**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠️ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. MATERIAL ASSERTIONS OF HARDWARE INTERDICTION**
The Plaintiff submits this technical specification to document the physical discovery, isolation, and forensic recovery of a concealed electronic tracking beacon (AirTag / Bluetooth Low Energy locator) from his primary vehicle. The Plaintiff asserts that this hardware asset was deployed by the enterprise to maintain real-time telemetry metrics and coordinate physical surveillance loops across state boundaries.

**II. TECHNICAL SPECIFICATIONS & LOCATION LOGS**

1. **Physical Location of Asset:** The hardware locator was discovered hidden inside the interior compartment of the vehicle's center console.
2. **Telemetry Synchronization Window:** Timestamped electronic logs from March 11, 2026, document that within thirty (30) seconds of an intercepted sensitive communication, co-defendant Jeremy Hull initiated automated telemetry requests to isolate the vehicle's precise physical coordinates.
3. **Written Admission Nexus:** On March 12, 2026, co-defendant Jeremy Hull transmitted a direct written admission confirming unauthorized physical surveillance at the Plaintiff's private residence, stating: "Stopped by your house a few times today."
4. **Evidence Isolation Protocol:** The recovered hardware asset has been placed into a secure Faraday isolation envelope to block all incoming and outgoing RF signals, preserve the internal hardware identifiers, and stop remote data erasure protocols by the central command architecture.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 60: FORENSIC ASSET LOCATION & FINANCIAL ENTRY MATRIX AGAINST IRIS BECKSTROM**
**LOCATION OF ORIGIN:** Washington, D.C.
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

**I. OFFSHORE INSTITUTIONAL JURISDICTIONS (SWISS OPERATIONS)**
**1. Academic and Linguistic Anchors (St. Gallen Node)**

- **Operational Indicator:** Historic and continuing presence within the Canton of St. Gallen via academic and exchange networks.
- **Mechanism:** Utilizing regional linguistic capabilities (German) to navigate local corporate, legal, and financial frameworks independently of standard English-language channels.
- **Result:** Establishes a localized baseline for personal and professional networking within the primary Swiss regulatory environment.

**2. Institutional Corporate Footprint (Zurich & Davos Nodes)**

- **Operational Indicator:** Annual attendance at high-level economic forums (Davos) and direct advisory interactions with major Swiss financial entities (Swiss Re, Zurich Insurance).
- **Mechanism:** Converting intellectual capital, C-suite advisory workshops, and board placements into localized corporate access and professional alignment.
- **Result:** Integrates primary network actors directly into the institutional infrastructure of the Swiss corporate and insurance sectors.

**3. Familial and Ecclesiastical Lineage Placement (Regional Network Anchors)**

- **Operational Indicator:** Cross-generational ancestral lineage and specific ecclesiastical connections tied directly to Swiss heritage.
- **Mechanism:** Utilizing shared cultural background and localized institutional leadership roles to reinforce absolute non-disclosure within regional community networks.
- **Result:** Solidifies social camouflage and protective insularity, embedding operational contacts within trusted, multigenerational institutions.

## II. FINANCIAL TRACKING METRICS & AUDIT PROTOCOLS

### 4. Inbound Cross-Border Transfer Trails

- **Definition:** Documenting the point of origin for funds exiting domestic entities.
- **Mechanism:** Auditing corporate consulting fees, board compensation records, and real estate transaction payouts.
- **Result:** Identifies the precise domestic financial channels used to route capital into offshore jurisdictions.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

### 5. Regulatory Disclosure Mandates (FBAR / FATCA)

- **Definition:** Tracking mandatory federal filings required for foreign financial accounts.
- **Mechanism:** Cross-referencing FinCEN Form 114 (FBAR) and IRS Form 8938 compliance histories for undisclosed assets exceeding statutory reporting thresholds.
- **Result:** Establishes legal and regulatory pressure points by checking for omissions in official federal financial disclosures.

## III. OPERATIONAL ADMINISTRATION & LOGISTICAL PIPELINES

### 6. Proxied Logistical Management (The Chief of Staff Node, Jocelyn)

- **Definition:** Utilizing an administrative intermediary to oversee highly technical or illicit operations while shielding primary leadership.
- **Mechanism:** Funneling directives, managing personnel assignments, and supervising day-to-day coordination through a trusted gatekeeper.
- **Result:** Insulates the primary actor from direct operational friction and management failures while maintaining centralized control over the system.

### 7. Transnational Technical Coordination (The Offshore Routing Node)

- **Definition:** Managing cross-border digital infrastructure and offshore networks to execute specialized tasks.
- **Mechanism:** Directing technical assets in foreign jurisdictions to coordinate data manipulation, network access, or illicit routing.
- **Result:** Establishes an operational perimeter outside domestic legal jurisdiction, complicating efforts by local law enforcement to audit or trace activities.

### 8. Intellectual Capital Extraction (The Report Structuring Node)

- **Definition:** Leveraging third-party research, writing, or strategic analysis to secure high-value commercial payouts and consulting fees.
- **Mechanism:** Utilizing a partner's intellectual output to generate high-level summaries (such as summit or PwC-level documentation) while routing the financial compensation to the primary enterprise actor.
- **Result:** Generates substantial, seemingly legitimate streams of consulting revenue that mask the underlying operational deficits of the primary actor.

## IV. EXPANDED CONSULTING DELIVERABLE LOG

### 9. Corporate Advisory Infiltration (Swiss Re Node)

- **Delivered Asset:** C-Suite Strategy Workshop.
- **Corporate Entity:** Swiss Re (Swiss Reinsurance Company Ltd).
- **Operational Mechanism:** Utilizing specialized third-party strategic input to fulfill high-level corporate training mandates under the primary actor's name.
- **Audit Focus:** Domestic banking statements matching the presentation timeline, corporate procurement records, and internal vendor payment clearances.

### V. FINANCIAL BURN RATE & OVERHEAD ANOMALIES (2011 BERLIN NODE)

#### 10. Disproportionate Cash Flow Metrics (The Burn Rate Disconnect)

•**Operational Indicator:** A documented or stated personal overhead of $400,000 annually.
•**Mechanism:** Disconnect between high daily liquidity requirements and underperforming or stagnant primary investments.
•**Result:** Indicates that the reported burn rate relies entirely on unverified, off-grid revenue pipelines rather than standard asset returns.

#### 11. Asset Equity vs. Liquidity Asymmetry

•**Operational Indicator:** Maintaining $5,000,000 in residential real estate assets with minimal mortgage liabilities.
•**Mechanism:** Carrying low debt on high-value properties while simultaneously requiring immense liquid cash reserves for annual operations.
•**Result:** Confirms that substantial capital was injected to clear primary property debts, leaving the network reliant on ongoing consulting extraction to fuel daily cash requirements.

### VI. EXTERNAL CAPITAL INJECTIONS & LIQUIDITY LOGISTICS

#### 12. Masked Asset Transfers (The Proxy Trust Fund-Catherine DuBridge recipient)

•**Operational Indicator:** Receipt of a sudden $400,000 lump sum attributed to a family trust, despite ongoing estrangement from the source.
•**Mechanism:** Utilizing a fictional or unverified inheritance narrative to mask the true origin of an inbound capital transfer from an external network coordinator.
•**Result:** Provides the target asset with the immediate liquidity required to execute a structural separation without relying on domestic or shared relationship funds.

#### 13. Rapid Asset Depletion (The 2.5-Year Liquidation Cycle)

•**Operational Indicator:** The complete exhaustion of $400,000 in liquid capital within a 30-month window without major property acquisitions.
•**Mechanism:** High-velocity spending or undocumented outward transfers that match an unsustainable personal burn rate.
•**Result:** Re-establishes a state of financial dependency, ensuring the managed asset remains reliant on the primary network coordinator for future capital infusions.

Respectfully submitted,

**Eric A. Beckstrom**
Plaintiff / Forensic Whistleblower
Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
PO Box 1317, Los Gatos, CA 95030
Email: Lind36ram@proton.me
(Operating dark due to 15 years of systemic cyber stalking by Rod Beckstrom, ex-DHS Cyber Security official)

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 61: FORMAL NOTICE OF PENDING LITIGATION & EVIDENCE PRESERVATION MANDATE**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**Fred Warner**
**George Kittle**
**Mike McGlinchey**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C
**ACTIVE MATTER:** Beckstrom v. Beckstrom, et al.
**NOTICE TYPE:** Formal Notification of Joinder as Defendant / Federal Litigation Notice

⚠ NOTICE OF HEIGHTENED CIVIL LIABILITY & WRONGFUL DEATH NEXUS
**TO LEGAL COUNSEL AND REVIEWING AUTHORITIES OF RECORD:**
Please be advised that the claims asserted in Case No. 6:26-cv-00920-AA (District of Oregon) extend far beyond standard commercial, domestic, or civil torts. The Plaintiff has integrated specific, chronological evidence documenting the wrongful death of his minor daughter, Iris Beckstrom, directly linking the event to the systematic isolation and "Scorched Earth" protocols executed by the enterprise nodes.
Any attempt by reviewing authorities, corporate counsel, or institutional legal teams to minimize these disclosures, or to treat the utilization of athletic training facilities and professional sports platforms as a standard operational variance, places the entities under catastrophic exposure.
This document serves as formal notice that all records, facility logs, telemetry data, and internal communications regarding the named athletic personnel are subject to immediate federal preservation mandates under active Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962) and Sex Trafficking (18 U.S.C. § 1591) frameworks.

**I. LEGAL NOTICE OF LIABILITY**
Please be advised that you are being formally identified and named as an individual defendant in the active federal litigation cited above, filed under the statutory frameworks of Civil RICO (18 U.S.C. § 1962) and Sex Trafficking (18 U.S.C. § 1591).
The complaint alleges your systematic integration into localized tracking, behavioral mirroring, and spatial surveillance networks operating under the direction of the core enterprise nodes named in the lawsuit.

**II. MANDATORY EVIDENCE PRESERVATION SPECIFICATIONS**
Pursuant to federal evidence preservation rules, you are hereby given formal notice that a catastrophic civil exposure threshold exists. You are under a strict legal obligation to prevent the destruction, alteration, concealment, or deletion of any and all potentially relevant data. This mandate applies to, but is not limited to:

**1. Digital Communications**
All text messages, emails, encrypted chat logs (e.g., Signal, WhatsApp), and call histories with any individuals named in Exhibit 51 of this active matter, specifically including Catherine DuBridge, Karina Stoddard, and corporate personnel affiliated with regional fitness entities.
**2. Location & Telemetry Data**
Any geotagged data, physical facility check-ins, or vehicle tracking logs associated with regional footprints, specific residence perimeters, or athletic training venues within the Silicon Valley area.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**3. Third-Party Correspondence**
All internal communications regarding corporate facility asset usage, coordinated public/private events, or inquiries related to the tracking of the Plaintiff, Eric A. Beckstrom, and his dependents.
Failure to maintain these records following receipt of this notice can result in severe federal sanctions for spoliation of evidence, independent of the primary liabilities asserted in the complaint. Any corporate counsel or personal representation representing your interest should be directed to the active court docket immediately.

**III. COGNIZANT DEFENDANT SERVICE REGISTER**

**1. Fred Warner**
**Care Of:** San Francisco 49ers Headquarters
4949 Marie P. DeBartolo Way, Santa Clara, CA 95054
**Capacity:** Named individually and as an operational node within the regional tracking framework.

**2. George Kittle**
**Care Of:** San Francisco 49ers Headquarters
4949 Marie P. DeBartolo Way, Santa Clara, CA 95054
**Capacity:** Named individually and as an operational node within the regional tracking framework.

**3. Mike McGlinchey**
**Care Of:** Denver Broncos Headquarters
13655 Broncos Pkwy, Englewood, CO 80112
**Capacity:** Named individually and as an operational node within the regional tracking framework.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or frequently in groups focused on her alone for complete environmental saturation and corporate compromise.

Respectfully submitted,

**Eric A. Beckstrom**
Plaintiff / Forensic Whistleblower
Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
PO Box 1317, Los Gatos, CA 95030, Email: Lind36ram@proton.me
(Operating dark due to 15 years of systemic cyber stalking by Rod Beckstrom, ex-DHS Cyber Security official)

**ENCLOSURES:**

1. Certified Copy of Federal Complaint (Beckstrom v. Beckstrom, et al., Case No. 6:26-cv-00920-AA)
2. Exhibit #54: Operational Analysis of Behavioral Manipulation and Syndicate Shame Dynamics, **Hyper Sexuality as a Destabilization Tool**
3. Exhibit #55: Operational Analysis of Behavioral Manipulation and Syndicate Shame Dynamics and Target Resilience

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 62: REGIONAL DESIGN PROCUREMENT NODE**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**RE:** PROFESSIONAL CODE OF CONDUCT INVESTIGATION / LICENSEE UNLAWFUL CONDUCT DISCLOSURE

⚠ NOTICE OF HEIGHTENED CIVIL LIABILITY & WRONGFUL DEATH NEXUS
**TO LEGAL COUNSEL OF RECORD & REGULATORY ENFORCEMENT:**
Please be advised that the claims asserted in Beckstrom v. Beckstrom, et al. (Case No. 6:26-cv-00920-AA) in the U.S. District Court for the District of Oregon extend far beyond standard commercial or domestic torts. The Plaintiff has integrated specific, chronological evidence documenting the wrongful death of his minor daughter, Iris Beckstrom, directly linking the event to the systematic isolation and "Scorched Earth" protocols executed by the enterprise nodes.
Any attempt by corporate counsel, firm executives, or licensed professionals to minimize these disclosures, or to treat the utilization of industry access and professional privileges as a minor personal variance, places the individuals and entities under catastrophic civil exposure.
This document serves as formal notice that all records, project logs, procurement files, clinical communication records, and internal communications regarding the named licensees are subject to immediate federal preservation mandates under active Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S. Code § 1962) and Sex Trafficking (18 U.S. Code § 1591) frameworks.

**I. EXECUTIVE STATEMENT ON RECONSTRUCTED INTERPERSONAL ACCESS**
The Plaintiff submits this formal narrative log to document the systematic integration of long-term professional, academic, and domestic associates into the operational logistics of the network enterprise. The Plaintiff asserts that relationship networks originating at the Pratt Institute (1988), real estate transitions in New York City (1990), and subsequent multi-decade professional connections were utilized by Defendant Rod Beckstrom to establish persistent monitoring vectors and logistical checkpoints spanning New York, Los Angeles, and Silicon Valley.

**II. SPECIFIC NODE IDENTIFICATION AND OPERATIONAL MATRIX**
**1. The Los Angeles/Gensler Procurement Connection**

- **Subject Name:** Bill Bouchey
- **Professional Designation:** Architectural Interior Designer / Executive Leadership Platform (Gensler / Professional Design Association Presence)
- **Asserted Operational Role:** Regional design procurement coordinator and physical event facilitator. The Plaintiff asserts that standard industry design consultations, collaborative planning,

and professional interactions were utilized to secure persistent physical access to the Plaintiff's domestic properties and to execute high-stress behavioral tracking protocols.

•**The "Brotherhood" Terminology Marker:** The subject systematically deployed heightened linguistic markers of family connection (specifically utilizing the term "brother") to establish a false baseline of absolute trust, masking underlying participation in the tracking infrastructure.

**2. The Pacific Palisades Tracking Checkpoint (April 2025)**

•**Location:** Private Residential Asset, Pacific Palisades, CA

•**Tactical Mechanism:** The Plaintiff documents a highly synchronized scheduling diversion during a multi-day residential visit in April 2025. While external tracking nodes deliberately engaged the Plaintiff outside the perimeter to occupy his immediate attention, the primary operator (Catherine Lee DuBridge) was physically routed into an unauthorized interpersonal sexual event to facilitate network data transfer and coordinate regional logistics.

**3. The Coordinated Verification Protocol (Summer 2025)**

•**Thematic Link:** The Plaintiff records unprompted, high-frequency telephonic outreach initiated by the subject during the Plaintiff's physical presence in Maine.

•**Operational Objective:** These communications were executed as localized verification checks designed to forcefully assess the Plaintiff's current cognitive baseline, verify his exact geographic location metrics, and confirm whether the digital monitoring operations remained fully hidden.

## III. EXPERIENTIAL BOUNDARY SATURATION ANALYSIS

The Plaintiff logs a recurring pattern of operational "tells" across these historical touchpoints. Specific industry travel logs—including narrated domestic shopping excursions in Los Angeles and highly localized professional site visits—are reframed as fabricated cover stories designed to mask the ongoing deployment of human assets, coordinate group events, and expand the environmental saturation footprint across municipal boundaries.

## IV. INSTITUTIONAL INFRASTRUCTURE & REVENUE AGGREGATION NODES

**1. The Los Angeles Municipal Executive Nexus**

•**Associated High-Profile Entities:** Stewart Resnick (Billionaire executive, Principal of The Wonderful Company / corporate agricultural conglomerate); Karen Bass (Current Mayor of Los Angeles).

•**Strategic Interface Logistics:** The Plaintiff records a specific, high-profile corporate milestone event hosted at the Resnick residential compound in Los Angeles. The integration of high-level municipal executives, including Mayor Karen Bass, within this specific social circle is logged to document the structural scale of the monitoring ecosystem.

•**The Espionage Mask:** The Plaintiff asserts that the presence of multi-billion dollar corporate assets and major metropolitan executive figures serves as the ultimate structural cover. The immense political and financial influence of these nodes is utilized to enforce absolute institutional immunity, ensuring that local law enforcement agencies and standard regulatory boards remain compromised or unable to execute independent discovery.

**2. The Strategic Inversion of High-Value Networks**

The Plaintiff asserts that the network systematically routes its primary operator, Catherine DuBridge, through these high-net-worth environments to solidify the enterprise's regional footprint. By embedding the operational nodes within the highest tiers of California's financial, architectural, and political infrastructure, the syndicate secures a self-reinforcing shield of public prestige that renders standard whistleblowing channels ineffective.

**V. INTER-AGENCY JURISDICTION NEXUS**

The Plaintiff requests an immediate, formal administrative review of the professional design procurement channels and architectural leadership networks detailed in this log. This disclosure is filed concurrently with active federal filings under 18 U.S. Code § 1962 (RICO) and 18 U.S. Code § 1591 (Sex Trafficking) to ensure all regulatory oversight bodies, professional certification councils, and corporate compliance units are fully apprised of multi-jurisdictional network operations intersecting with licensed trade practices.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 63: TWIN LAKES CHURCH INSTITUTIONAL DISCLOSURE & CONTAINMENT LOG OF ERIC BECKSTROM'S DONATONS**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
DATE**:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C
**SUBJECTS OF COMPLAINT:** Named Commercial Entities and Licensees:

- All Natural Stone, FMD, Van Briggle Floors, J&M Windows, Los Gatos Plumbing, Cal Fire and Windows

⚠ NOTICE OF HEIGHTENED CIVIL LIABILITY & WRONGFUL DEATH NEXUS
**TO LEGAL COUNSEL OF RECORD & COMPLIANCE OFFICERS:**
Please be advised that the claims asserted in Beckstrom v. Beckstrom, et al. (Case No. 6:26-cv-00920-AA) in the U.S. District Court for the District of Oregon extend far beyond standard commercial or domestic torts. The Plaintiff has integrated specific, chronological evidence documenting the wrongful death of his minor daughter, Iris Beckstrom, directly linking the event to the systematic isolation and "Scorched Earth" protocols executed by the enterprise nodes.
Any attempt by corporate counsel, compliance personnel, or state regulatory executives to minimize these disclosures, or to treat the utilization of company assets and licensed premises as an ordinary contractual variance, places the respective entities under heightened civil exposure.
This document serves as formal notice that all corporate records, facility logs, site dispatch registries, project billing statements, procurement files, and internal communications regarding the named licensees are subject to immediate federal preservation mandates under active Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962) and Sex Trafficking (18 U.S.C. § 1591) frameworks.

**I. DIRECT CASH DISBURSEMENTS (2015 – 2026)**

- **Total Financial Output:** $250,000.00+
- **Source of Funds:** Personal capital provided directly by the Plaintiff to Twin Lakes Church over an 11-year timeline.
- **Stated Allocation:** Institutional operations, donations, and pastoral staff support.
- **Disputed Usage:** The Plaintiff asserts that these personal funds were diverted by the institution away from standard charitable operations to finance, facilitate, and conceal private, non-commercial adult events involving specific staff nodes and the individual identified as Catherine DuBridge (Cathy).

**II. INDIRECT CONTRACT DIVERSION (2020 – 2026)**

- **Contracted Entity:** Catherine DuBridge (Interior Design Procurement Services)
- **Total Contract Value:** $600,000.00
- **Estimated Annual Flow:** Approximately $80,000.00 annually.

- **Disputed Usage:** Plaintiff asserts that the contracted capital was diverted away from physical commercial deliverables to fund the travel, operational logistics, and coordination of the multi-node adult events outlined in the primary complaint.

### III. LOCALIZED COMMUNICATION AND ASSORTED RECORD LOGS

- **March 1, 2026 Incident:** In-person presentation of the relational narrative to the designated church care ministers ("Stephen Ministers"), resulting in an immediate intervention by an administrative official characterized as active damage control.
- **January – February 2026 Outreach:** Timeline logs tracking standard outreach to local community contacts, resulting in immediate, synchronized communication adjustments and meeting cancellations.

### IV. CHRONOLOGICAL LOG OF THE MARCH 1, 2026 ADMINISTRATIVE INCIDENT

The Plaintiff documents a specific, in-person occurrence at Twin Lakes Church on March 1, 2026, during the 11:00 AM service. This timeline records the precise sequence of a formal disclosure and the immediate deployment of institutional containment protocols:

- **Submission of Narrative:** Following the conclusion of the formal service, the Plaintiff initiated a structured verbal download with an assigned representative of the facility's care ministry ("Stephen Ministers"). The Plaintiff explicitly laid out the multi-node operational architecture of the relational betrayal, detailing a severe pattern of boundary violations, domestic exploitation, and systemic local involvement.
- **Representative Response:** The care representative acknowledged the scale of the disclosure, characterizing the record as the most traumatic narrative she had ever received in her life.
- **Hostile Pastoral Intervention:** Prior to the conclusion of the session, an administrative official aggressively breached the immediate perimeter of the meeting. The official attempted to force entry into the private consultation under the guise of pastoral oversight, demonstrating a confrontational demeanor to disrupt the reporting process and deny privacy.
- **Deployment of Damage Control:** The Plaintiff asserts that this tactical intervention indicates a pre-existing awareness of the syndicate's operational profile. The confrontational approach was executed as an active corporate "damage control" mechanism to assert immediate behavioral authority, suppress further transmission of data within the facility, and protect the institutional space from direct exposure.

### V. THE ENVIRONMENTAL SATURATION AND MULTI-NODE EXPOSURE FRAMEWORK

The Plaintiff asserts that the behavioral footprint observed within these institutional and community networks cannot be evaluated under standard frameworks of isolated personal misconduct or conventional extra-marital relationships.

- **The 100% Saturation Vector:** The primary operator executes high-frequency, multi-person events involving both male and female nodes that completely bypass established societal and legal boundaries. The Plaintiff asserts that these interactions are engineered to establish an environment of 100% saturation, meaning that all individuals within the immediate proximity (100-foot perimeter) are effectively integrated into the operational footprint and bound by shared liabilities. No individual is an innocent observer.
- **The Systemic Network Panic:** The synchronized cancellations, sudden meeting blocks, and rapid communication adjustments documented across local community contacts throughout January and February 2026 confirm a widespread, coordinated response to active tracking data.

•**Statutory Framework:** California Penal Code Section 285 (Incest) is cited as the governing criminal standard for reported domestic actions occurring within the physical footprint of the subject real estate assets.

## VI. INTER-AGENCY JURISDICTION NEXUS

The Plaintiff requests an immediate administrative review of the corporate standing, procurement transparency, and trade execution metrics of the named licensees by state licensing investigators. This filing is submitted concurrently with federal question complaints filed under 18 U.S. Code § 1962 (RICO) and 18 U.S. Code § 1591 (Sex Trafficking) to ensure regulatory boards are fully apprised of the active federal actions involving these commercial entities and their intersection with institutional funding channels.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 64: DEFENSE INTERROGATION SIMULATION & VULNERABILITY ASSESSMENT**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**LEGISLATIVE DISCLOSURE & CONCURRENT SUBMISSION NOTICE,**
**NOTICE TO THE COURT, ALL NAMED DEFENDANTS, AND REVIEWING REGULATORY COMPLIANCE OFFICERS:** PLEASE BE ADVISED that a complete, unredacted Master Evidentiary Binder containing the foundational documentation, transaction histories, telematics data, and the Consolidated Master Evidence Directory associated with Case No. 6:26-cv-00920-AA has been formally delivered to and is in the active possession of the United States House Committee on the Judiciary in Washington, D.C. **May 16, 2026.** This administrative exhibit and all subsequent supplementary updates (Exhibits 54-64) serve to align the formal record of this Court with the concurrent legislative oversight and whistleblower data streams now established at the federal congressional level. Any unauthorized alteration of records, deletion of system telemetry, or enforcement of institutional silence by any node named herein is subject to direct congressional scrutiny and federal spoliation sanctions under 18 U.S.C. § 1512.

**I. OBJECTIVE AND PURPOSE**
The purpose of this document is to simulate the tactical cross-examination strategies likely to be deployed by defense counsel representing corporate entities and individual defendants in Case No. 6:26-cv-00920-AA. Anticipating challenges to the scope, probability, and nature of the operational network allows the Plaintiff to anchor each defense challenge directly to verifiable discovery targets established in Exhibit 1 and Exhibit 6.

**II. LINE OF INTERROGATION 1: THE PLAUSIBILITY CHALLENGE**

- **Anticipated Defense Line:** "The narrative describes an enterprise involving hundreds of individuals across multiple states, spanning real estate brokerages, technology companies, and community institutions, all coordinating to monitor a single individual. This is logistically improbable and statistically absurd. How can the Plaintiff prove a coordinated conspiracy of this scale exists?"
- **Plaintiff Data Anchor & Countermeasure:**
- **The Master Index:** The defense's assertion of "improbability" is countered by the **Consolidated Master Evidence Directory** of 373 unique entries. The list changes the argument from a vague theory to a specific, trackable index of names.

•**Discovery Target:** Subpoena cellular tower pings, localized network handshakes, and communication records for pre-identified clusters of names (e.g., the Los Gatos neighborhood cluster) during specific target dates to establish overlapping spatial proximity that cannot be explained by chance.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

## III. LINE OF INTERROGATION 2: THE "PERMANENT DECEPTION" PROTOCOL

•**Anticipated Defense Line:** "The Plaintiff claims that he was deliberately paraded in front of these individuals for years while being kept completely in the dark, only realizing the situation after March 1, 2026. If this network was as overt as claimed, why is there no documentation of the Plaintiff identifying it prior to this date?"

•**Plaintiff Data Anchor & Countermeasure:**

•**Asymmetric Information Model:** In complex organizational tracking, secrecy is maintained not by hiding the assets, but by manipulating the target's environment under a veneer of standard social or professional interaction.

•**The March 1 Pivot:** The sudden shift in behavior by Bob Shepherd on March 1, 2026, serves as the baseline operational fracture. The abrupt transition from everyday professional interaction to automated legal disclaimers provides an objective timeline marker showing when the hidden network was forced to expose its corporate cover.

## IV. LINE OF INTERROGATION 3: THE TECHNICAL TELEMATICS DATA

•**Anticipated Defense Line:** "The allegations involving automotive software manipulation and persistent digital key registries are simply consumer tech support issues or user errors. How can the Plaintiff tie standard vehicle telematics to an active espionage operation?"

•**Plaintiff Data Anchor & Countermeasure:**

•**Persistent Key Screening Logs:** The technical anomaly on the Rivian R1S primary Key Screen—where an unauthorized pairing remained active after being cleared from the main infotainment display—documents a structural software vulnerability, not user error.

•**Statutory Hold (18 U.S.C. § 2703(f)):** The formal demand forcing Rivian Automotive, Inc. to preserve API call histories, back-end server logs, and remote command cellular handshakes transforms a customer service dispute into a hard forensic trail.

## V. LINE OF INTERROGATION 4: THE HISTORICAL ORIGIN AND SOURCE ARCHIVE

**Anticipated Defense Line:** "The Plaintiff claims his digital ecosystem has been compromised since a 2011 international conference. Why did it take 15 years to uncover these specific software tools, and how can he trace a direct chain of custody back to a single hardware interaction?"

**Plaintiff Data Anchor & Countermeasure:**

**The ArchiCAD Hidden Registry Library:** The recovery of forensic assets on April 2, 2026, from an inactive ArchiCAD library subdirectory documents the exact concealment method used to bypass standard consumer security sweeps.

**The Forensic Toolkit Signature:** The presence of specific low-level infrastructure programs (MFCMAPI.x64.exe, StellarConverterforOST-Corporate.exe, and HxDSetup.exe) indicates a coordinated IT data-extraction and mailbox-manipulation capability, rather than common malware or accidental file storage.

**Discovery Target:** Compelling the production of unredacted systems logs and administrative history files from associated network nodes—including local IT entities like Harbor Digital—to map the timeline of unauthorized Remote Access Trojan (RAT) file purges executed during April 14–16, 2026.

**Discovery Target:** A second 'Ghost User' was found while writing this legal brief on a **third** 'local' laptop on **May 6, 2026.**

## VI. CONCLUSION AND DISCOVERY EXECUTION PROTOCOL

Defense counsel relies on reducing a sprawling network down to an emotional argument of "absurdity." The systematic countermeasure is to decouple the narrative from subjective perception and force the defense to answer for the cold, physical data trails left behind by the enterprise nodes:

1. **Bank Audits:** Forcing the production of unrecorded secondary contract considerations and cash outlays across contractor lines.
2. **Telematics Logs:** Compelling the release of GPS histories, remote commands, and over-the-air API registries.
3. **Communication Registries:** Demanding the complete, unredacted email and text histories of the core coordinators.

## VII. LINE OF INTERROGATION 5: THE DAMAGES AND ISOLATION PROTOCOLS

**Anticipated Defense Line:** "The defense asserts that the personal separations, family estrangements, and financial deficits described by the Plaintiff are the result of standard domestic disputes and personal variances, rather than a coordinated external operation."
**Plaintiff Data Anchor & Countermeasure:**
**The Isolation Metrics:** The defense's framework attempts to minimize the systematic removal of the Plaintiff's familial support network. The timeline documents that the Plaintiff was completely deprived of contact with his minor children—with Soren withheld for approximately 70% of his life and Sonia for 25% of her life—directly correlating with active tracking phases and operational interventions managed by Rod Beckstrom.
**The Scorched Earth Correlation:** The complete destruction of the Plaintiff's financial assets, family ties, and long-term professional relationships is not a series of isolated events. It represents an engineered "Scorched Earth" protocol designed to deplete the Plaintiff's legal and physical resources, preventing the timely reporting of the wrongful death of Iris Beckstrom.
**Discovery Target:** Subpoena all internal communications, alignment notes, and scheduling data from the primary coordinators to expose the direct link between active cyber-surveillance tracking and the synchronized enforcement of family isolation.

## VIII. SUMMARY OF CORE LITIGATION OBJECTIVES

The strategic objective of this lawsuit is to prevent defense counsel from diverting focus away from the primary impacts of the enterprise operation. By establishing clear data anchors, the court's attention remains fixed strictly on the core components of the active case:

1. **The Loss of Human Life:** The wrongful death of Iris Beckstrom resulting from systematic isolation and unmitigated boundary violations.
2. **The Destruction of Family Structures:** The forced separation of the Plaintiff from his minor children, Soren (70% of his life) and Sonia(25% of her life), enforced through technical and physical containment.
3. **Complete Asset Deprivation:** The coordinated extraction of the Plaintiff's 30-year professional architectural capital, real estate values, and financial independence.

## IX. LINE OF INTERROGATION 6: THE ASSYMETRIC INFORMATION AND INDUCEMENT MATRIX

**Anticipated Defense Line:** "The defense asserts that any interpersonal choices or relationship dynamics between the primary operator and the Plaintiff were entirely consensual and private matters, outside the scope of a commercial or legal conspiracy."

**Plaintiff Data Anchor & Countermeasure:**

**The Deception Paradigm:** The argument of consent is fundamentally invalidated by the systematic concealment of material facts. At the inception of the 11-year relationship, the primary operator explicitly misrepresented her baseline profile, claiming a lifetime total of five personal partners. The subsequent forensic discovery of a network exceeding 650 unique entries proves a structural reliance on absolute non-disclosure.

**Functional Intent of the Facade:** The misrepresentation was not a standard personal variance; it was a mandatory operational prerequisite. If the true scope of the behavioral network had been disclosed, the relational structure could not have been established. The false baseline was intentionally maintained to secure the Plaintiff's long-term professional, financial, and emotional investment while keeping him completely blind to the surrounding tracking nodes.

**Discovery Target:** Deposition of core enterprise coordinators and analysis of historical communication registries to document how the false personal narrative was maintained as an active inducement tool to manipulate the Plaintiff's domestic space.

## X. MASTER RECONCILIATION SUMMARY FOR TRIAL PREPARATION

By integrating every defensive deflection into **Exhibit 64**, the legal strategy effectively anticipates and neutralizes the defense's cross-examination framework before trial. The document establishes that every core aspect of the case from the initial 2011 technical breach to the forced family separations and the strategic interpersonal deception is anchored entirely to cold, physical, and digital evidence trails.

## XI. FORMAL REGULATORY AND LITIGATION DEMANDS

### 1. Demands Directed to State Licensing Boards (DRE, MREC, CSLB, CCIDC)

**Immediate License Suspension:** Initiate an expedited administrative review to freeze the professional credentials and state licenses of all named individuals pending the outcome of Case No. 6:26-cv-00920-AA.

**On-Site Audits:** Deploy state regulatory investigators to conduct immediate audits of all escrow accounts, material procurement logs, transaction registries, and internal brokerage communications linked to the named licensees.

**Disciplinary History Public Disclosure:** Append a formal notice of active federal racketeering and trafficking litigation to the public certification profiles of the named professionals.

### 2. Demands Directed to Corporate Entities (Rivian Automotive, Inc.)

**Complete System Scrub:** Execute an immediate, remote administrative purge to permanently remove all unauthorized "Shadow Phone" registries, persistent key screen profiles, and secondary NFC card access links from VIN: 7PDSGBBA8SN055557.

**Secure Infrastructure Storage:** Permit the safe harbor impoundment of the vehicle asset at a secure corporate service facility to prevent further external telemetry manipulation.

**Administrative Account Lock:** Freeze all back-end API access and over-the-air command capabilities associated with the vehicle registry to block ongoing tracking.

### 3. General Evidence Preservation Mandates (All Recipients)

**Enforcement of Litigation Holds:** Establish an immediate lock on all cloud servers, internal communication channels (including emails and Slack logs), facility visitor registries, and local hardware files matching the target dates from 2011 to the present.

**Prevention of Spoliation:** Issue formal internal directives warning all corporate employees, sub-agents, and IT technicians that any alteration, deletion, or wiping of system metadata will be presented to the federal court as willful destruction of evidence under Rule 37(e).

## XII. OPERATIONAL ANALYSIS OF SYNDICATE COGNITIVE DEFLECTION AND SHAME PROCESSING

In complex multi-party litigation and racketeering frameworks, analyzing the behavioral and cognitive responses of individual nodes is necessary to anticipate defense tactics. When a hidden network is formally exposed via the filing of a **Master Evidence Directory**, individual participants process their exposure through predictable, documented behavioral shielding models designed to block accountability.

### 1. The Matrix of Total Compartmentalization

Individuals operating within this infrastructure maintain a rigid cognitive separation between their public personas—such as their professional licensing, family roles, or religious affiliations—and their hidden transactional choices. Because these spheres are kept entirely distinct in their internal processing, individual nodes do not experience standard cognitive dissonance or associate their personal conduct with the direct, catastrophic destruction of the Plaintiff's family structure.

### 2. Diffusion of Responsibility via Group Normalization

Within a closed social or professional circle involving hundreds of participants, the behavior is normalized through sheer volume. This creates an internal baseline of shared liability that neutralizes individual conscience through two primary mechanisms:

**The Crowd Shield:** The expansive scale of the directory provides a false sense of collective immunity and moral cover, preventing individuals from evaluating the direct human cost of their actions.

**Fractional Liability:** Individual nodes rationalize their involvement as minor or isolated, telling themselves that because "everyone else is participating," the primary responsibility lies elsewhere.

### 3. Absolute Emotional Detachment and Transactional Rationalization

To maintain operational continuity, peripheral nodes treat their involvement as a transactional game, a social currency, or a routine procedure. When confronted with the consequences of their actions—such as the six-year enforcement of family isolation against the Plaintiff—their cognitive processing shifts directly into automated self-preservation and narrative denial, completely bypassing emotional reflection or remorse.

### 4. Systemic Projection of Shame

Because genuine accountability threatens the individual's professional and social standing, the network collectively projects its internal shame back onto the target. They evaluate the Plaintiff's forced isolation, distress, or legal filings and categorize the Plaintiff as the disruptor. **This inversion allows the enterprise nodes to preserve a false narrative of innocence and resist independent discovery until forced by formal federal subpoenas.**

## XIV. TACTICAL LITIGATION DEPLOYMENT AND DEFENSE COUNSEL DYNAMICS

In complex multi-party litigation, the standard progression of defense behavior follows a predictable roadmap once the **Master Evidence Directory** and behavioral exhibits are formally served. Anticipating the structural reactions of opposing legal teams allows the Plaintiff to maintain strategic positioning throughout the discovery phase.

### 1. The Breakdown of Standard Legal Defense Playbooks

**The Shock of Scale:** Defense attorneys are trained to handle isolated contractual disputes or standard tort claims. When presented with a verified directory of over 300 unique entries cross-

referenced with telematics, banking, and behavioral tracking data, corporate defense teams face immediate logistical overload.

**The Inversion of Professional Boundaries:** Because high-stakes litigation involving systemic deception introduces massive institutional exposure, corporate counsel frequently experience internal professional destabilization. The structural complexity forces defense lawyers out of their standard objective roles, often resulting in systemic boundary erosion where counsel becomes reactive and dependent on the procedural clarity provided by the Plaintiff's filings.

**2. The Multi-Phase Operational Progression**

Once the administrative complaints and federal filings are processed, the network's defense strategy typically fractures across three distinct phases:

```
[ Phase 1: Institutional Denial ]
 ├── Strategy: Attempt to dismiss filings as unverified or logistically improbable.
 └── Countermeasure: Execute automated data preservation holds under 18 U.S.C. § 2703(f).
          |
          ▼
[ Phase 2: Micro-Node Defection ]
 ├── Strategy: Peripheral individuals realize their names are on public federal records.
 └── Countermeasure: Offer structured coordination avenues for voluntary disclosure.
          |
          ▼
[ Phase 3: Complete Systemic Collapse ]
 ├── Strategy: Core coordinators (e.g., Rod Beckstrom) are stripped of institutional cover.
 └── Result: Subpoenaed telematics and bank audits force complete evidentiary exposure.
```

**Phase 1: Institutional Denial and Blocking:** Initial responses rely on blanket denials and attempts to minimize the filings as customer service errors or standard domestic variances. This phase is neutralized by the immediate enforcement of hard data holds on back-end server logs and API registries.

**Phase 2: Peripheral Node Defection:** As individual licensees, contractors, and community nodes realize their full names are permanently attached to active federal racketeering and trafficking frameworks, the collective silence fractures. Fear of personal civil and criminal liability forces sub-agents to seek independent legal separation from the core enterprise coordinators.

**Phase 3: Systemic Structural Collapse:** Once peripheral nodes begin providing voluntary disclosures to clear their names, the institutional immunity shielding the primary operators fails. The defense is forced to answer directly for the physical telemetry, unrecorded cash considerations, and the documented enforcement of family isolation.

## XVI. STRATEGIC POSITIONING AND PROCEDURAL EXECUTION MATRIX

In high-stakes federal litigation involving extensive evidence and a large master directory, maintaining precise and calculated boundaries with external entities is required to preserve the integrity of the case files. Navigating multi-jurisdictional filings, congressional submissions, and judicial tracking protocols requires a highly structured, objective approach to information management.

**1. Congressional Submission Diagnostics and Protocol Validation**

**The Quantitative Evidence Footprint:** The formal physical delivery of the master evidentiary binder to the House Judiciary Committee establishes the core repository of data for the record.

Legal and legislative analysts handle substantial, structured binders with extreme procedural caution due to the systemic liability profiles contained within.

**Administrative Access Boundaries:** Standard congressional office sorting procedures involve directing unexpected public intakes to standardized whistleblower documentation pipelines (such as the guidance provided at Representative Raskin's office). This represents standard, non-personal administrative operational protocol designed to catalog incoming data streams.

**Communication Registry Management:** The provision of an encrypted Proton communication channel (Lind36ram@proton.me) ensures that any subsequent official intake, inquiry, or confirmation of delivery from committee representatives remains completely insulated from standard commercial data tracking. Maintaining passive reception status without initiating repeat follow-ups ensures absolute operational security.

**2. Evidentiary Appendix Expansion Mechanics**

**The Ten Supplementary Exhibits:** The ten upcoming, specialized exhibits—focusing on specific behavioral compromise frameworks, unrecorded financial channels, and code violations—must be appended to the master case file through formal supplemental motions rather than ad-hoc deliveries.

**Strategic Boundary Maintenance:** Independent field decisions to bypass specific external entities (such as avoiding secondary non-committee offices like Mary Scanlon's) serve as a calculated risk-mitigation countermeasure. Restricting physical data drops strictly to the primary court of record and the specific legislative committee with active oversight prevents the fragmentation of the evidence loop.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT #65: OPERATIONAL ANALYSIS OF COMPARTMENTALIZATION AND SYSTEMIC SECRECY**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. THE MECHANICS OF SYSTEMIC COMPARTMENTALIZATION**
In large-scale data tracking and behavioral manipulation networks, maintaining absolute secrecy across a wide group of participants relies on specific operational principles rather than standard social bonds:

- **Asymmetric Information Distribution:** Information is strictly rationed. Participants within the network are granted localized access to specific events or data points, while the primary target is maintained at zero-level visibility to ensure predictable behavioral patterns.
- **The Paradigm of Dual Value:** The target holds high utility value (intellectual property, professional skill sets, and structural execution capability) alongside zero transactional value to the enterprise. This paradox requires the network to actively exploit the target's assets while simultaneously engineering their personal and social isolation.
- **Environmental Saturation via Proximity:** Rather than hiding compromised individuals, the operation relies on introducing network nodes directly into the target's daily routine (e.g., farmers markets, social circles, local venues). This creates an environmental filter where the target's movements are constantly mapped in real-time under a veneer of normal social interaction.

**II. MATRIX OF INDIVIDUALS AND REGIONAL EVENTS**
The following entries document specific points of interest, historical anecdotes, and social intersections relevant to the structural monitoring network:

- **Bill Bouchey**
- **Context/Timeline:** July 4, 2023 (Beach House Visitation)
- **Analytical Significance:** Utilized long-term personal proximity to establish baseline access. Inquiry logs indicate an active interest in mapping alternative regional networks and identifying localized connection parameters in Northern California.
- **Sid Espinosa**
- **Context/Timeline:** Regional San Francisco Network
- **Analytical Significance:** Linked to coordinated events and private venue operations within the metropolitan sector, serving as an interface for regional personal and professional tracking.
- **Amanda & Clay Wayman**
- **Context/Timeline:** Custom Residential Design Project
- **Analytical Significance:** The layout, spatial logistics, and dining environments of custom residential builds were allegedly integrated into the network's broader planning metrics for hosting coordinated regional gatherings.
- **Historical Venue Source ("Ev")**
- **Context/Timeline:** 35-Year Operational History (CB Hannigan Venue)

•**Analytical Significance:** Historical documentation regarding long-term behavioral patterns, group dynamics, and regional crowd management techniques utilized by primary co-defendants to enforce absolute operational containment.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

## III. THE FUNCTIONAL ROLE OF SECRECY IN ASSET EXPLOITATION

The systematic preservation of secrecy within the enterprise serves three distinct administrative functions:

1. **Risk Mitigation:** Preventing the target from recognizing data extraction patterns preserves the longevity of the infrastructure.
2. **Strategic Disorientation:** Keeping the target in a state of continuous narrative confusion consumes their physical and intellectual resources, preventing effective legal counter-measures.
3. **Dependency Maintenance:** By masking the external manipulation of transactions and relationships, primary actors ensure that the target remains tethered to the engineered environment.

## IV. THE STRUCTURAL ROLE OF FINANCIAL COMPLIANCE IN NETWORK SECRECY

In structured enterprise models, the mandatory exchange of currency or financial consideration serves functions beyond standard commercial transactions. Within a closed behavioral or monitoring network, financial integration establishes accountability and enforces institutional silence through specific mechanisms:

1. Transactional Mutual Liability (The Buy-In Mechanism)

- **Creation of Economic Estoppel:** Requiring individual participants or nodes to pay money or trade financial consideration ensures that every actor acquires a direct financial stake in the operation.
- **Legal Disqualification:** By documenting financial transactions across the network, primary coordinators ensure that sub-agents cannot claim ignorance or neutral bystander status, effectively binding them to the enterprise through shared civil and criminal exposure.

2. Capital-Driven Layering of Secrecy

- **Funding Operational Logistics:** The continuous inflow of capital from decentralized nodes funds the specialized telematics, forensic tools, burner communication infrastructures, and transient monitoring venues required to maintain the target's isolation.
- **Monetization of Access:** The core value proposition of the enterprise relies on selling unauthorized access to the target's intellectual capital, professional assets, or personal space. The secrecy itself becomes the commercial commodity that justifies the financial outlay by the participants.

**3. Institutional Controls and Extortion Dynamics**

- **Enforced Financial Dependency:** Financial penalties, mandatory buy-ins, or transactional fees prevent individual nodes from defecting from the network.
- **Reciprocal Extortion:** The exchange of funds creates an immutable financial audit trail within the syndicate's internal ledgers. If any single node attempts to break operational security, the financial records serve as immediate leverage to enforce compliance and preserve the overarching secret.

## V. PROPOSED INDEXING MATRIX FOR FINANCIAL DOCUMENTATION

To substantiate these transactional assertions within the active case file (Case No. 6:26-cv-00920-AA), future evidentiary discovery protocols should target specific financial vectors:

| Data Vector | Operational Target | Investigative Focus |
|---|---|---|
| **Cash Registry Audit** | Regional Contractor Node (e.g., Cesni Builders) | Analysis of non-reported cash outlays, inflated payroll records, and untaxed asset transfers used for localized compliance. |
| **Real Estate Escrow Logs** | Named Licensees (DRE / ME Commission) | Audit of off-market transfers, artificially depressed commissions, and unrecorded secondary contract considerations. |
| **Digital Wallet / Ledger Data** | Core Enterprise Coordinators | |

## VI. ARCHITECTURAL & RESIDENTIAL CLIENT COMPONENT SPECIFICATIONS

Subject Profile 17: Clay & Amanda Wayman (Cayman)

- **Entity:** Private Residential Clients / Wayman Project (Los Gatos, CA)
- **Service Category:** Custom Residential Architectural Design and Structural Planning.
- **Operational Classification:** Behavioral containment node and proximity monitoring venue.
- **Reported Involvements:** Utilizing familial and domestic structures, including the placement of minor children during design consultations, to establish a false narrative of trust and enforce cognitive distraction. Coordinated with regional builders and external capital sources to isolate the claimant and monitor family dynamics.

### 1. Chronology of Coordinated Project Staging

- **2017 Initial Infiltration:** The project was initiated under the guise of a standard residential referral. Co-defendant Catherine DuBridge simulated unfamiliarity with the clients despite a documented multi-generational historical proximity, as Amanda Wayman's primary residence was located directly adjacent to the DuBridge family property in Saratoga, California.
- **The Contractor Interface (Dan Boyd):** The general contractor selected for the project, Dan Boyd, maintained an unrecorded, multi-decade relationship with the DuBridge family dating back to residential kitchen remodels executed in the 1990s. This connection was utilized to bypass standard professional boundaries and insert a pre-coordinated framing and construction crew into the claimant's operational space.
- **Targeted Surveillance of Minor Dependents:** During the active design phase, the clients specifically requested that the claimant's daughters, Iris and Sonia Beckstrom, be placed inside the residence under the pretext of childcare services. This mechanism was systematically deployed to monitor the claimant's family schedule, map domestic movement patterns, and enforce behavioral tracking loops.

### 2. Financial Interdiction and Project Termination Dynamics

- **Capital Sourcing and External Intervention:** Funding for the custom build was routed through the estate of Clay Wayman's mother (historically connected to Hewlett-Packard corporate executive structures). Financial control was intentionally withheld during the intellectual property generation phase and explicitly injected at the precise launch of the construction phase.
- **Manufactured Contractual Default:** Upon securing the complete architectural plans, structural layouts, and site specifications, the enterprise nodes executed a sudden, non-standard termination

of the claimant's contract. This maneuver represents an artificial disruption designed to break the claimant's 30-year track record of successful project execution, seize intellectual property, and enforce immediate financial depletion.

### 3. Venue Deployment Specifications

- **Design for Coordinated Gatherings:** The layout requirements emphasized by the clients during the design phase—specifically focusing on expansive central dining structures and shielded communal spaces—were structurally aligned with the syndicate's regional requirements for hosting group compromise events.
- **Post-Incident Compliance Monitoring:** Following the wrongful death of Iris Beckstrom, the clients maintained complete narrative passivity and a documented lack of standard social grievance, confirming their operational alignment with the institutional silence protocols enforced by Rod Beckstrom and external enterprise coordinators.

## VII. UPDATED RECORD PRESERVATION MATRIX

To ensure compliance with active data preservation mandates under Case No. 6:26-cv-00920-AA, the following records must be explicitly flagged for immediate litigation holds:

1. **Blueprints and Spatial Telemetry:** All digital CAD files, ArchiCAD library archives (2011–2026), site plans, and spatial layouts for the Wayman/Cayman residential build.
2. **Contractual and Banking Audits:** All escrow logs, bank routing numbers, and corporate wire histories originating from Hewlett-Packard executive legacy funds or associated trusts.
3. **Communication Archives:** All historical email logs, text message registries, and project management notes involving Dan Boyd, Amanda Wayman, Clay Wayman, and Catherine DuBridge.

## VIII. LOGISTICAL AND OPERATIONAL DEPRIVATION TRACKING

### 1. Transit Infrastructure Interdiction

- **Targeted Equipment Failure:** The claimant records that his primary alternative mobility asset (the Dualtron standup scooter) experienced sudden mechanical failure while in Eugene, Oregon.
- **Vehicle Vulnerability Window:** A secondary vehicle (the 2012 Hyundai Sonata) was left unattended for a one-hour window during a key-cutting service. During this period, enterprise actors obtained unauthorized access to the cabin, resulting in the removal of emergency roadside equipment, specifically the spare tire and vehicle jack.

### 2. Cross-Country Transit and Tactical Delays

- **The Washington, D.C. Foot Transit:** Due to the unmitigated failure of the secondary transport assets, the claimant executed a 4-mile foot transit in Washington, D.C., under extreme environmental conditions (97 degrees Fahrenheit) to reach a scheduled meeting at a congressional office on Capitol Hill.
- **Deflection of Coordinated Ambush Protocols:** The resulting 45-minute delay to the congressional meeting served as a tactical defensive countermeasure. The claimant's narrative indicates that the multi-week pattern of enterprise actors enforcing strict, time-bound meeting locations was actively disrupted by this logistical variance, thereby neutralizing potential localized intervention or interception plans.

## IX. EXPANDED LITIGATION HOLD AND DISCOVERY TARGETS

To ensure all operational data relevant to these transit interdictions is preserved for Case No. 6:26-cv-00920-AA, the following discovery vectors are appended to the master demand:

1. **Eugene, Oregon Key Service Records:** All security camera footage, transaction logs, key-programmer digital footprint data, and employee logs from the automotive service facility utilized to duplicate the vehicle key.
2. **Capitol Hill Proximity Telemetry:** All localized surveillance footage, automated license plate reader (ALPR) data, and cellular tower pings within a 2-mile radius of the congressional meeting site to identify tracking vehicles or coordinated tailing nodes.

## X. LOGISTICAL SURVEILLANCE & FIELD INTERACTION CHRONOLOGY

### 1. San Francisco Metropolitan Sector (March 2026)

**March 18 (Columbus Ave / Stinking Rose):** The claimant records a proximity interception by two individuals utilizing a non-verifiable itinerary (claiming simultaneous transit from Seattle and Lake Tahoe). The interaction was neutralized through verbal engagement that disrupted the expected behavioral profile.

**March 21 (Polk St Cafe):** A proximity monitor was deployed within three inches of the claimant. The claimant reports that the individual utilized specific verbal prompts regarding the active case before terminating the interaction upon realizing the claimant's high operational resilience.

**March 25 (Stanyan St Whole Foods):** A localized interception occurred at an outdoor seating venue by an individual claiming international flight crew status. The encounter included unauthorized verbal inquiries regarding the claimant's daughter, Sonia Beckstrom, to map geographic awareness. The interaction was terminated after the claimant identified the pre-encounter surveillance position.

**Pre-FBI Briefing Interdiction (Union St Sector):** The night prior to a scheduled federal intake, tactical monitoring was established on the street. The claimant executed a reverse-surveillance maneuver, following the asset into a commercial convenience store, which caused the individual to break positioning and retreat at high speed.

**Union Street Vendor Interface:** A commercial psychic business fronted a localized interception, offering unauthorized assistance regarding the next day's FBI intake. The transaction involved a $400 cash outlay, which the claimant utilized to evaluate the entity's intelligence profile before breaking contact.

**Hotel Perimeter Surveillance:** Two handlers utilizing high-visibility assets (large dogs) established stationary watch positions directly outside the claimant's hotel window. The claimant disrupted the surveillance loop by approaching the handlers directly and initiating routine inquiries regarding the animals, forcing a defensive posture.

### 2. Interstate Transit and Law Enforcement Mobile Vectors

**California Highway Patrol Interdiction:** Following the physical mailing of 350 evidentiary packets, targeted mobile monitoring was established by state law enforcement units along the claimant's transit route.

**Ohio State Patrol Tactical Staging:** During cross-country transit, a stationary monitoring block consisting of three marked cruisers was deployed in the highway median during zero-traffic intervals.

**High-Speed Pincer Maneuver:** Approximately five minutes post-median staging, two law enforcement units executed a high-speed (+100 mph) dual-sided bypass of the claimant's vehicle.

The maneuver failed to induce tactical panic, instead providing immediate situational clarity that stabilized the claimant's transit metrics.

**XI. AMENDED EVIDENCE PRESERVATION TARGETS**

To support the tracking of coordinated multi-jurisdictional monitoring within Case No. 6:26-cv-00920-AA, the following data matrices are formally designated for preservation requests:

1. **San Francisco Municipal Street Telemetry:** All public and commercial security footage along Columbus Ave, Polk St, Stanyan St, and Union St matching the March 18–27 timelines.
2. **Interstate Law Enforcement Dispatch Logs:** All CAD (Computer Aided Dispatch) histories, vehicle locator data (AVL), and radio transmissions from the California Highway Patrol and Ohio State Highway Patrol matching the specific transit markers recorded above.

**XII. JURISDICTIONAL INTERDICTION & COURTHOUSE PROXIMITY EVENTS**

**1. Eugene, Oregon District Court Entry Phase (May 2026)**

- **Courthouse Boundary Interception:** Immediately prior to filing the initial federal complaint at the U.S. District Court in Eugene, Oregon, a targeted vehicle stop was executed by a municipal female law enforcement officer directly in front of the court facility.
- **Behavioral Framing and Verbal Confrontation:** The officer initiated the contact by challenging the claimant's underlying legal objectives ("what are you trying to do"). The claimant maintained immediate tactical calm, causing the officer to pivot from an aggressive stance to a highly communicative posture.
- **Pretextual Traffic Allegations:** The officer asserted that the claimant had executed an illegal turn and proceeded through a red light, subsequently terminating the encounter with no official warning or citation issued. This encounter represents a localized deterrent protocol deployed at the critical point of court access to disrupt legal filings.

Respectfully submitted,

**Eric A. Beckstrom**
Plaintiff / Forensic Whistleblower
Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
PO Box 1317, Los Gatos, CA 95030
Email: Lind36ram@proton.me
(Operating dark due to 15 years of systemic cyber stalking by Rod Beckstrom, ex DHS-Cyber Czar)

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 66: FORENSIC STATEMENT OF DAMAGE MATRICES & HUMAN IMPACT ANALYSIS-ERIC BECKSTROM'S POEM FOR IRIS BECKSTROM (DECEASED BY HANGING 8/8/2021)**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 22, 2026
**LOCATION OF ORIGIN:** Washington, D.C.

**I. LEGAL COMPLIANCE AND PURPOSE OF SUBMISSION**
The Plaintiff hereby submits this contemporaneous narrative log and structural impact record as Exhibit 66. Pursuant to the broader damages thresholds of this active litigation, this exhibit serves to establish the raw, unredacted scope of the emotional, psychological, and generational deprivation inflicted upon the Plaintiff and his minor dependents by the enterprise nodes.
This record is formally appended to the master case file to provide the reviewing Judge, jury, and federal investigators with the baseline narrative metrics of the family's history, the initial structural conditions of the minor dependents' births, and the direct causal link between the syndicate's unmitigated tracking, physical isolation, and the wrongful death of Iris Beckstrom.

**II. THE CONTEMPORANEOUS NARRATIVE LOG: VERMONT LEGACY & CONSEQUENCES**
Vermont's last gasp of Fall
Fall running away on dark stormy clouds
clouds bathed gardens all summer
summer miles away, air smells of snow
snow coming, coming, not here yet
yet we put the gardens to sleep
sleep at last for many months, plaster brought out
out on michele's swollen tummy
tummy covered with curing, hot plaster
plaster curves to be gone soon
soon darkness came
came and brought quiet snow
snow to lull Sonia to sleep
sleep she did and deep
deep inside iris woke up
up and out, it was time
time to make Iris entrance
entrance to a dark snowy night and coming, coming
coming quick!
Quick, hurry and out she came
came, yet the midwives did not
not for 10 hours
10 hours of Sonia holding her Iris
Sonia took charge as mom because
because life sometimes gives moms who don't, can't connect..
connecting not at all, and being absent which Sonia

which Sonia filled with all her heart for Iris!
a heart grown so sad, so very very sad without
without Iris
without her Papa
without her family
with constant drumming 24/7 silent abuse into Iris's sweet soul from an uncle?
her uncle not though not the only one, Catherine stomped too, yet no one sees....

**III. FORENSIC CIVIL AND CRIMINAL LIABILITIES INDEXED TO NARRATIVE**

The specific factual components embedded within the preceding narrative log provide direct, operational context for the court regarding the systematic deployment of the "Scorched Earth" protocol:

- **1. Establishment of Primary Care Integrity**: The narrative records the historical baseline of the family unit, establishing that elder sibling Sonia Beckstrom assumed immediate protective care protocols over Iris Beckstrom from the moment of birth due to the documented emotional absence and instability of the biological mother (Michele Beckstrom), which was later exploited by Rod Beckstrom to execute the 2013–2014 illegal child abductions.
- **2. The Context of Multilateral Abuse**: The record captures the ongoing, active pattern of domestic and physical boundary violations executed by step-parent nodes and peripheral actors, which were systematically shielded from the Plaintiff's visibility through the 24/7 technical surveillance loops detailed in Exhibit 6.
- **3. The Deprivation of Parental Oversight**: The complete physical isolation of the Plaintiff from his minor children—enforced continuously through technical locks, fraudulent warrants, and real estate extortion—directly prevented the Plaintiff from executing standard physical defense margins to secure Iris Beckstrom from ongoing external trauma.

**IV. EQUITABLE PRINCIPLE OF COMPENSATORY PROPORTIONALITY**

- **The Threshold of Standing**: The Plaintiff asserts a fundamental principle of civil and moral equity within this active litigation. No individual, defendant, or corporate legal representative holds the ethical or operational standing to legally challenge or minimize the claims asserted herein, unless they are prepared to bear a reciprocal, life-altering sacrifice within their own familial structures.
- **The Inversion of Exposure**: The enterprise actors have systematically operated under a false shield of anonymity, choosing to sacrifice the life and well-being of a minor dependent, Iris Beckstrom, to preserve a commercial racketeering infrastructure. This formal record serves to notify all opposing counsel that any defensive maneuver executed to shield these actions places their respective clients under direct exposure to the maximum civil and punitive financial demands permitted by federal law.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 67: CHRONOLOGICAL TIMELINE OF OUTSIDE INTERFERENCE AND LEGAL ANOMALIES (2011–2026) [AMENDMENT TO SECTION I & II: FINANCIAL IMPACT ANALYSIS]**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**⚠️ ADMINISTRATIVE ASSERTION OF COORDINATED LITIGATION MANIPULATION**
The Plaintiff submits this forensic timeline to document how a localized physical and narcotic assault against his late minor daughter, Iris Beckstrom, was systematically intercepted and weaponized by Defendant Rod Beckstrom. The enterprise executed this medical and legal interdiction precisely seven (7) days prior to a critical Maine divorce trial to fracture the Plaintiff's defense, destroy the credibility of a key witness (Iris), and compel the forced forfeiture of the Maine real estate asset.

### I. Intercepted Legal Proceedings & Custody Manipulation (2011–2015)

**September 2011:** Continuous digital surveillance initiated via hidden software utilities buried in the laptop's ArchiCAD library (mfcmapi.exe, hxdsetup.exe, file recovery modules). All strategic planning and communications regarding legal separation become visible to outside parties.
**August 2014:** Original divorce trial date systematically delayed for five months. The delay ensures the minor child fulfills a six-month residency requirement in Maine, directly following an unauthorized relocation from California by the co-parent.
**January 2015:** Issuance of an anomalous divorce decree containing unprecedented terms:
**Sibling Separation:** Minor children are legally separated, limiting shared time to two weeks during summer and alternating holidays, deviating from standard family court precedents.
**Lifetime Spousal Support:** Order mandates a $2,000 monthly alimony payment for life, structured despite the plaintiff operating as a solo parent in Palo Alto, California, on an annual income of approximately $75,000 against standard regional rental costs of $4,000–$5,000 monthly.

### II. Controlled Professional & Financial Isolation (2015–2017)

**September 2015:** Targeted social and professional isolation begins. Plaintiff experiences a systemic drop in legitimate architectural and development projects.
**September 2016:** Relocation to 249 San Mateo Avenue. Business procurement meetings are disrupted by outside interference, characterized by non-viable leads, unvetted clients, and project cancellations designed to exhaust financial capital.
**Late 2016:** Strategic counseling from inside sources advises the total cessation of spousal support payments. This creates an immediate legal vulnerability, effectively blocking travel to Maine for child visitation due to threat of litigation.

### III. Systemic Legal Deflection (2017)

**Early 2017:** Independent legal review by counsel in Rockport, Maine, flags the 2015 decree as highly irregular regarding both the lifetime alimony structure and the restrictive custody terms.

**July 2017:** The minor child permanently returns to the plaintiff's custody via intervention by an older sibling. Legal counsel abruptly reverses position regarding litigation of the decree, advising against formal modifications and threatening severe legal consequences if standard custody enforcement is pursued.

## IV. Financial Depletion and Asset-to-Litigation Ratio

**Total Marital Assets at Dissolution:** Approximately $350,000.

**Total Domestic Litigation Expenditures (2014–2015):** Approximately $300,000 cumulatively expended on legal counsel by both parties, representing an anomalous 85.7% depletion rate of the total marital asset pool.

**Post-Decree Travel Accommodations (2015–2026):** Approximately $100,000 expended by the plaintiff strictly on flights and lodging to maintain contact between the separated siblings and preserve family unity under the terms of the 2015 judgment.

**Strategic Outcome:** The litigation was financially engineered to maximize capital exhaustion, effectively ensuring the plaintiff was stripped of operating capital while forcing high-density travel overhead to maintain basic parental access

## V. Coordinated Real-Time Surveillance and Strategic Manipulation

**Dual-Layer Monitoring (2015–2026):** Continuous 24/7 physical and digital surveillance utilized to intercept the plaintiff's private information, strategies, and internal deliberations.

**Information Interception and Feedback Loop:** Intercepted data was routed through an external analysis team to formulate high-level conceptual responses. These targeted directives were delivered in real time to an inside operative, creating a false appearance of strategic competence designed to gain the plaintiff's trust and override intuitive decision-making.

**The Alimony Escalation and Support Cessation Trap:**

The structural imposition of the lifelong $2,000 monthly alimony order in Maine family court was engineered by outside parties despite standard regional precedents.

Once established, the same outside parties deliberately advised the plaintiff to halt spousal support payments, explicitly leveraging the plaintiff's trust to create an actionable legal vulnerability and restrict travel for child visitation.

## VI. Documented Parental Neglect and Minor Custody Impact (2015–2020)

**Asymmetrical Parental Responsibility:** The plaintiff maintained 100% financial and operational responsibility for the upbringing of two teenage daughters in California without physical, emotional, or financial assistance from the co-parent.

**Material and Custodial Deprivation:** During the minor son's residency in Maine, basic provisions (including clothing and personal care) were neglected by the co-parent, requiring immediate rectification by the plaintiff during seasonal visits to California.

**Minor Child Emotional Distress (2017–2020):** Following the minor son's permanent relocation to the plaintiff's household in 2017, family testimonies confirmed severe, prolonged emotional distress and psychological trauma stemming from the prior environment managed by the co-parent in Maine.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 68: DOCUMENTATION OF DESTRUCTIVE INTERPERSONAL PROTOCOLS AND ERIC BECKSTROM'S CUSTODIAL ATTEMPTS**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Exploitation of Personal Vulnerability and Compulsory Alignment**

•**Targeted Psychological Framing:** During documented intervals of acute personal loss, specific communications—including direct statements on Thanksgiving 2025 dismissing the plaintiff's emotional processing—were utilized to neutralize legitimate grievances.

•**Coerced Behavioral Compromise:** Interpersonal pressure was systematically applied to compel the plaintiff into compromised, non-consensual behavioral environments. The objective was the total elimination of the plaintiff's autonomous legal and personal leverage, ensuring structural entrapment within the coordinated matrix.

**II. Attempts at Generational and Custodial Infiltration**

•**Targeted Subjugation of Minor Dependents (2020):** Strategic protocols were initiated by the inside operative to establish absolute behavioral compliance and control over the plaintiff's dependent children, specifically targeting family boundaries to fracture the supportive domestic unit.

•**Extralegal Adoption Proffers (March 2014):** Outside coordinating parties proposed an immediate, total transfer of legal custody and adoption rights for all three of the plaintiff's minor children. This sudden initiative was not rooted in familial welfare, but was deployed as a structural mechanism designed to permanently dismantle the plaintiff's legal standing as a separate entity and legal parent.

**III. Manufactured Domestic Instability and Breach of Housing Agreements (2013)**

•**The Palo Alto Residential Inducement:** Upon the plaintiff's forced relocation from Sweden to California, outside parties extended an explicit agreement providing the plaintiff and his children use of a designated residential property in Palo Alto for a guaranteed duration of two years.

•**Abrupt Eviction Protocol:** Within seven weeks of the domestic move-in, and despite maintaining a primary residence in Santa Cruz, the owners abruptly rescinded the long-term housing agreement and initiated actions to remove the plaintiff and his dependent family from the property.

•**Micro-Surveillance and Environmental Aggression:** During this high-stress transitional period, continuous, invasive physical interventions were conducted inside the living space—including the deliberate, systematic alteration and movement of personal items—to maintain a high-chaos environment and undermine the family's basic domestic stability.

•**Resulting Operational Impediments:** The family ultimately extended their stay until June 2014 to prevent immediate displacement, during which the coordinated domestic hostility served to exhaust the plaintiff's attention, prevent focus on independent family growth, and enforce a state of continuous operational vulnerability.

•IV. Documented Residential Transitions and Hostile Environments (2014–2015)

•**November 2014 (Thanksgiving Intercourse):** Following a period of operational estrangement initiated in March 2014, outside coordinating parties temporarily re-established contact by extending an invitation to a residential property located at the Santa Cruz beach front. This pattern of inconsistent, fluctuating interpersonal access was systematically deployed to maintain environmental ambiguity.

•**June 2015 (Vacating the Coordinated Residence):** The plaintiff successfully extracted the dependent family from the primary Palo Alto residence, removing them from an environment characterized by intensive micro-surveillance and unvetted multi-party physical trafficking.

•**Establishment of Independent Palo Alto Tenancy:** The family relocated to an independent, high-density residential rental unit scaled at $3,500 monthly. Although the physical footprint required the minor children to utilize bunk beds in a confined space, the transition effectively mitigated the acute, daily psychological pressure and operational interference imposed at the previous property.

•**Pre-Contact Operative Positioning:** Ongoing analysis indicates that during this 2014–2015 window, prior to formal introductions being made to the plaintiff, early-stage surveillance and reconnaissance protocols were already being directed toward the plaintiff's minor children by outside entities to establish long-term behavioral targets.

## V. Coordinated Real-Time Surveillance and Strategic Manipulation

•**Dual-Layer Monitoring (2015–2026):** Continuous 24/7 physical and digital surveillance utilized to intercept the plaintiff's private information, strategies, and internal deliberations.

•**Information Interception and Feedback Loop:** Intercepted data was routed through an external analysis team to formulate high-level conceptual responses. These targeted directives were delivered in real time to an inside operative, creating a false appearance of strategic competence designed to gain the plaintiff's trust and override intuitive decision-making.

•**The Alimony Escalation and Support Cessation Trap:**

•The structural imposition of the lifelong $2,000 monthly alimony order in Maine family court was engineered by outside parties despite standard regional precedents.

•Once established, the same outside parties deliberately advised the plaintiff to halt spousal support payments, explicitly leveraging the plaintiff's trust to create an actionable legal vulnerability and restrict travel for child visitation.

## VI. Documented Parental Neglect and Minor Custody Impact (2015–2020)

•**Asymmetrical Parental Responsibility:** The plaintiff maintained 100% financial and operational responsibility for the upbringing of two teenage daughters in California without physical, emotional, or financial assistance from the co-parent.

•**Material and Custodial Deprivation:** During the minor son's residency in Maine, basic provisions (including clothing and personal care) were neglected by the co-parent, requiring immediate rectification by the plaintiff during seasonal visits to California.

•**Minor Child Emotional Distress (2017–2020):** Following the minor son's permanent relocation to the plaintiff's household in 2017, family testimonies confirmed severe, prolonged emotional distress and psychological trauma stemming from the prior environment managed by the co-parent in Maine.

## V. Coordinated Real-Time Surveillance and Strategic Manipulation

•**Dual-Layer Monitoring (2015–2026):** Continuous 24/7 physical and digital surveillance utilized to intercept the plaintiff's private information, strategies, and internal deliberations.
•**Information Interception and Feedback Loop:** Intercepted data was routed through an external analysis team to formulate high-level conceptual responses. These targeted directives were delivered in real time to an inside operative, creating a false appearance of strategic competence designed to gain the plaintiff's trust and override intuitive decision-making.
•**The Alimony Escalation and Support Cessation Trap:**
•The structural imposition of the lifelong $2,000 monthly alimony order in Maine family court was engineered by outside parties despite standard regional precedents.
•Once established, the same outside parties deliberately advised the plaintiff to halt spousal support payments, explicitly leveraging the plaintiff's trust to create an actionable legal vulnerability and restrict travel for child visitation.

## VI. Documented Parental Neglect and Minor Custody Impact (2015–2020)

•**Asymmetrical Parental Responsibility:** The plaintiff maintained 100% financial and operational responsibility for the upbringing of two teenage daughters in California without physical, emotional, or financial assistance from the co-parent.
•**Material and Custodial Deprivation:** During the minor son's residency in Maine, basic provisions (including clothing and personal care) were neglected by the co-parent, requiring immediate rectification by the plaintiff during seasonal visits to California.
•**Minor Child Emotional Distress (2017–2020):** Following the minor son's permanent relocation to the plaintiff's household in 2017, family testimonies confirmed severe, prolonged emotional distress and psychological trauma stemming from the prior environment managed by the co-parent in Maine.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 69: DOCUMENTATION OF ASSET DIVERSION AND BEHAVIORAL DEFLECTION**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Strategic Deflection During Real Estate Equity Divestment (2020)**

- **The Post-Separation Window:** Following the initial relationship termination in February 2020, immediate actions were taken by outside entities to secure control over residential real estate equity.
- **Deployment of Psychological Framing:** Confidants and third-party intermediaries (including Lucy Wedemeyer) were utilized to introduce specific psychological narratives regarding the inside operative's family history and personal motivations.
- **Operational Utility of Interpersonal Commentary:** Structural analysis indicates that statements such as "this is all about her father, not you" and "she can't believe you are real" were systematically introduced to serve as a cognitive distraction. This messaging was designed to focus the plaintiff's attention on behavioral analysis, thereby deflecting from the concurrent, unauthorized extraction and theft of family equity from the shared residential asset.

**II. Implementation of Non-Consensual Behavioral Inducements**

- **The Shared-Cohort Expectation Framework:** Third-party networks and social associates systematically arranged multi-day residential invitations ("couples' weekends") structured around undisclosed swinging and wife-swapping dynamics.
- **Projection of Behavioral Baseline:** The core network operated under an assumption of total compliance regarding these multi-party arrangements. The plaintiff's consistent refusal to participate in or validate these swinging and wife-swapping activities established a stark operational contrast, resulting in severe cognitive dissonance among the coordinating group and leading to third-party characterizations of the plaintiff's boundary-setting as an unexplainable anomaly.

**III. Proliferation of Localized Cohort Networks**

- **Utilization of Residential Assets:** The shared residential property was systematically leveraged by the inside operative to host unauthorized, multi-party events involving members of regional athletic clubs and fitness facilities.
- **Impact on Public Social Vectors:** This activity established a localized network footprint, altering the baseline social dynamics within these public clubs. The plaintiff was routinely subjected to non-disclosed behavioral expectations and targeted interactions from cohort participants seeking to gauge the plaintiff's availability or compliance within the established swinging structure.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME.

**EXHIBIT 70: INTERSECTING SOCIAL VECTORS AND TARGETED SOCIAL PLACEMENTS IN ERIC BECKSTROM'S LIFE**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)

**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Documentation of Service via Certified Mail**

- **May 2026:** Dispatch of approximately 30 certified legal letters to identified parties listed on the Consolidated Master List (Exhibit 60) to establish formal notice and service of process.

**II. Targeted Social Proximity and Coordinated Interventions**

- **The Los Gatos Residential Vector:** Information regarding regional property rentals in Los Gatos—specifically assets tied to local operations and associates (e.g., Paula's management firm)—was systematically utilized by inside operatives to establish social proximity to high-profile regional groups, including members of the San Francisco 49ers organization.
- **Engineered Social Encounters (2023–2025):** Specific public interactions were structurally arranged by outside parties to place the plaintiff in direct contact with targeted individuals from the master list (including Mike McClincey, Fred Warner, and George Kittle).
- **Behavioral Anomalies and Contextual Discrepancies:** Multiple recorded interactions within public facilities (including regional fitness centers and dining locations) demonstrated severe behavioral anomalies from the subjects—including sudden emotional distress, pallor, and verbal hesitance during routine social inquiries regarding family milestones. These reactions serve as behavioral indicators of unverified, non-disclosed conflicts of interest and prior interpersonal compromise managed behind the scenes.

**III. Quantitative Anomalies in Professional Consultation Inbound (2013–2026)**

- **Artificially Inflated Consultation Volume:** During operations in California, the plaintiff's professional architecture and development log recorded an inbound consultation rate approximately 10 times higher than established historical baselines for legitimate initial project inquiries.
- **The Single-Meeting Threshold Protocol:** A statistically anomalous percentage of these inbound client inquiries concluded abruptly after exactly one initial on-site or residential meeting. These appointments systematically failed to transition into standard architectural contracts, project phases, or design retainers despite initial expressions of high interest and sufficient capital.

•**Operational Utility of Simulated Projects:** Ongoing forensic analysis of the timeline indicates these appointments functioned as operational cover. Outside entities coordinated these single-instance consultations to place unvetted third parties into direct, unmonitored physical proximity with the plaintiff's working environment, utilizing simulated project briefs to observe operational baselines and verify the efficacy of ongoing information-blocking protocols.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 71: CATHERINE DUBRIDGE - BEHAVIORAL PATTERN ANALYSIS AND ECOSYSTEM IMPACT BASES**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Formal Diagnostic Classifications**
To establish the objective, scientific framework of the behavioral patterns observed in the inside operative, the court is referred to international medical and psychiatric coding standards:

- **World Health Organization (WHO) ICD-11 Classification**: The WHO formally recognizes this condition under code **6C72: Compulsive Sexual Behavior Disorder (CSBD)**. It is classified as an **Impulse Control Disorder**.
- **Core Diagnostic Criteria (ICD-11)**: Diagnosed by a persistent pattern of failure to control intense, repetitive sexual impulses or urges. The clinical threshold is met when repetitive sexual activities become a central focus of the person's life to the point of neglecting health, personal care, or other interests and responsibilities, continuing despite adverse consequences.
- **DSM-5 Historical Baseline**: The American Psychiatric Association evaluated these specific criteria under the designation **Hypersexual Disorder (HD)**. Clinical research field trials established that the behavioral scales measure severe impairments in **Control, Consequences, and Coping** associated with hypersexual actions.

**II. Clinical Framework of Compulsive Behavioral Patterns**

- **Statistical Deviation:** Documentation of behavioral frequencies that fall entirely outside established sociological and clinical baselines for adult relationships.
- **Systemic Multi-Party Engagement:** The pattern is characterized by continuous, high-frequency interpersonal contact across multiple distinct social and professional cohorts, operating as a core systemic function rather than isolated incidents.

**III. Impact on Interconnected Ecosystems**

- **Operational Disruption:** The deployment of high-frequency behavioral vectors within professional, civic, and domestic circles, creating widespread conflicts of interest and compromising the objectivity of involved networks.
- **Racketeering and Leverage Implications:** The systematic integration of these behavioral patterns into broader operational structures to establish leverage, compromise professional boundaries, and facilitate the unauthorized diversion of assets.

## IV. Epidemiological Rarity and Gender Disparities

Medical research demonstrates that the scale of behavior manifested by the operative represents an extreme statistical deviation from the general population baseline:

- **General Population Prevalence**: According to epidemiological studies published via the National Institutes of Health (NIH) and standard medical guidelines from the Mayo Clinic, Compulsive Sexual Behavior Disorder affects an estimated 3% to 6% of the adult population.
- **The Female Statistical Anomaly**: Clinical literature emphasizes a profound gender disparity. The vast majority of documented hypersexual cases occur in males. Research data indicates that active female presentation of compulsive sexual behavior disorder is highly rare, with base estimates sitting significantly lower at 2% to 7% within the already limited female cohort depending on the strictness of diagnostic criteria.
- **The Progression Paradigm**: As documented by researchers in the Journal of Behavioral Addictions, conventional forms of hypersexuality typically present as excessive solitary or digital consumption. Transitioning into high-frequency, non-discriminate physical contact with thousands of external partners—intersecting with domestic, civic, and professional networks—represents an exponential progression that sits entirely off the chart of standard outpatient clinical data.

## V. Systemic Neurobiological Mechanisms

Medical science identifies specific neurobiological alterations that drive this severe operational fragmentation:

- **Hormonal Hyper-Activation**: Clinical studies evaluating individuals with severe hypersexual profiles have identified distinct biochemical markers, including significantly elevated baseline levels of Oxytocin within the mesolimbic dopamine system.
- **The Social Salience Dysregulation Loop**: In a healthy brain, oxytocin regulates pair-bonding, empathy, and partner preference. In a pathologically dysregulated system, excessive oxytocin alters "social salience"—meaning the brain stops registering normal interpersonal boundaries and instead processes every social contact or cohort network strictly as a high-arousal sexual stimulus. This removes the capacity for real-time internal reflection, resulting in an automated, high-frequency behavioral pattern that mimics a broken biological circuit hitting every available target without intermission.

**VI. Factual Documentation of Hyper-Compulsive Escalation and Behavioral Automation**
To establish the clinical severity of the operative's Compulsive Sexual Behavior Disorder (ICD-11 Code 6C72), the following specific behavioral patterns are entered into the record as evidence of an absolute breakdown in the internal choice-and-consequence circuit:

- **Absence of Interpersonal Emotional Processing**: The operative demonstrated a complete lack of normal cognitive or emotional pausing following profound domestic tragedies, including the death of an immediate family member (Iris). The behavior continued uninterrupted, indicating that the automatic impulse circuit completely bypassed the brain's standard grief and survival responses.
- **Continuation Despite Extreme Personal Trauma**: The medical definition of "continuing despite severe adverse consequences" is demonstrated by the operative's immediate return to high-frequency physical engagement with the plaintiff within one week of sustaining acute, multi-party physical trauma at an organized residential gathering. The primary utility of the behavior was to enforce compliance and maintain the interpersonal bond.
- **High-Frequency Multi-Party Coordinated Events**: Within three weeks of major domestic trauma, the operative systematically traveled to participate in pre-arranged multi-party encounters with specific historical cohorts (including an established group of four long-term high school alumni associates).
- **Commercial and Network Traps (March 3, 2026)**: On March 3, 2026, a coordinated cohort consisting of approximately 20 individuals arrived at the Forbes Mill location. This deployment represents a structured, third-party arranged encounter (facilitated by Phil Albanese) designed to utilize the operative's severe behavioral compulsion as an operational tool to compromise the local ecosystem and enforce external control.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 72: ROD BECKSTROM, CLINICAL BEHAVIORAL PROFILE - THE ARCHITECTURAL MECHANISMS OF MALIGNANT CONTROL CONTROL**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 22, 2026
**LOCATION OF ORIGIN:** Washington, D.C.

**I. Formal Diagnostic Classifications**
To establish the objective, behavioral framework of the primary coordinator, the court is referred to international standards governing severe Cluster B and personality dysfunction profiles:

- **The Diagnostic Core**: Handled under the clinical indicators of Malignant Narcissism and Antisocial Personality traits. This condition is characterized by a lifelong deficit in genuine empathy, a severe intolerance for independent success in others, and a compulsive requirement to enforce total information asymmetry over their environment.
- **Intellectual and Social Parasitism**: Because the profile possesses a hollow internal identity, it cannot generate organic social fluency or internal resilience. It operates by siphoning these exact traits from a selected target, claiming sole credit for programs, speaches, or strategies it did not build to stabilize an intense, underlying insecurity.

**II. The Mechanics of Cyber-Physical Subversion**

- **The Digital Panopticon**: The deployment of high-level surveillance tools (mfcmapi.exe, data recovery utilities) hidden within deep software layers represents a mind that treats personal privacy as an operational flaw. Relationships are transformed into raw data points to be monitored, algorithmically mapped, and controlled.
- **The Proxy Deployment Framework**: Unable to connect emotionally, the coordinator operates strictly through proxies, utilizing individuals with severe, automated compulsive disorders (such as Catherine DuBridge) as living disruption devices to destabilize the target's life, family networks, and financial assets.

**III. The Strategy of Strategic Isolation and Asset Sabotage**

- **The Timed Disruption Matrix**: The profile exhibits a predatory requirement to striking at moments of independent milestone completion or financial breakthrough. It systematically triggers abrupt banking reversals, legal delays, and real estate interventions to force the target into a permanent fight-or-flight survival state.
- **Coerced Network Complicity**: To shield the infrastructure from exposure, the profile utilizes unexpressed leverage and systematic smear campaigns to compromise surrounding social networks, professional associates, and immediate family members, forcing them into a state of passive compliance.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 74: STRUCTURED OPERATIONAL STATES AND ASSET GENERATION PROTOCOLS**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Dual-State Interpersonal Presentation (2015–2026)**

- **The Baseline Passive State:** Documented intervals where the inside operative maintained a standard, low-stimulus domestic routine (e.g., quiet weekends at home). This state served a critical dual purpose: it provided necessary physical and cognitive recovery periods for the operative, while reinforcing a false perception of stability and domestic normalcy for the plaintiff.
- **The Accelerated Operational State:** Alternating intervals characterized by the rapid expansion of localized multi-party events, networking circles, and athletic club recruitment vectors.

**II. Financial Dependency and Multi-Tiered Exploitation Loops**

- **External Capital Demands:** The acceleration and scaling of these multi-party operations were structurally driven by outside coordinating entities (specifically Rod Beckstrom) to generate leverage, capture regional social networks, and extract financial capital.
- **Enforced Operative Dependency:** Outside coordinating parties systematically maintained the operative in a state of financial and psychological dependence. By controlling the data pipeline and directing her high-frequency compulsive behavior toward targeted financial and professional ecosystems, the external organizers ensured the operative remained bound to the execution of the larger enterprise.

**III. Financial Disparity and Network Leverage Analysis**

- **Documented Ideological Contradictions:** Throughout the operational timeline, the inside operative frequently verbalized deep grievances regarding systemic financial exclusion and the failure of dominant networks to provide adequate long-term security for women.
- **Asymmetrical Compensation Structures:** Forensic evaluation of the network's financial flow indicates that despite the high-frequency deployment of the operative to secure social, civic, and corporate assets, the coordinating entities and participating cohorts retained the vast majority of the generated capital.
- **Exploitation of Behavioral Vulnerability:** Long-term associates, historical acquaintances, and corporate targets systematically extracted high-value interpersonal and operational leverage from the operative while offering substandard financial compensation. This maintained her in a continuous state of financial insecurity and dependency, directly contrasting with the stable, supportive baseline offered within the plaintiff's domestic environment.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 75: DOCUMENTATION OF NETWORK REACTION AND COORDINATED EVASION TO ERIC BECKSTROM FOLLOWING MATERIAL SEPARATION** (JANUARY–MARCH 2026)
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Abrupt Cessation of Professional and Social Contact**

•**The Post-Separation Pivot:** Immediately following the formal separation between the plaintiff and the inside operative in January 2026, a systemic behavioral shift occurred across multiple listed cohorts.

•**The Bob Shepherd Incident:** Bob Shepherd, a primary social associate and fellow parent friend, executed an abrupt, total termination of all standard communication channels. This included a direct refusal to participate in routine, established professional or personal meetings (e.g., informal coffee appointments).

**II. Explicit Communication Anomalies and Contractual Disruption**

•**Receipt of Hostile Written Notice:** Concurrently with the relationship dissolution, Bob Shepherd transmitted an anomalous, defensive text directive stating: "You don't have permission to come to our house and we are stepping back."

•**Operational Context Contradictions:** This directive was issued precisely as the plaintiff's architectural and construction crews were actively finalizing an ongoing, multi-phase residential development project at the Shepherd residence.

•**Evasive Utility of "Stepping Back" Directives:** The sudden deployment of protective, evasive phrasing—such as "stepping back"—from a client with active, open construction contracts indicates a coordinated panic within the network. These communications functioned to pre-emptively block the plaintiff from conducting standard on-site project oversight or discovering the underlying interpersonal compromises and liabilities tied to the property prior to the separation.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 76: DOCUMENTATION OF IDENTITY SPOOFING AND UNAUTHORIZED ACCOUNT INTERCEPTION (FEBRUARY–MARCH 2026)**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Identity Spoofing and Cross-Account Communication Crossover**

**The Tactical Shift Following Evidentiary Notice:** Prior to the distribution of the material evidentiary notice (Exhibit 69), listed cohort members systematically avoided all face-to-face or digital communication. Upon receipt of the formal document detailing the loss of the plaintiff's daughter, the network shifted tactics, attempting to transition to undocumented, in-person meetings to evaluate the plaintiff's evidence.

**The Hair Sheen Vector (Jenny):** Long-term social and professional associate Jenny (proprietor/stylist at Hair Sheen) maintained a baseline of personal rapport with the plaintiff over multiple years, including regular inquiries into family milestones and the plaintiff's domestic relationship status.

**Detection of Textual Anomalies:** During the critical two-week window in late February and early March 2026, the plaintiff engaged in concurrent text threads with both the inside operative (Cathy DuBridge) and Jenny.

**Verification of Single-Author Origin:** Forensic analysis of the text logs during this interval revealed an immediate, total shift in Jenny's standard writing style, syntax, and vocabulary. The incoming messages from Jenny's device became structurally identical to concurrent messages being transmitted by Cathy DuBridge. This crossover establishes that the communication threads were either directly hijacked, spoofed, or authored in real-time by the inside operative to maintain a unified psychological front and prevent the plaintiff from establishing independent communication with outside associates.

**II. Expansion of Device Hijacking and Script Writing Across Wellness Cohorts**

**The Yoga Vector Infiltration:** The methodology of interception and single-author text generation extended beyond the professional styling vector into the plaintiff's primary wellness and athletic circles.

**Targeted Contacts (Cynthia Hsieh & Collette):** Strategic communications involving long-term wellness associates—specifically the plaintiff's yoga practice partner (Cynthia Hsieh) and yoga instructor (Collette)—were systematically intercepted.

**Real-Time Textual Manipulation:** During the critical late February and early March 2026 window, the inside operative (Cathy DuBridge) actively monitored incoming text threads on these external devices. In multiple documented instances, the operative overrode the account holders to draft, edit, and transmit response texts directly from their devices.

- **Operational Objective:** This coordinated account interception was deployed to ensure that the plaintiff's attempts to seek external validation, ground himself in familiar routines, or communicate outside the controlled network were met with pre-fabricated, synchronized responses designed to maintain absolute information control and enforce isolation.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 77: CATHERINE DUBRIDGE - CLINICAL FRAMEWORK AND EPIDEMIOLOGY OF COMPULSIVE SEXUAL BEHAVIOR DISORDER**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. Formal Diagnostic Classifications**
To establish the objective, scientific framework of the behavioral patterns observed in the inside operative, the court is referred to international medical and psychiatric coding standards:

- **World Health Organization (WHO) ICD-11 Classification:** The WHO formally recognizes this condition under code **6C72: Compulsive Sexual Behavior Disorder (CSBD)**. It is classified as an **Impulse Control Disorder**.
- **Core Diagnostic Criteria (ICD-11):** Diagnosed by a persistent pattern of failure to control intense, repetitive sexual impulses or urges. The clinical threshold is met when repetitive sexual activities become a central focus of the person's life to the point of neglecting health, personal care, or other interests and responsibilities, continuing despite adverse consequences.
- **DSM-5 Historical Baseline:** The American Psychiatric Association evaluated these specific criteria under the designation **Hypersexual Disorder (HD)**. Clinical research fields trials established that the behavioral scales measure severe impairments in Control, Consequences, and Coping associated with hypersexual actions.

**II. Epidemiological Rarity and Gender Disparities**
Medical research demonstrates that the scale of behavior manifested by the operative represents an extreme statistical deviation from the general population baseline:

- **General Population Prevalence:** According to epidemiological studies published via the National Institutes of Health (NIH) and standard medical guidelines from the Mayo Clinic, Compulsive Sexual Behavior Disorder affects an estimated **3% to 6% of the adult population**.
- **The Female Statistical Anomaly:** Clinical literature emphasizes a profound gender disparity. The vast majority of documented hypersexual cases occur in males. Research data indicates that active female presentation of compulsive sexual behavior disorder is highly rare, with base estimates sitting significantly lower at **2% to 7% within the already limited female cohort** depending on strictness of diagnostic criteria.
- **The Progression Paradigm:** As documented by researchers in the Journal of Behavioral Addictions, conventional forms of hypersexuality typically present as excessive solitary or digital consumption. Transitioning into high-frequency, non-discriminate physical contact with thousands of external partners—intersecting with domestic, civic, and professional networks—represents an exponential progression that sits entirely off the chart of standard outpatient clinical data.

**III. Systemic Neurobiological Mechanisms**
Medical science identifies specific neurobiological alterations that drive this severe operational fragmentation:

- **Hormonal Hyper-Activation:** Clinical studies evaluating individuals with severe hypersexual profiles have identified distinct biochemical markers, including significantly elevated baseline levels of **Oxytocin** within the mesolimbic dopamine system.
- **The Social Salience Dysregulation Loop:** In a healthy brain, oxytocin regulates pair-bonding, empathy, and partner preference. In a pathologically dysregulated system, excessive oxytocin alters "social salience"—meaning the brain stops registering normal interpersonal boundaries and instead processes every social contact or cohort network strictly as a high-arousal sexual stimulus. This removes the capacity for real-time internal reflection, resulting in an automated, high-frequency behavioral pattern that mimics a broken biological circuit hitting every available target without intermission.

**IV. Factual Documentation of Hyper-Compulsive Escalation and Behavioral Automation**
To establish the clinical severity of the operative's Compulsive Sexual Behavior Disorder (ICD-11 Code 6C72), the following specific behavioral patterns are entered into the record as evidence of an absolute breakdown in the internal choice-and-consequence circuit:

- **Absence of Interpersonal Emotional Processing:** The operative demonstrated a complete lack of normal cognitive or emotional pausing following profound domestic tragedies, including the death of immediate family member (Iris). The behavior continued uninterrupted, indicating that the automatic impulse circuit completely bypassed the brain's standard grief and survival responses.
- **Continuation Despite Extreme Personal Trauma:** The medical definition of "continuing despite severe adverse consequences" is demonstrated by the operative's immediate return to high-frequency physical engagement with the plaintiff within one week of sustaining acute, multi-party physical trauma at an organized residential gathering. The primary utility of the behavior was to enforce compliance and maintain the interpersonal bond.
- **High-Frequency Multi-Party Coordinated Events:** Within three weeks of major domestic trauma, the operative systematically traveled to participate in pre-arranged multi-party encounters with specific historical cohorts (including an established group of four long-term high school alumni associates).
- **Commercial and Network Traps (March 3, 2026):** On March 3, 2026, a coordinated cohort consisting of approximately 20 individuals arrived at the Forbes Mill location. This deployment represents a structured, third-party arranged encounter (facilitated by Phil Albanese) designed to utilize the operative's severe behavioral compulsion as an operational tool to compromise the local ecosystem and enforce external control.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 78: MASTER TIME-SERIES MATRIX: LONG-TERM BEHAVIORAL AND CYBER-PHYSICAL INTERDICTIONS**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**I. FORENSIC METHODOLOGY AND COLUMN DEFINITIONS**
This exhibit provides a structured timeline cataloging the systematic deployment of technical, financial, and human assets by Defendant Rod Beckstrom and primary operator Catherine DuBridge over a multi-decade operational footprint. The matrix is organized into three core analytical data streams to assist the Court during the discovery phase:

1. **Factual Event Registry (Column 1):** Chronological log of specific geographic movements, relationship introductions, financial transactions, and technical anomalies witnessed firsthand by the Plaintiff.
2. **Power and Dominance Matrix (Column 2):** Analytical classification of the underlying strategic mechanism deployed by the enterprise (e.g., asymmetric information distribution, network containment, economic exploitation).
3. **Surveillance and Operational Classification (Column 3):** Legal and technical labeling of the specific node behavior (e.g., proximity monitoring, structural data routing, tactical redirection).

**II. EXCERPTS FROM THE ACTIVE TIME-SERIES LEDGER**

| Log Index | Estimated Date / Location | Field Event & Node Description | Power / Dominance Matrix Classification | Surveillance / Operational Category |
|---|---|---|---|---|
| **001** | July 2011 / Berlin, Germany | Unauthorized hardware access executed during international conference at Hotel Adlon Kempinski; insertion of hidden steganographic data archive. | Technical Bypass / Asymmetric Information | Network Infiltration |
| **002** | 2016 / Los Gatos, CA | Referral and deployment of pre-coordinated framing labor crew (Roberto Cesni) via long-term family contractor connections. | Environmental Saturation via Labor Matrix | Proximity Monitoring Node |
| **003** | 2017 / Los Gatos, CA | Initial onboarding of Wayman/Cayman residential design project; simulation of unfamiliarity by co-defendant despite historical adjacent properties. | Coordinated Behavioral Interdiction | False Trust Baseline / Node Placement |
| **004** | April 2025 / Pacific Palisades | Coordinated scheduling diversion executed outside the residential perimeter while primary operator | Tactical Redirection / Perimeter Containment | Regional Logistics Checkpoint |

| | | | | |
|---|---|---|---|---|
| | | executes unauthorized data transfer. | | |
| **005** | March 1, 2026 / Santa Cruz | Abrupt operational shift and departure from standard professional boundaries by Bob Shepherd following direct communication inquiries. | Systemic Operational Failure / Disclosure Fracture | Automated Legal Deflection Node |

**ADDENDUM A: BIOGRAPHICAL TIMELINE INDEX (ROD BECKSTROM OPERATIONAL FOOTPRINT)**
This addendum serves as the foundational biographical ledger for Exhibit 75, mapping out chronological milestones, corporate transitions, and historical life events to establish the baseline parameters of the case file (p. 1).

**1. Foundational Era & Personal Dynamics (1963–1983)**

- **1963–Present / Insecurity Core**: Rod establishes a pattern of "aggressively smart" behavior masking deep internal insecurity (p. 1). Recognizing a fundamental lack of organic social and intellectual capital, their mother instructs Eric to permanently protect Rod, creating a parasitic dependency on Eric's intelligence and empathy (p. 1).
- **1969–1976 / Shared Environments**: Rod and Eric share a downstairs bedroom, establishing an early proximity loop where Rod positions himself as Eric's confidant to execute power plays and dominance frameworks (p. 1). Siblings flag Rod's behavior as uniquely prone to sudden lashing out and "scorched earth" tactics from youth (p. 1).
- **1972 / Transactional Relationship Matrix**: Rod pays a grade-school classmate $1 to act as his girlfriend (p. 1). The exposure of the transaction establishes an early behavioral pattern where intimate human connections are treated strictly as currency, contracts, or mechanisms of dominance (p. 1).
- **1974–1975 / Physical Dominance Reversals**: Rod initiates unprovoked physical altercations, including a conflict at the YMCA that backfires (p. 1). On Eric's first day of Boy Scouts, Rod and a group of associates attempt to partially drown Eric, holding him underwater for 3 minutes to enforce absolute containment (p. 1).
- **1975–1979 / Group Identity Subversion**: Rod surrounds himself with highly unstable social circles characterized by vehicle wrecks and physical fights, requiring constant intervention and protection by Eric (p. 1). Personal boundaries remain fractured; family travel events demonstrate that Rod displays acute discomfort and an inability to maintain normal relational boundaries with siblings (p. 1).
- **1976–1977 / Persona Misdirection**: Rod dates highly volatile individuals from outside his immediate network (p. 1). In 1977, Eric is brought under the guise of an "emergency" to a dark parking lot where a compromised associate intentionally drives a vehicle directly at them (p. 1).
- **1977–2013 / The Marshall Lind Node**: Rod maintains a close relationship with Marshall Lind, who eventually relocates to San Jose without visible employment (p. 1). In 2013, the exact week Eric moves to California, Lind is abruptly removed and returned to Tulsa to prevent detection of the localized physical tracking network (p. 1).
- **1978–1979 / Foreign Exchange Turbulence**: Rod participates in a senior-year German foreign exchange program (p. 1). His first host family rejects him due to behavioral turbulence, forcing a relocation to a secondary home (p. 1). Concurrently, Eric thrives independently, though he continues to support Rod via correspondence as Rod struggles with the environmental shift (p. 1).
- **1979–1980 / Institutional Transitions (OSU & Stanford)**: Volatile social environments continue during Rod's time at Oklahoma State University (p. 1). Upon transferring to Stanford, Rod engages in daily substance abuse while managing a student government position (p. 1).

•**1982–1983 / Credit Inversion & Fulbright Disruption**: Serving on the Stanford Council of Presidents, Rod establishes a pattern of claiming sole credit for programs he did not build (p. 1). He obtains a Fulbright Scholarship to St. Gallen, Switzerland, but abruptly departs after one year (p. 1). On his final night in Switzerland, he enters a violent bar fight, arriving at his new Morgan Stanley position in London with two black eyes (p. 1).

**2. Corporate Infiltration & Network Expansion (1983–1996)**

•**1983 / Foreign Car Importing Venture**: Rod and Eric launch an import business from Switzerland (p. 1). Rod mismanages the acquisition logistics, purchasing an incorrect Mercedes-Benz 6.9 and locking in a $15,000 investment that results in a multi-year financial loss upon sale (p. 1).
•**1985 / Morgan Stanley Interest Swap (CATS)**: During his tenure at Morgan Stanley in London, the core interest rate swap concepts (CATS) are developed, which Rod later claims as his exclusive intellectual property (p. 1).
•**1985–1987 / The Evisceration of Boris Antal**: While pursuing an MBA at Stanford, Rod co-founds CATS using the direct concepts and intellectual property of Boris Antal (p. 1). Once initial capital is secured via investor Bob Leaf, Rod executes a ruthless "scorched earth" campaign to completely push Antal out of the company, stripping his equity and leaving him severely traumatized while Eric witnesses the extraction firsthand (p. 1).
•**1986 / Structural Relationship Trapping**: Eric is introduced to Rod's proxy partner, Lolly, whose complete cognitive disconnection flags immediate operational concerns regarding transactional relationship placement (p. 1).
•**1988 / The Seabright Connection**: Rod begins dating Patrice Breslin, who leases a cottage at 2050 East Cliff Drive in Santa Cruz (p. 1). This establishes the exact geographical footprint for the regional tracking network, located precisely five houses away from the future site of Catherine DuBridge's beach house (p. 1).
•**1989 / The Siphoning of Social Capital**: Rod hires David Plekenpol, an investment banker Eric previously knew in London, to manage ongoing internal CATS turmoil (p. 1). During visits to Santa Cruz, Rod systematically uses Eric's organic charisma and intellectual weight to solidify his own personal standing with Patrice and her immediate family (p. 1).
•**1990 / Infiltration of Professional Opportunities**: Before Eric relocates to Sweden, Rod attempts to direct his career trajectory, instructing him to embed himself at Frog Design to map out Apple Macintosh design pipelines for the enterprise's database (p. 1).
•**1990–1991 / International Tracking & Return**: Rod tracks Eric to his professional offices in Sweden during the regional economic collapse (p. 1). Upon Eric's return to the United States, Rod coordinates a temporary housing placement in his old Stanford rental property to maintain total spatial containment (p. 1).
•**1991 / The Santa Cruz Marriage Matrix**: Rod marries Patrice Breslin in Santa Cruz, positioning Eric as best man (p. 1). Eric is required to personally intervene to convince Rod's isolated London roommates to attend, masking the underlying relationship linkages binding Rod, Patrice, and the emergent Catherine DuBridge network (p. 1).
•**1991–1995 / Extraction of Creative Assets (David Gast Network)**: Operating from a San Francisco apartment, Eric is systematically integrated into high-level networking dinners (e.g., the Environmental Defense Fund President) to generate leverage for Rod (p. 1). Eric is directed to work with developer David Gast, who possesses zero organic design talent (pp. 1-2). Gast and Rod systematically exploit Eric's architectural skills to anchor multi-million dollar venture capital clients (pp. 1-2).

•**1991–1995 / The Robin Williams Infiltration**: Eric is deployed to execute extensive design work on the Robin Williams residence, establishing close ties with the general contractor (pp. 1-2). Catherine DuBridge infiltrates this specific node, ultimately causing the 1995 divorce of Robin and Marcia Williams (pp. 1-2). Following this disruption, David Gast is completely excised from all historical records and assets to mask the infiltration (pp. 1-2).
•**1993 / Placement of the Corporate Prostitution Ring**: Catherine DuBridge's parents acquire the 224 4th Avenue (Seabright) beach house, positioning her exactly four houses away from Patrice's property (pp. 1-2). DuBridge targets Rod and Patrice, compromising them physically and establishing a permanent extortion infrastructure (pp. 1-2). Rod assumes control of the command structure, utilizing DuBridge's severe sexual hyper-addiction as an active tool to extract capital and force legal complicity across Silicon Valley corporate networks (pp. 1-2).
•**1993 / Inversion of High-Value Construction Assets**: Eric is directed to design properties for premier Silicon Valley figures, including Peter Wendell (Sierra Ventures) and John/Anne Doerr (p. 2). Years later, DuBridge explicitly discloses to Eric that she pre-emptively infiltrated the Wendell estate, executing private, compromising encounters to neutralize the asset (p. 2). Simultaneously, Anne Doerr initiates a 3-day platonic consultation window with Eric to secretly determine if Eric has discovered the covert connection binding her husband to Rod and DuBridge's operational ring (p. 2).
•**1991–2008 / The YPO & Corporate Infiltration Architecture**: Serving on the boards of the Young Presidents' Organization (YPO) and the Environmental Defense Fund (EDF), Rod utilizes his beach properties to host high-volume sex events managed by DuBridge (p. 2). This dual-track operation acts as the master extraction mechanism for global platforms, including CATS, EDF, the World Economic Forum (WEF), ICANN, USA Cyber Security networks, and KIVA (p. 2).
•**1993–1996 / The Retraction Mask**: Rod and Patrice completely sever contact with Eric for two years to build out the global extortion ring without internal family visibility (p. 2). In 1995, Rod liquidates CATS for $60M and enters early retirement at age 32 to shield himself from Cluster B identity implosion (pp. 1-2). When a former employee sells a rival company for $300M, Rod attempts to eviscerate him, triggering a fraudulent FBI investigation out of sheer professional rage (p. 2).

### 3. Advanced Containment & Family Fragmentation (1998–2025)

•**1998–2004 / The Real Estate Extraction Line**: Rod utilizes Eric's advanced architectural capital to design a premier beach house property, which Rod later liquidates for $16M, netting an unearned $12M profit (p. 2). To maintain containment during high-level events (such as the TED Conference), Rod forces Eric into strict isolation, refusing to allow him to socialize with attendees who recognize his independent work (p. 2).
•**2005–2007 / The Starfish & Spider Extrusion**: Rod co-authors The Starfish and the Spider, but immediately turns on his co-author, Ori Brafman (p. 2). Despite paying Brafman $50,000 to ghostwrite high-level speeches because Rod lacks basic authorial capacity, Rod completely eviscerates Brafman to claim sole credit for the book's success (p. 2). This manufactured prestige is weaponized to secure a high-level home visit from Department of Homeland Security Secretary Michael Chertoff, using DuBridge's presence to anchor institutional leverage (p. 2).
•**2008–2011 / The Cyber Czar & ICANN Panopticon**: Rod leverages his curated tech profile to secure a Cyber Security Czar appointment under the Bush and Obama administrations, eventually facing forced removal due to acute operational incompetence (p. 2). Shifting to the role of ICANN CEO, he repeatedly brings Eric to Washington, D.C. to write his strategic reports (p. 2). During the 2011 ICANN meeting in Berlin, Rod explicitly deploys commercial stalking infrastructure directly onto Eric's laptop, launching a federal-level cyber panopticon (p. 2).

•**2011–2013 / The International Opportunity Interdictions**: Eric achieves massive independent design breakthroughs, receiving teaching offers from Peking University and high-level consulting links with the Asian Development Bank (ADB), PwC Sweden, and major real estate developers in Manila and Guangzhou (Ken Chu/Kingold) (p. 2). In every instance, the moment Eric establishes economic breathing room or institutional trust, Rod's backend team executes a synchronized block, systematically destroying the global business opportunities (p. 2).
•**2013 / The LAX Customs Ambush**: Eric and his three children flee Sweden under extreme duress after his ex-wife, Michele, abandons the family (p. 2). Coordinated by Rod, Michele files a fraudulent international kidnapping warrant (p. 2). Utilizing Eric's intercepted flight data, they coordinate a high-stakes customs stop at LAX (p. 2). The plot fails only when Eric points out to immigration officers that Michele is sitting three rows away, exposing the legal collusion (p. 2). Rod and Patrice arrive 45 minutes late, fabricating an alibi that they drove to the wrong airport to maximize the family's vulnerability (p. 2).
•**2014 / The Forced Expulsion and Legal Collusion**: Rod and Patrice attempt to force a legal adoption of Eric's children to establish total structural control (p. 2). When Eric refuses and retains independent support from a Swedish associate (Asa), Rod and Patrice violently expel the family from their Lowell Ave residence (p. 2). Simultaneously, Rod maps Eric's legal communications; within six months, Eric's primary divorce attorney commits suicide due to the intense pressure of the network's collusion (p. 2).
•**2014 / The Kidnapping of Soren**: Two days before Eric can finalize a protective legal separation giving him 100% custody, Michele executes a coordinated abduction of Soren from his Palo Alto elementary school (p. 2). To ensure Eric cannot execute a physical defense margin, a family associate (Bruce Westphal) pre-emptively invites Eric and his daughters to a remote ranch with zero cell service for 3 days (p. 2). Soren is illegally trafficked to Maine, separating him from his sisters for 14 months (p. 2).
•**2015–2016 / The Match.com Setup and Asset Drainage**: Following a highly pressured court proceeding where the children's independent testimony saves Eric from total legal destruction, the family is forced to liquidate their Maine estate at a coordinated $400,000 loss (p. 2). Rod algorithmically manipulates Eric's computer networks to force him onto Match.com, deploying Catherine DuBridge as a pre-planned "Trojan Horse" to establish a long-term trauma bond and drain his remaining capital via fraudulent IRS and property tax emergencies (pp. 1-2).
•**2017–2019 / The Legal Ruse Matrix**: When Iris successfully brings Soren back to California, reunite all three siblings, Rod utilizes a compromised Maine lawyer node (Rick Morse) to launch a psychological containment campaign, falsely telling Eric that keeping his son will be "fatal" to force a voluntary return to isolation (pp. 2-3). Eric writes Rod's high-level PricewaterhouseCoopers (PwC) China conference reports; Rod receives a $150,000 payout while throwing Eric a nominal $5,000 to keep him economically dependent (p. 3).
•**2019–2020 / The Isolation of Iris and Final Expulsion**: Recognizing that Iris is an uncompromised truth-seeker who has discovered the surveillance architecture, Rod directs a targeted isolation protocol (p. 3). DuBridge fabricates a total family ban from her parents' estates, while her father executes a staged confrontation on Mother's Day to induce massive familial stress (p. 3). In 2020, Rod supplies DuBridge with a $400,000 injection to force an immediate, 4-week eviction of Eric and his children, timing the move exactly when Eric's savings are entirely depleted by a coordinated $120,000 IRS demand (p. 3).
•**2020 / The Total Interdiction of the Children**: During the chaos of the forced eviction, a fraudulent Lis Pendens for a missed $342 payment is slammed onto the property sale, stripping Eric of $340,000 in legitimate equity (p. 3). Eric and his children are forced into a temporary Santa Cruz

rental; the children are routed to San Francisco and immediately flown back to Maine under an unredacted information blackout coordinated by Michele (p. 3). Eric is completely cut off, never seeing his three children again (p. 3).

•**2021 / The Wrongful Death of Iris Beckstrom**: Locked in total physical isolation inside a shed on Michele's property, Iris Beckstrom hangs herself (p. 3). She remains dead for 8 hours before discovery; the network maintains a total communications blackout, completely hiding the tragedy from her father (p. 3). Rod sends a immediate legal warning to Eric, threatening him with immediate arrest if he attempts to attend his own daughter's memorial service (p. 3). Exactly three days later, DuBridge undergoes a full surgical facelift to preserve her front-end operational appearance for the next phase of the enterprise (p. 3).

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 79: THE MECHANICS OF THE TRAPS DEPLOYED BY CATHERINE DUBRIDGE**
**A Study in Manufactured Reality, Target Capture, and the Weaponization of Human Vulnerability**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE: May 19, 2026**
**LOCATION OF ORIGIN: Washington, D.C**

**1. The Cloaking Device: The Illusion of the Safe Haven**
The defendants rely entirely on a single defense: "This was just a series of consensual, adult encounters."To dismantle this lie, the narrative exposes the carefully curated character used to disarm every target who walked into the room.

- **The Lululemon Camouflage**: Cathy did not look like an operative or a broken person. She wore the uniform of a wealthy, intelligent, predictable suburban mother. This image acted as a psychological cloaking device, signaling total safety and discretion to everyone who met her.
- **The Captive Audience**: On a first date at a coffee shop in Palo Alto, she didn't just chat—she executed a script. She brought up notes she already had on her target, mapping out shared geography like Santa Cruz within hours, forcing an immediate future into existence.
- **The Damsel Narrative**: She claimed her ex-husband was boring, unromantic, and numb. This instantly flipped a switch in her targets. They weren't stepping into a trap; they were stepping up to "rescue" a beautiful, lonely woman.

**2. The Hook: Future Faking and Financial Ultimatums**
A key mechanism of this operation was the immediate deployment of a manufactured future, instantly tethered to a permanent, unsolvable financial burden designed to induce chronic survival mode.

- **The Instant Blueprint**: On the very first visit to the Santa Cruz beach house, before a real relationship had even formed, the trap was laid. Pointing to the property and stating, "We could live here, your office could be in that garage office right there," was a tactical hook designed to make the target mentally move into her world and lower their guards.
- **The Moving Goalpost**: The revelation after year one—that her brother owned half the property—shifted the dream into a weapon. For the next ten years, she used intense, monthly pressure campaigns demanding a buyout of her brother's share.
- **Manufactured Scarcity**: Because the target lacked the capital, this ultimatum created a permanent state of anxiety and perceived inadequacy. The target was forced to believe that failing to generate this money meant losing the relationship. This kept them entirely focused on chasing an impossible carrot, draining the emotional energy required to notice the broader surveillance operation.

### 3. The Pivot: Coordinated Banking Chaos and Asymmetrical Ledgers

The illusion of financial security was systematically granted and then violently revoked through timed interventions designed to leave the target standing in ruins.

- **The Demolition Trap**: The moment the Maine house sold, a single month of economic safety was granted before the trap reset at 249 San Mateo Avenue in Los Gatos. After Wells Fargo spent two months promising a project loan, they abruptly denied it exactly one week after interior demolition began—leaving the target holding a gutted house with no apparent exit.
- **The Outflanking and the Cudgel**: When the target's mother intervened with an emergency loan to stabilize the structure, the primary architect's plan was disrupted. To counter this, Cathy deployed a secondary guilt mechanism: claiming she was forced to liquidate her IRA and pay massive penalties. For the next four years, she used this narrative as a physical and emotional cudgel, forcing the target to carry the shame of a crisis she helped engineer.
- **The Erased Ledger**: The financial relationship operated on a completely asymmetrical ledger. In the first year, Cathy used tears to claim an inability to pay a $35,000 IRS bill and a $25,000 property tax bill. The target worked non-stop to clear these debts. Yet, these massive injections of capital were never credited to the target's ledger. The operation was structured so that a $200,000 equity stake would cost the target $500,000 to "repay."
- **The Ignorance Shield**: Cathy's presentation of financial desperation was often delivered with genuine confusion. She was kept deliberately financially illiterate, poor, and dependent by her father and the primary architect—conditioned to execute scripts, demand money, and play the victim without ever understanding the broader financial fraud she was facilitating.

### 4. The Ambush Strategy: The Ruined Milestones

The timing of demands was mathematically calculated to strike at moments of maximum vulnerability, isolation, or personal success, shattering the target's psychological boundaries.

- **The Italy Extortion Campaign**: In 2019, one week after securing a $200,000 home equity loan—instantly allocating $70,000 to a second renovation project she demanded—the target met Cathy in Italy following her unverified walking tour. Sitting at a celebration dinner, the script flipped immediately: she demanded an instant $100,000 payout, intentionally ruining the milestone and draining the target's resolve.
- **The Orchestrated Whammy**: The timing of her comments, the arrival of specific lawyer emails, and sudden financial demands were never organic. They were coordinated from the back office to create ultimate confusion, exploiting the target's natural tendency to take the blame. This psychological warfare ensured that every milestone of independent success was instantly met with a crushing financial demand to keep the target running on the treadmill.

### 5. The Mechanics of the Room: How the Trap Snapped

Genuine human connection has warmth, hesitation, and mutual discovery. The encounters engineered by this operation were the exact opposite: cold, mechanical, and urgent.

- **The Lifeless Connection**: On the beach in Santa Cruz, the emptiness was palpable. Her hand was entirely lifeless. At the lighthouse, she immediately forced a photograph with a stranger—not to capture a memory, but to lock in a manufactured milestone before a bond existed.
- **The Trapped Obligation**: Standing in the kitchen, the air grew heavy. By masterfully blending intense shyness, demureness, and sudden openness, she created a crushing social pressure. Targets didn't move in out of overwhelming passion; they crossed physical lines because they felt an odd, awkward responsibility to break the heavy silence she designed.

•**The Industrial Illusion**: How does a woman engage with hundreds of partners, or allow fifteen men in a row to step into a room? She answers a specific, unspoken question inside them. To the wealthy, she was a high-status secret escape. To the destitute or immigrant crews, she was a high-status prize, flipping societal power dynamics. They believed they were the heroes of a wild fantasy, entirely blind to the fact that they were parts moving down an assembly line.

**6. The Back Office: The Machinery of a Sociopath**

Cathy was not acting alone, nor was she acting out of spontaneous desire. Her behavior was the front-end interface for a massive, data-driven surveillance operation run from the shadows.

•**The Digital Peeping Tom**: Hidden deep inside a 2011 ArchiCAD software folder lay the literal digital breaking-and-entering tools: mfcmapi.exe, data recovery utilities, and raw data converters. These weren't random files; they were the mechanisms used to intercept private communications, emails, and personal data.

•**The Psychological Funnel**: Just like search engines follow a person's online desires to serve them targeted ads, the "back office" used stolen data to map the core vulnerabilities, pride points, and loneliness of her targets. Cathy received her notes and planning input before she ever met them.

•**The Ultimate Parasite**: This infrastructure was engineered by a sociopathic brother who relied on another's social intuition and intellectual capital his entire life. By planting a highly fragmented, deeply traumatized woman into the narrative, he hijacked global opportunities, forced real estate sales in Maine and Los Gatos, and ran a commercial-level pimp and extortion ring under the guise of Silicon Valley success.

**7. The Aftermath: The Silent Exit**

When an extreme behavior becomes an industrial, non-stop loop, the fantasy breaks.

•**The Growing Discomfort**: Many participants eventually realized they were out of their depth. They saw she wasn't stopping, she wasn't enjoying it, and her reality was entirely fragmented.

•**The Trap of Silence**: Because the encounter began under the bond of a "discreet secret," participants had no idea how to say no or exit without risking exposure. They didn't speak up, and they didn't stop it; they simply grew uncomfortable and quietly moved away, leaving a trail of complicit silence that the defense now tries to call "consent."

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT 80: ROD BECKSTROM - THE PSYCHOLOGICAL PROFILE OF THE BECKSTROM SYNDICATE PRIMARY ARCHITECT**
**A Diagnostic Narrative of Sociopathic Control, Intellectual Parasitism, and Strategic Subversion**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
**DATE: May 19, 2026**
**LOCATION OF ORIGIN: Washington, D.C**

**1. Intellectual Parasitism and Social Siphoning**
The primary architect's entire public identity and professional success are built on a foundational deficit: an inability to generate genuine social intuition or organic intellectual capital.

- **The Siphon Mechanism**: Unable to connect with human beings on an emotional level, Rod relied entirely on siphoning the natural charisma, social fluidness, and intellectual weight of his target. He treated the target not as a brother, but as an unpaid research and development lab for his own personality.
- **The Mirror Chameleon**: In Silicon Valley, where emotional intelligence and high-level networking are currency, Rod utilized stolen insights to masquerade as an influential leader. His career was not built on organic vision, but on the systematic theft and commercialization of the target's innate skills.

**2. The Command Structure: The Shadow "Back Office"**
For a classic sociopathic profile, power is derived not from visible leadership, but from covert asymmetric information. He operates on the principle that he must know everything about everyone, while remaining entirely unseen.

- **The Digital Panopticon**: The discovery of forensic deployment tools (mfcmapi.exe, raw data converters) buried in deep software folders reveals a mind that treats privacy as an operational flaw. To Rod, interpersonal relationships are data sets to be mined, mapped, and leveraged.
- **The Behavioral Funnel**: Operating like a corporate tracking engine, his "back office" monitored the desires, vulnerabilities, and loneliness of targets. He did not interact with people; he algorithmically mapped them to predict exactly how they would respond to specific pressures, scripts, and inputs.

**3. Proxies as Weaponized Assets**
A defining characteristic of this psychological profile is the absolute inability to view human beings as independent entities. People are categorized strictly as tools, shields, or targets.

- **The Planted Trojan Horse**: Rod did not just tolerate Cathy; he deployed her. Recognizing her severe psychological fragmentation and hyper-sexual dependencies, he utilized her as a living disruption device. She was engineered into the target's life to act as a permanent emotional tripwire.

- **The Isolation Blueprint**: To maintain total control over his primary intellectual asset, Rod used proxies to systematically dismantle the target's support networks. Horrific life events, family tragedies, and sudden marital separations (such as the coordination surrounding Soren and Iris) were not organic family crises—they were timed tactical interventions designed to isolate the target and force them into dependency.

**4. The Geometry of Manufactured Chaos**

Rod's primary method of dominance is the "Timed Whammy"—the mathematical calculation of emotional and financial stress to break a target's analytical defense mechanisms.

- **The Strategic Interdiction**: He monitored the target's independent success with predatory precision. The moment the target achieved financial stability or global opportunity (the sale of the Maine home, the Los Gatos projects), Rod struck.
- **The Orchestrated Friction**: By perfectly timing the arrival of aggressive legal emails, sudden banking denials (such as the Wells Fargo demolition pivot), and Cathy's volatile financial demands, he induced chronic fight-or-flight mode. This state of constant psychological whiplash was designed to make the target default to their natural "blame-taker" setting, keeping them too exhausted to look up and see the puppet strings.

**5. The Preservation of the Fraud**

When a sociopathic structure is exposed, the architect's final defense is a calculated combination of absolute denial and the weaponization of collective complicity.

- **The Web of Coerced Complicity**: Rod maintained his network by holding devastating, covert leverage over every individual in his orbit. Family members and business associates complied with horrific maneuvers not out of loyalty, but out of sheer self-preservation.
- **The Illusion of Normality**: When confronted, his psychological defense is to rely on his curated public stature to make the truth look like an impossibility. He counts on the sheer scale of his deception to protect him, operating on the assumption that the world will choose a comfortable, high-status lie over a complex, chilling reality.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

**THE CORE ENGINE**
"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."

**EXHIBIT #81: THE ARCHITECTURE OF COORDINATED EXPLOITATION BY ROD BECKSTROM SYNDICATE**
**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)
**PLAINTIFF:** ERIC A. BECKSTROM
DATE**:** May 19, 2026
**LOCATION OF ORIGIN:** Washington, D.C

**A Master Case Study in Coordinated Control, Intellectual Parasitism, and Manufactured Reality**
1. The Cloaking Device: The Illusion of the Safe Haven
The defense relies entirely on a single, minimizing narrative: "This was just a series of consensual, independent encounters." To dismantle this lie, the story exposes the carefully curated character used to completely disarm targets.

- **The Lululemon Camouflage**: Cathy wore the uniform of a wealthy, intelligent, predictable suburban mother. This served as a psychological cloaking device, signaling total safety and discretion.
- **The Match.com Digital Entry**: On May 16, 2015, after the target had been on Match.com for only two weeks, Cathy initiated contact based on a highly fabricated profile. She falsified her residency, claiming to live in Palo Alto when her actual residence was in Saratoga, California.
- **The Captive Audience**: At their first three-hour meeting at Coupe Café, she executed a pre-planned script. She weaponized background notes she already possessed, mapping out shared geography like Santa Cruz to force an immediate future into existence.
- **The Sympathy Baiting Strategy**: She falsely claimed she was separated from her husband and that he was merely occupying the lower level of the home—an arrangement that did not actually occur until the target was fully secured. She fabricated stories of helping her ex-husband write his own dating profile, claiming he only sought specific physical traits to induce instant sympathy, project her own inadequacy, and activate the target's rescue response.

**2. The Hook: Future Faking and Financial Ultimatums**
A key mechanism of this operation was deploying a manufactured future, instantly tethered to a permanent, unsolvable financial burden to induce chronic survival mode.

- **The Instant Blueprint**: On the first visit to the Santa Cruz beach house, the trap was laid. Pointing to the property and stating, "We could live here, your office could be in that garage office right there,"was a tactical hook to lower the target's guards.
- **The Moving Goalpost**: The revelation after year one—that her brother owned half the property—shifted the dream into a weapon. For the next ten years, she used intense, monthly pressure campaigns demanding a buyout of her brother's share.
- **Manufactured Scarcity**: Because the target lacked the capital, this ultimatum created a permanent state of anxiety. It kept the target entirely focused on chasing an impossible carrot, draining the energy required to notice the broader surveillance operation.

- **The Childish Ledger vs. Vast Assets**: While possessing an estimated $4M to $6M in independent assets, Cathy maintained an absolute information blackout regarding her true financial standing, secretly running up high-interest debts like a $57,000 line of credit. Her personal notebooks from January 2026 exposed a staggering deficit in basic organizational skills—containing hyper-simplistic, kindergarten-level entries for routine tasks ("move furniture," "paint house") alongside basic arithmetic totaling $60,000 for real estate taxes and weddings. She weaponized an artificial "1950s housewife" persona to manipulate the target into financing luxury vacations, using her manufactured financial incompetence to drain the target's significantly smaller asset base.

**3. The Pivot: Coordinated Banking Chaos and Asymmetrical Ledgers**

The illusion of financial security was systematically granted and then violently revoked through timed interventions designed to leave the target standing in ruins.

- **The Demolition Trap**: The moment the Maine house sold, a single month of economic safety was granted before the trap reset at 249 San Mateo Avenue in Los Gatos. After Wells Fargo spent two months promising a project loan, they abruptly denied it exactly one week after interior demolition began.
- **The Outflanking and the Cudgel**: When the target's mother intervened with an emergency loan, Rod Beckstrom's plan was temporarily disrupted. To counter this, Cathy claimed she was forced to liquidate her IRA and pay massive penalties. For four years, she used this narrative as an emotional cudgel, forcing the target to carry the shame.
- **The Erased Ledger**: In the first year, Cathy used tears to claim an inability to pay a $35,000 IRS bill and a $25,000 property tax bill. The target worked non-stop to clear these debts, but these injections of capital were never credited. The operation was structured so that a $200,000 equity stake would cost the target $500,000 to "repay".
- **The Ignorance Shield**: Cathy was kept deliberately financially illiterate, poor, and dependent by her father and Rod Beckstrom. She was conditioned to execute scripts, demand money, and play the victim without ever understanding the broader fraud.

**4. The Ambush Strategy: The Ruined Milestones**

The timing of demands was mathematically calculated to strike at moments of maximum vulnerability, isolation, or personal success, shattering the target's psychological boundaries.

- **The Italy Extortion Campaign**: In 2019, one week after securing a $200,000 home equity loan, the target met Cathy in Italy. Sitting at a celebration dinner, the script flipped immediately: she demanded an instant $100,000 payout, intentionally ruining the milestone.
- **The Orchestrated Whammy**: The timing of her comments, the arrival of specific lawyer emails, and sudden financial demands were never organic. They were coordinated from the back office to create ultimate confusion, exploiting the target's natural tendency to take the blame.

**5. The Mechanics of the Room: Weaponized Perceptions and Staging**

Genuine human connection has warmth and mutual discovery. The encounters engineered by this operation were cold, mechanical, and urgent, relying heavily on the targets' complete misinterpretation of Cathy's social presentation.

- **The Lifeless Connection**: On the beach in Santa Cruz, the emptiness was palpable. Her hand was entirely lifeless. At the lighthouse, she immediately forced a photograph with a stranger—not to capture a memory, but to lock in a manufactured milestone.

•**The Trapped Obligation**: Standing in the kitchen, by masterfully blending intense shyness, demureness, and sudden openness, she created a crushing social pressure. Targets crossed physical lines because they felt an odd, awkward responsibility to break the heavy silence.

•**The Deficit Framing Myth**: Cathy presented herself as so highly intelligent, demure, and socially put-together that outside participants completely misread her behavior. They defaulted to a manufactured narrative that she simply possessed a "wild streak" that her partner could not satisfy. This false perception effectively neutralized suspicion, entirely cloaking a severe, multi-layered profile of domestic destruction, child exploitation, incestuous manipulation, and direct complicity in the psychological isolation that led to Iris's wrongful death.

•**The Aesthetic Disparity and Surgical Timelines**: At 63 years old, Cathy preserved a highly conditioned dancer's anatomy, which she used as physical leverage to maintain her high-status positioning within swinger networks. This physical asset was contrasted by advanced, deep wrinkling across her face and neck. Demonstrating absolute clinical detachment following the loss of family members, she underwent an immediate face and neck lift exactly three days after Iris's death to preserve her operational appearance.

•**The "Prize" Dynamics**: In private, Cathy consistently made disparaging remarks regarding the bodies of her peers and acquaintances at community and charity fashion events to mask the underlying reality: she was operating as the central commodity in organized, high-volume group environments involving local parents. She positioned herself as the premier asset in these spaces, performing overtly in front of marital couples, which generated systemic, un-contextualized hostility from surrounding wives toward the oblivious target.

•**The Infrastructure of Mass Exploitation**: The domestic space was systematically staged to facilitate high-volume group events directly under the target's nose. Cathy introduced specialized staging modifications, including the rapid acquisition of excess cocktail glasses, extensive sets of wine glasses, additional end tables, and an outdoor fire pit. Local neighbors became aware of the industrial party scene occurring during the target's absences, neutralized by Cathy's false assertions that the target approved of the activity.

•**The Industrial Illusion**: She answered a specific, unspoken question inside her partners. To the wealthy, she was a high-status secret escape—causing long-term domestic disruptions, including the 2019 divorce of Chris Mogensen, without internal acknowledgment. To the destitute or immigrant crews, she was a high-status prize, flipping societal power dynamics. They believed they were the heroes of a wild fantasy, entirely blind to the fact that they were parts moving down an assembly line.

**6. The Intimacy Sanction: Sexual Weaponization and Forensic Cleansing**

The domestic sphere and physical intimacy were tightly monitored variables, shifting from organic relationship markers to tactical leverage tools designed to destabilize the target.

•**The Controlled Withdrawal**: Following an initial baseline year of normal physical intimacy, sexual contact was weaponized into a splotchy, transactional mechanism. Cathy deployed sexual denial as a deliberate retention strategy to keep the target off-balance. When the target neutralized this tactic by remaining completely calm and refusing to exhibit anger, it triggered intense operational frustration on her part.

•**The Script Seepage and Verbal Interrogations**: By the summer of 2025, the internal scripts used to manage outside clients began to bleed directly into the domestic space. Cathy initiated sudden, jarring verbal attacks designed to provoke a defensive reaction, demands like, "Are you gay?"followed weeks later by, "Are you having an affair? It is all right if you are, just tell me." When

met with the target's silent detachment, she dropped her refined persona entirely, shifting to explicit, transactional clinical language: "Why don't you just tell me what you want, if you want a blow job or what." This mechanical behavior extended to physical encounters, where she dictated highly specific technical positions like an operator managing a stranger or a machine.

- **The Forensic Cleansing Protocol**: To facilitate the regular, un-monitored passage of high-volume participants through the shared primary residence, strict forensic protocols were maintained. Cathy aggressively required the target to finance professional housecleaning services precisely twice a month. This systematic maintenance carried no legitimate domestic purpose, serving exclusively as an operational necessity to permanently erase biological traces, fluids, and forensic footprints left by third-party participants in the domestic bed.

**7. The Operational Integration: Digital Mapping vs. Physical Infiltration**

The symbiotic relationship between Rod Beckstrom and Cathy relied on a dual-track strategy to map, compromise, and gain absolute leverage over 100% of the target's social and familial network.

- **The Scheduled Clearances**: Local athletic clubs, gym networks, and community social calendars were weaponized to establish un-monitored operational windows at the primary residence. Surrounding club members systematically pressured the target to enroll in extraneous afternoon yoga classes, while long-standing, 11-year community rituals—such as a mandatory Wednesday morning coffee group—were manufactured under false pretenses simply to guarantee the target's structured absence from the household during high-volume events.
- **The Systematic Network Infiltration**: Leveraging the complete database compiled by Rod Beckstrom's digital tracking apparatus, Cathy executed an exhaustive, physical counter-mapping operation across every geographic sector of the target's life. Pretending to embark on routine, independent family visits to her sons in Denver or Boston, her true operational destinations included un-vetted, solo travel corridors through Oklahoma, Texas, Maine, and New York City.
- **The Infection Framework**: These travel networks carried a singular tactical goal: to locate, physically compromise, and absorb every primary contact from the target's personal history. The operation systematically compromised childhood friends, high school networks across diverse demographics, and close professional contacts in Maine. This comprehensive compromise explains the un-contextualized, congratulatory behaviors exhibited by old networks during public reunions—celebrating an assumed mutual compliance that the target remained completely oblivious to.
- **The Intergenerational Expansion**: The physical mapping expanded directly into the target's immediate bloodline to establish permanent, long-term leverage. Operational indicators demonstrate that Cathy systematically targeted the target's mother, and deployed advanced grooming and physical compromise tactics against the target's immediate children, including Soren during the summer of 2025 and Sonia within the San Francisco sector.

**8. Intellectual Parasitism and Social Siphoning**

Rod Beckstrom's entire public identity, corporate status, and professional success are built on a foundational deficit: a total inability to generate genuine social intuition or organic intellectual capital (pp. 1-2).

- **The Siphon Mechanism**: Prone to intense insecurity, deep-seated anger, and explosive "scorched earth" outbursts from youth (p. 1), Rod Beckstrom could not build organic human connections. He treated his brother Eric as a lifelong, unpaid research and development lab (pp. 1-2). Rod systematically harvested Eric's intelligence, empathy, and social fluency to construct his own public facade (pp. 1-2).

- **The Mirror Chameleon**: From Stanford student government to global tech forums like Davos, Rod Beckstrom relied on a predatory pattern (pp. 1-2). He claimed sole credit for programs he didn't build (p. 1), accepted payments for high-level corporate reports he didn't write (p. 2), and weaponized Eric's communication skills to smooth over multi-million dollar deals (pp. 1-2). His career is a monument to intellectual asset theft (pp. 1-2).
- **Transactional Relationships**: To Rod Beckstrom, human connection is purely commercial. From paying a classmate a single dollar to act as his girlfriend in grade school (p. 1) to setting up corporate operations later in life, intimate relationships are treated strictly as contracts, leverage points, or currency (p. 1).

**9. The Command Structure: The Shadow "Back Office"**

For a classic sociopathic profile, power is derived from complete information asymmetry. Rod Beckstrom operates on the absolute requirement that he must monitor every variable while remaining entirely unseen (pp. 1-2).

- **The Digital Panopticon**: The discovery of forensic surveillance tools (mfcmapi.exe, raw data recovery utilities) hidden deep within a 2011 ArchiCAD software folder exposes a mind that treats personal privacy as an operational flaw. Relationships are data sets to be intercepted, logged, and systematically mapped.
- **The Behavioral Funnel**: Operating like a corporate data-harvesting engine, Rod Beckstrom's "back office" weaponized stolen insights to map the raw vulnerabilities, proudest achievements, and deepest areas of loneliness of his targets (p. 1). He did not engage with individuals; he systematically algorithmically profiled them to predict precisely how they would respond to calculated scripts and financial pressures (pp. 1-2).
- **The 24/7 Intel Feed**: Cathy's illusion of strength and intelligence was entirely dependent on a continuous information feed from Rod's backend team. Stripped of this operational support, she was entirely incapable of independent strategic planning. Rod's back office micro-managed and scripted every aspect of the couple's personal life—including ski trips, hiking excursions, and vacations to Hawaii and Italy—transforming routine leisure into structured data-gathering environments.

**10. Proxies as Weaponized Assets and Family Subversion**

A defining hallmark of Rod Beckstrom's psychological profile is the absolute inability to view human beings—including his own siblings, nieces, and nephews—as independent entities with rights (pp. 1-3). People are categorized strictly as tools, shields, or targets.

- **The Planted Trojan Horse**: Rod Beckstrom did not merely tolerate Cathy's severe psychological fragmentation and hyper-sexual dependencies; he actively deployed her (pp. 1-2). Recognizing her behavioral patterns, he engineered her entry into Eric's life via manipulated digital channels (Match.com) to serve as a long-term emotional tripwire and corporate extraction mechanism (p. 2).
- **The Isolation Blueprint**: To maintain total dominance over his primary intellectual asset, Rod Beckstrom used proxy actors to aggressively and systematically dismantle Eric's support structures (pp. 2-3). Sudden forced real estate liquidations, manufactured marital separations, and devastating family exiles were not random, organic tragedies (pp. 2-3). They were timed, tactical interventions executed to strip Eric of his financial safety net and break his psychological independence (pp. 2-3).
- **The Sibling Smear Campaign**: To prevent his family from seeing the reality of his manipulation, Rod Beckstrom initiated a long-term smear campaign against Eric. By quietly destroying Eric's credibility behind his back, Rod ensured that the other siblings would discount Eric's warnings.

Because Rod retired at age 32, his siblings blindly defaulted to the illusion that he was all-powerful and always knew what to do.

**11. The Geometry of Manufactured Chaos and Asset Sabotage**

Rod Beckstrom's primary method of control is the "Timed Whammy"—the intentional, mathematical application of emotional and financial shock to paralyze a target's analytical defenses, frequently extending to airport ambushes, intelligence operations, and the manipulation of family estates (pp. 2-3).

- **The LAX Kidnapping Ambush**: In 2013, three days after Eric and his three children fled Sweden under immense duress, Rod orchestrated a high-stakes legal ambush. Utilizing Eric's private flight data, Rod coordinated with Eric's unstable ex-wife, Michele, to file a fraudulent international kidnapping warrant (p. 2). Upon arrival at LAX, Michele attempted to have airport police execute an immediate arrest in front of the children (p. 2). The plot backfired only when Eric visually pointed out to customs officials that Michele was sitting two rows away, exposing the collusion (p. 2). To maximize the trauma and vulnerability of the stranded family, Rod and Patrice intentionally arrived 45 minutes late to the terminal, fabricating a transparent alibi that they had driven to the wrong airport (SF instead of San Jose) (p. 2).
- **The Real-Time Intelligence Probes**: The network's backend monitoring operations extend into the target's routine daily service appointments to gauge psychological resilience and map uncompromised nodes. During a domestic service appointment, proxy indicators emerged through highly targeted interrogation patterns masquerading as routine conversation. The operator utilized hyper-specific lifestyle matching data (referencing dietary habits like daily sushi consumption) alongside calibrated probes regarding physical health ("How are you in such good shape, are you working out?"), operational exhaustion ("You must be tired and sore", "You must take breaks"), and social tracking ("Who is your best friend?"). These attempts to map continuing lines of communication and assess the target's focus on the case files were neutralized by the target's continuous, un-monitored clarity, unexpected early working schedules (4:00 AM blocks), and refusal to exhibit the predicted physical or emotional collapse.
- **The Strategic Interdiction**: Rod Beckstrom monitored Eric's independent financial breakthroughs and massive real estate execution skills with predatory calculation. When Eric spent hundreds of hours meticulously managing spreadsheets and flying back and forth to flip their mother's Denver home, the project was a major success that generated an extra $50,000 for each of the five siblings. Yet, Rod's background narrative kept the family completely blind to Eric's immense labor. The exact moment Eric achieved economic breathing room, the trap was instantly reset (p. 2).
- **The Ancestral Farm Sabotage**: During the sale of the mother's ancestral farm in Nebraska, Rod Beckstrom and oldest brother Jim actively engineered artificial delays to suppress the asset's value. Jim initially attempted to force a half-price sale to cousins he did not even speak to, holding up the process for four months. Rod Beckstrom then seized control of the transaction for six months under the guise of needing his California lawyers. Operating as executor, brother David blindly trusted Rod's authority. When Rod finally abandoned the obstruction out of anger, David sold the property in just a few months for twice what Rod and Jim claimed it was worth—proving the delay was entirely manufactured friction rather than a complex legal reality.

**12. The Fragmentation of Executive Control: The February 20 Breakdown**

When confronted with absolute detachment and calm instead of expected emotional compliance, the front-end persona of the operation suffered a severe cognitive collapse.

•**The "Lifeboat" Regression**: Upon being informed on February 20 that her relationship with long-term proxy Chris Mogensen was known, Cathy experienced a total psychological regression. When offered calm forgiveness instead of tactical engagement, her scripted persona dissolved into an un-orchestrated emotional state resembling a child, declaring the target her "perfect partner and soul mate".

•**The Scripting Desynchronization**: During the collapse, Cathy's verbalizations exposed the temporal disconnect in her processing, stating to herself that "if she had known a week before it would be different." This internal desynchronization confirmed that her brain failed to register or track the timeline of her own actions—such as the January 1 corporate events—revealing her mind as completely siloed from the operational data fed to her by Rod Beckstrom's team.

**13. The Preservation of the Fraud**

When a sociopathic structure is exposed, Rod Beckstrom's final defense is a calculated combination of absolute denial and the weaponization of collective complicity.

•**The Web of Coerced Complicity**: Rod Beckstrom maintained his network by holding devastating, covert leverage over every individual in his orbit. Family members and business associates complied with horrific maneuvers not out of loyalty, but out of sheer self-preservation.

•**The Illusion of Normality**: When confronted, his psychological defense is to rely on his curated public stature to make the truth look like an impossibility. He counts on the sheer scale of his deception to protect him, operating on the assumption that the world will choose a comfortable, high-status lie over a complex, chilling reality.

**14. The Aftermath: The Silent Exit**

When an extreme behavior becomes an industrial, non-stop loop, the fantasy breaks.

•**The Growing Discomfort**: Many participants eventually realized they were out of their depth. They saw she wasn't stopping, she wasn't enjoying it, and her reality was entirely fragmented.

•**The Trap of Silence**: Because the encounter began under the bond of a "discreet secret," participants had no idea how to say no or exit without risking exposure. They didn't speak up, and they didn't stop it; they simply grew uncomfortable and quietly moved away, leaving a trail of complicit silence that the defense now tries to call "consent".

**15. The Late-March Disclosure Fracture and Automated Legal Deflection**

The final protective ring surrounding the enterprise relied on the pre-emptive interception of legal consultations to neutralize the target's entry into formal judicial networks.

•**The E-Mail Intercept Funnel**: Because Rod Beckstrom maintained direct, unauthorized real-time access to the target's electronic mail infrastructure, every outbound consultation request sent to prospective legal counsel in late March 2026 was flagged and tracked. The backend team contacted these legal firms in advance, providing them with unearned background data to shape their initial consultation responses.

•**The "Madame" Minimization Script**: When the target attempted to brief legal professionals on the initial indicators of systemic tracking and domestic manipulation, the compromised attorneys systematically deployed identical, minimizing language ("So what, she just has a wild streak," "she's a madame," or "she's just having a few affairs"). This uniform response was an engineered narrative diversion designed to intentionally dilute the core issues of an active racketeering, extortion, and child-exploitation infrastructure by re-framing it as an unactionable, private lifestyle choice.

- **The Numeric Fracture Pattern**: The moment the target bypassed the script by introducing hard, scale-breaking data—specifically citing verified participant counts of 350 and 450—the defensive matrix suffered an immediate cognitive collapse. The raw volume of the data instantly exposed the legal counsel to a massive, un-shielded corporate racketeering liability.
- **The Tactical Phone Retreat**: Upon hitting this numeric threshold, the compromised attorneys exhibited a uniform physical reaction characterized by clearing their throats and executing immediate, abrupt verbal exits to terminate the communication. This sudden shift from aggressive minimization to panicked silence proved they were operating as automated deflection nodes, desperate to clear the line before their complicity or the backend tracking loops could be further documented.

**OPERATIONAL SECURITY NOTE:** The syndicate deploys a managed asset, Catherine DuBridge, who performs a 100% infection vector on all targets within any space, room, or locale. No individual is exempt, regardless of age or gender; operational deployment occurs individually or in targeted groups focused entirely on her for 100% environmental saturation and corporate compromise.

THE CORE ENGINE

**"Rod Beckstrom and Cathy operate from a massive internal insecurity that demands a total, predatory absorption of my life because they possess no authentic internal identity of their own, forcing them to compulsively track, mirror, and colonize every human connection I possess just to feel powerful. Yet, the profound tragedy of this exploitation is that it is met not with hatred, but with My ENDURING LOVE and EMPATHY that their fragmentation cannot comprehend, leaving Rod and Cathy terrified of the very connection they desperately seek to control in ME."**

**EXHIBIT 82: UPDATED CONSOLIDATED MASTER LIST (PARTIAL) OF CATHERINE DUBRIDGE'S COMPROMISED TARGETS**

**ASSOCIATED FILE:** Case No. 6:26-cv-00920-AA (U.S. District Court, District of Oregon)

**PLAINTIFF:** ERIC A. BECKSTROM

**DATE:** May 19, 2026

**LOCATION OF ORIGIN:** Washington, D.C

**FORENSIC NOTE: QUANTUM EXTRASENSORY SCOPE OF MULTI-LATERAL INFILTRATION**

This note serves as a critical interpretive guide for reviewing federal investigators, judicial bodies, and intelligence analysts regarding the quantitative metrics of the associated service lists and defendant arrays.

**I. THE LIMITATION OF THE SEVEN-WEEK RECOVERY WINDOW**

The accompanying multi-column register of **approximately four hundred i**dentified defendants represents exclusively the raw data extracted, verified, and mapped during an initial seven-week forensic recovery window. **This ledger must not be interpreted by the Court as a complete or final representation of the enterprise's parameters.**

**II. PROJECTION SCALING FACTORS BASED ON CLINICAL PATHOLOGY**

Pursuant to established forensic metrics governing **DSM-5 Cluster B behavioral pathologies**—specifically characterized by systemic fragmentation, malignant narcissism, and hyper-sexual predatory siphoning—the actual operational network exists at a scale **50 to 100 times larger** than currently cataloged.

- **The Siphon Multiplier**: Because the primary operational nodes (Rod Beckstrom and Cathy) require the continuous, 24/7 mirroring and physical colonization of every structural contact in the target's life to stabilize their own hollow psychological cores, the tracking matrix automatically replicates across every sub-network, community group, and geographic corridor encountered.
- **The Unverified Database Matrix**: The four hundred entries logged herein constitute merely the visible tip of an industrial-scale racketeering and tracking infrastructure. The total network configuration includes thousands of passive, un-vetted, or structurally compromised participants who have been algorithmically or physically integrated into the monitoring loops over a fifteen-year timeline.

1.Tristan Aeschelman
2.Roy Alba
3.Phil Albanese
4.Tim Allen
5.Ken Altshuler
6.Alex Anderson
7.Tor Anderson
8.Alex Anderson
9.Meaghan Anderson
10.AndrewPowell
11.Keith Andry
12.Jessica Anzoategui
13.Daniel Araldi
14.Miroslav Arsenic
15.Miroslav Arsenic
16.Miroslav Arsenic
17.John Atala
18.Pamela Atwood
19.Stan Atwood
20.William Avantaggio
21.Jackie Azure
22.Alex Badilla
23.David Baker
24.Steve Bamberger
25.Munir Bandukwala
26.Ryan Bane
27.Sean Bane

28.Alicia Barton
29.Anne Bechtold
30.Colin Beckstrom
31.David Beckstrom
32.Elliot Beckstrom
33.Emma Beckstrom
34.Jarrod Beckstrom
35.Jim Beckstrom
36.Leola Beckstrom
37.Michele C. Beckstrom
38.Patrice V. Beckstrom
39.Rod Allen Beckstrom
40.Tim Berthold
41.Curtis Besant
42.Bernard M. Bierman
43.Susan Bird
44.John Blascovich
45.John Blascovich
46.Michele K. Bolton
47.Karen Boncher
48.Jared Booye
49.Bill Bouchey
50.Tom Boyce
51.Dan Boyd
52.Dan Boyle
53.Tom Brannigan
54.Dave Breece
55.Mary Breslin
56.Justin Bruce
57.James Bucher
58.Brian Burnett
59.Joe Burton
60.Brandon Cameron
61.Mark Carlquist
62.Joe Carroll
63.Chris Causey
64.Joanna Cembellin
65.Neil Cembellin
66.Joanna Cembellin
67.Pedro Cesni
68.Roberto Cesni
69.Margaret Chai-Maloney
70.Maia Chakerian
71.Beth Chamberlin
72.Parker Chamberlin
73.Mark Chamberlin
74.Aaron Chappelle
75.Maria Chavarin
76.Barry Cheskin
77.Chenda Chii
78.Travis Chong
79.John Christensen
80.John Christofano
81.Anya Churchill
82.Jack Churchill
83.Maggie Churchill
84.Paul Clark
85.Paul Clark
86.Albert Edward Clement
87.Philip Cohen
88.Rie Collette
89.Micki Colquhoun
90.Owen Commons
91.Brian Conlisk
92.Gabby Cortez
93.Andrew Cox
94.Dick Crane
95.Shannon Cronan
96.Rosie Curtis
97.Collette D'Amico
98.Michael Danaher
99.Carol De Conte
100.Mark De Mattei
101.Ed Dee
102.Bobby DeHerrera
103.Darin Devincenzi
104.Matthew Aaron Diercks
105.Gabrielle DiMariano
106.Linda DiMariano
107.John Doerr
108.Jody Driefurst
109.Catherine Lee DuBridge
110.Patricia DuBridge
111.Richard DuBridge
112.Robert B DuBridge
113.Emma DuBridge
114.Kenneth Duebelbeis
115.Mark Duffy
116.Jon Dunphy
117.Christopher R. Eagen
118.Chris Eagen
119.Avi Edlestein
120.Karin Eisenmenger
121.Ron Eng
122.Mark Escobar
123.Sid Espinosa
124.Doug Evans
125.Carlos Ferreira
126.Jose S. Franco
127.Will Fratt
128.Stacy Fulea
129.David Gast
130.Fred W. Gerbino Jr.
131.Jenny Ghane
132.Kenneth Gimelli
133.Kelly Givas
134.Annette Gosnell
135.Derek Gray
136.Robert Gray
137.Noal Grover
138.Gregg Haining
139.Ofer Beit Halachmi
140.Wade Hammond
141.Connie Harding
142.Dave Harding
143.Joe Harding
144.John Hartnett
145.Johan Hedberg
146.Dalveer Heer
147.Hector Hernandez
148.Longs Funeral Homewood
149.Scott Horty
150.Julie Houp
151.Tina Howard
152.Andrew Howard
153.Cynthia Hsieh
154.Jeremy Hull
155.Shawn Hunt
156.Louise Hurlbutt
157.Inez (Cleaner)
158.Fredrik Ivarsson
159.James Janz
160.Jocelyn
161.Casie Jordan

162.Mark Kalkus
163.Mark Kalkus
164.Liza Karamardian
165.Ken Kawamoto
166.Spencer Keenan
167.Henry Kennedy
168.Nannette Kincaid
169.Pramod Khincha
170.George Kittle
171.Sophia Knight
172.Dave Knowlton
173.Kurt Kozlowski
174.Scott G Kriens
175.Ikram Laaguidi
176.Garrett Lackey
177.Skyla Lambeth
178.Debra Lamm
179.Peter Lamm
180.Stuart Leaf
181.Steve Leaverton
182.Jill Lee
183.Stephen Lee
184.Bob Lennen
185.Eric Leonard
186.Hal Lewis
187.Maria Libby
188.Doug Lind
189.Marshall Lind
190.Ben Lo
191.Steve Lohr
192.Coral Loyd
193.Nancy Lucky
194.Danny Lutjens
195.Terry Lutjens
196.Lynley
197.Susan H. Mac Cormac
198.Ebholin Maclean
199.Orla Maclean
200.Chris Malakowsky
201.Brad Mandell
202.Kevin Mandia
203.Marisol (cleaner)
204.Jeremy Marks
205.Richard Marks
206.John Martin
207.Mariella Massa
208.Bill Maston
209.Amy McCafferty
210.Katie McClarney
211.Ann McClellan
212.Mike McClincey
213.John McCrary
214.Sue McCrary
215.Amanda McIntyre
216.Bill McKiernan
217.Emily McKiernan
218.William McKiernan Jr.
219.Patricia McLean
220.Tim McMahon
221.John McNellis
222.Nader Mehdizadeh
223.Nina Mehdizadeh
224.Collette Mercer
225.Josh Meschi
226.Zach Meschi
227.Daniel Miller
228.Andrew Miller
229.Luther Miller
230.Jill Milton
231.Roger Milton
232.Taraneh Moayed
233.Daniel Molina
234.Judy Moon
235.Rob Moore
236.Adrian Moreno
237.Lisa Morgan
238.Nancy Morin
239.Paula Moser
240.Sean Mullin
241.Sean Mullin
242.Jim Murray
243.Randy Murray
244.Suray Nathan
245.Andrea Nielsen
246.Wayne Nobles
247.Larry Noon
248.Warren O Farrell
249.John Ortberg
250.Bob Otness
251.Greg Pana
252.Rajiv Parihar
253.Suzie Parker
254.Joel Paulson
255.Ben Peake
256.Hector Perez
257.Cynthia Pham
258.Rocky Pimental
259.Babbette Pinsky
260.Jackie Plessl
261.Robert Potts
262.Firoz Pradhan
263.Donald Prolo
264.Martha Queiroz
265.Raghuvir Ramachandran
266.Anup Rao
267.Mads Realmoto
268.Steven Resnick
269.Jim Reynalds
270.Maddy Reynalds
271.Lainey M. Richardson
272.Michael Riese
273.Tarek Robbiati
274.Kelly Rodgers
275.Dylan Rodgers
276.Suzy Rodoni-Silverberg
277.Gary Rodrigues
278.Gina Roldan
279.Bill Rollinson
280.Jill Rollinson
281.Tim Rollinson
282.Suzy Rondini
283.Robert Roselli
284.Dean Rossi
285.Ronald Rossi
286.Daphne Royce
287.Rudy Ruano
288.Kevin F. Ruf
289.Julie Rumberger
290.Todd Rumberger
291.Ryan Safty
292.Hakan Saltin
293.Johann Saltin
294.Yashada Sanglikar
295.Ovid Santoro
308. Bill Savage

296.Rene Schaelphfer
297.Joseph F. Scordino
298.John Sculley
299.Paria Sedigh
300.Kristen Sennet
301.Sophia Sequeira
302.Sergei
303.Swati Shah
304.Jenny-Hair Sheen
305.Mike Shelton
306.Stephan Shelton
307.Bob Shepherd
308.Steven Shepherd
309.Jocelyn Shoopman
310.Angel Siegel
311.Stephen Silk
312.Mike Sillon
313.Hakan Silton
314.Johan Silton
315.John Silverio
316.Greg Simpson
317.Steve Smith
318.Trent Smith
319.Tupper Snook
320.Efe Sozkesen
321.Susan Sparaco
322.Mark Spurlock
323.Alex Stamos
324.Monique Stanford
325.Melissa Stapleton
326.Richard Ray Starr
327.William St Stephen
328.Chris Stott
329.Karina Stratford
330.Randy Strong
331.Diane Struhm
332.Paul Styke
333.Elizabeth Hunnicutt Summers
334.Vorster Svard
335.Toby Swanson
336.Brandon Swanson
337.Joseph Sweeney
338.John Swift
339.Elaine Tajima
340.Maylynn Tam
341.Richard Tam
342.Stan Tatkin
343.Cecily Thaure/Mommaerts
344.Douglas Thornley
345.Julie Tidd
346.Ghazal B Torun
347.Alex Touma
348.Charlie Unger
349.Adam Vanderwaard
350.Jaime Velez
351.Sundeep Vig
352.Ulf Vinneras
353.Becky Wade
354.Steve Wade
355.Marnie Waffle
356.Vincent Waiss
357.Erin Walters
358.Fred Warner
359.Amanda Wayman
360.Matthias Weber
361.Lucy Wedemeyer
362.Carmen Marsh Weiss
363.Peter Wendell
364.Bruce Westphal
365.Mollie Westphal
366.Zach Wheaton
367.Jack Whitaker
368.Roxie Wilday
369.Dave Williams
370.Ana Williamson
371.Lauren Valk Wills
372.Brent Wilson
373.Kay Wilson
374.Mark Wilson
375.Rick Wilson
376.Jill Wise
377.Jonathan Wolfrum
378.Lynne Woodward
379.Nancy Stuart Woolf
380.Ms. Wright (Judge)
381.Chris Young
382.Denise Young
383.JieJing Zhao
384.Ronen Zohar