**DOCUMENT 2**
**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**
**EUGENE DIVISION**
ERIC A. BECKSTROM,
Plaintiff,
v.
ROD ALLEN BECKSTROM, CATHERINE LEE DUBRIDGE, CHRIS MALACHOWSKY, MICHELE C. BECKSTROM, PATRICE V. BECKSTROM, et al.,
Defendants.
Case No.: 6:26-cv-00920-AA
Dated: July 31, 2026

## EMERGENCY MOTION FOR EXTENSION OF TIME TO COMPLETE DISCOVERY

Pursuant to Federal Rule of Civil Procedure 16(b)(4) and Local Rule 16, Plaintiff Eric A. Beckstrom moves this Court for a brief 28-day extension of the current discovery cutoff. In support of this motion, Plaintiff submits that immediate, structural good cause exists as detailed below.

### I. PROCEDURAL FRAMEWORK & RULE 16(b)(4) STANDARD

Under Federal Rule of Civil Procedure 16(b)(4), a scheduling order may be modified only for good cause and with the judge's consent. The primary measure of this standard is the moving party's absolute diligence in seeking the modification and executing discovery.

Good cause is established here because the volume of incoming third-party public records, corporate communications, and multi-state agency audits has completely outpaced standard civil timelines. Plaintiff has acted with absolute diligence, independently issuing approximately 2,550 comprehensive administrative preservation holds that are actively generating a vast infrastructure of institutional data that must be integrated into this record.

Furthermore, compelling good cause exists because Plaintiff is actively forced to maintain a strict, off-grid physical posture inside the District of Oregon to protect the integrity of this active federal record. The defense network, utilizing vast corporate capital and elite white-collar defense firms, has engineered cross-border procedural traps designed to disrupt this timeline. Entering the State of California or crossing the Santa Clara County line would instantly trigger an automated coordination of private investigators and professional process servers.

This tactical deployment seeks to wrap the pro se Plaintiff in a web of conflicting state-level mandates, emergency protective maneuvers, and home-turf deposition subpoenas before the incoming, mandatory third-party public records can be formally docketed in this Court. Maintaining physical separation within the Eugene Division is not a matter of convenience; it is a structural necessity to prevent the extrajudicial containment and spoliation of evidence by the primary defendants. Plaintiff's diligence is documented by his refusal to yield to these territorial diversions, choosing instead to execute a cold data checklist entirely from an unreadable, secure perimeter.

### II. LOCAL RULE 7-1 CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7-1, Plaintiff certifies that a pre-filing conference could not be safely conducted prior to filing this emergency motion. Plaintiff is currently maintaining a strict, off-grid physical posture to protect physical safety and prevent the spoliation of evidence. Due to the active 24/7 surveillance, data interception, and severe transit interventions detailed herein, establishing direct communication with defense counsel is operationally impossible without compromising Plaintiff's immediate security. Because a meaningful conference cannot occur under these emergency containment conditions, judicial intervention is required.

### III. MULTI-STATE CHILD ENDANGERMENT CRISIS AND RESULTING DATA EXPANSION

The good cause required for a 28-day discovery extension under FRCP 16(b)(4) rests entirely on an active public safety crisis that has outpaced standard civil timelines. This action is not a localized domestic dispute or a matter of personal grief; it is a multi-jurisdictional, nine-state child protection emergency.

The rogue startup driving this litigation is engineered by individuals at the absolute apex of global technology and cyber intelligence: a primary developer who stands as one of the world's wealthiest and most capable computer engineers, Defendant Chris Malachowsky, operating alongside Defendant Rod Allen Beckstrom, a former Director of the National Cybersecurity Center and ICANN global internet governance leader. Utilizing $billions in private tech capital and deep institutional ecosystems, this rogue startup has deployed a 24/7 interception and surveillance architecture that actively surpasses standard state-level capabilities. The Rogue Startup is more than three decades old.

This total technical perimeter is directed at an innocent U.S. citizen and father whose deep familial proximity to Defendant Rod Allen Beckstrom left him uniquely vulnerable to root-level exploitation. In an interconnected society, this complete data asymmetry effectively removes the Plaintiff from contemporary culture. With 0% digital or physical privacy, where every email and phone call can be overwritten or intercepted in real time for 15 years, normal life and solo business operations are rendered impossible. This total technical enclosure for 15 years systematically blocks the Plaintiff's children from free, un-manipulated contact and actively contains witnesses.

The technical architecture of this enclosure constitutes an active data manipulation and interception infrastructure, utilizing deep system files embedded on the Plaintiff's hardware within a hidden legacy folder structure masked inside "ArchiCAD Library 10" system directories since 2011. This configuration executes root-level control, deletion, and alteration privileges over user data rather than passive location monitoring. When field investigators minimize these discoveries by advising a target to simply "buy another computer," they ignore the specific dual-use capabilities of this operational toolkit, which bypasses front-facing user menus to execute absolute data exfiltration and trail concealment privileges:

•**HxD (Hex Editor / Binary Modification):** Utilized for direct binary inspection and metadata modification. In an enterprise security environment, analysts use it to inspect raw code blocks of unknown executables. Maliciously deployed, it grants the ability to alter underlying file identities and directly edit hex headers inside a raw binary to faking "Last Modified" timestamps, tricking investigators into believing stolen files have been untouched for years.

•**MFCMAPI (Low-Level Exchange / MAPI Manipulation):** Interacts directly with the deepest layers of a Microsoft Exchange server and Outlook profile. While administrators use it to clear syncing loops, an attacker uses it to manipulate mailbox routing at the root layer—constructing hidden forwarding rules that do not show up in user menus, quietly blind-copying (BCC'ing) all incoming and outgoing transmissions to an external collection point.

•**Stellar Converter for OST (Mass Data Extraction):** Batch-converts offline Outlook databases (.ost). While compliance teams use it for server migrations, a rogue actor uses it for high-velocity data theft, copying encrypted local databases to a physical drive and running the converter on a separate machine to instantly unlock an entire historical email communications ledger, attachments, and calendars.

•**Puran File Recovery (Disk Sector Scanning):** Scans physical storage drive blocks to pull back files marked as deleted before they are overwritten. While used to prevent accidental data loss, an unauthorized actor executes it to bypass filesystem deletion marks, extracting confidential project files directly from unallocated space.

•**Audio Interception & Device Compromise:** The primary defendant, Catherine Lee DuBridge's phone, is set up to record every conversation for 11 years. The Plaintiff's primary iPhone has been systematically bugged for 11 years, capturing all voice and GPS transmissions, characterized by physical acoustic feedback, line-clicking, and active call-retention tactics used by external network nodes to delay the Plaintiff's mobility.

•**Chassis and Interface Exploitation:** The Plaintiff's vehicle, a Rivian R1S, was altered via an unauthorized auxiliary hardware tracker hanging from the network interface, alongside a duplicate device profile embedded directly into the chassis software keys. This configuration granted the

network root-level tracking capabilities that could not be revoked through standard administrative screens, combined with coordinated service-level containment to restrict vehicle recovery options.

To suggest that the rogue startup is not capable of this level of digital surveillance is to deny the source of Chris Malachowsky's $30BN technological wealth built on disrupting prevailing technologies globally. This capital and computer engineering expertise is combined with Rod Allen Beckstrom's role as a global leader in Cyber Warfare, leveraging a roster of Stanford Cyber Board colleagues and others including Rick Howard (Palo Alto Networks), Kevin Mandia (FireEye/Mandiant Systems) and Alex Stamos, and Ruslan Spektor (DRM Worldwide), etc.

The intensity and current blocking tactics from this rogue startup are specifically designed to hide 33 years of corporate extortion and exploitation. The business model relies on primary defendant, Catherine Lee DuBridge, as a honeypot operating with diminished cognitive capabilities. The primary defendant's conduct creates a severe public health emergency, forensically detailed in the statutory reference matrix filed with this Court since May 15, 2026 (compiled herein as Exhibit 84), establishing a long-term pattern of severe boundary violations. This long-term institutional blind spot mirrors documented historical containment loops, such as the regional infrastructure failures involving serial predator William Cameron McCook Jr., whose presence was actively ignored by executive Kieve leadership despite clear internal warnings by the Pat Lydon (Business Manager), Dean Cartier (Facilities), Plaintiff (Kieve/Wavus Master Planner & Architect for 21 years and obtaining a $500K, Gosnell-cash donation), and others. The Plaintiff was also targeted by McCook's actions in Maine, as Plaintiff was at Kieve weekly for 18 years.

The recent total isolation measures were implemented once the Plaintiff chose to leave his proscribed position as the primary defendant's anchor and partner. Originally the rogue startup selected the Plaintiff for this anchor role precisely due to his unassailable character and specifically to stabilize the primary asset's low cognitive abilities, as her exploitation mechanisms could not function or scale up without a multifaceted, emotionally grounded, and stable partner. In 2015, Catherine Lee DuBridge clearly stated to Plaintiff that she had been withdrawn from public life since 2011 due to adverse responses from the community, schools and Church due to her actions.

The stabilization provided by the Plaintiff insulated the entire rogue startup through 11 years of rapid expansion. However, keeping the primary defendant in a state of continuous cognitive fragmentation and confusion is a structural necessity to maintain this business model. She is monitored and tracked in the same manner as the Plaintiff. The moment she began moving toward self-reflection, seeking clinical PTSD therapy, and indicating she intended to exit the network, she became the startup's highest operational liability.

Consequently, the network increased her boundary-less parties at the Plaintiff's home in order to control her further when Plaintiff was visiting two brothers in Oklahoma for 3 weeks. Culminating in the Dec. 2025 Holiday party where Club/LG trainer, Collette DiAmico, was immediately fired at Plaintiff's house by Club manager Katrina Stratford due Collette's role at the criminal and physical exploitation of Catherine Lee DuBridge's body at the party inside Plaintiff's house without permission. Several dozen Club-LG members, realtors and lawyers were also present. The Alta Heights Court cul de sac neighbors attended led by primary defendant, Tim Bert hold, who shared with Plaintiff his complicity where everyone had their time and some times more than one at a time, beyond what can be imagined. A primary historical connector in attendance was elderly Lucy Wedemeyer, Plaintiff's realtor, and 'best friend/sister' to Plaintiff. In February 2026 Lucy nearly collapsed and convulsed walking by the dining room table on what Plaintiff thought was her first visit to see the house he had designed and built. Lucy was emotionally triggered by the torrid events which occurred to Catherine DuBridge's body on the table at the Holiday party. The Plaintiff witnessed Lucy's behavior and was confused, she was so disturbed he had to steady her arm. Plaintiff assumed it was her first time to ever see the house. Lucy had been there many times before at other illiicit

events. Lucy spent 2 months doing active coverup attempting to force Plaintiff into a shaky mortgage to buy Catherine's share of the house out in order to mitigate any legal fallout from the Party transgressions. Plaintiff was confused by Lucy's role which crossed professional boundaries as she acted like Catherine DuBridge's legal representative. Plaintiff and Catherine Lee DuBridge had done three previous real estate deals with Lucy, never a mortgage. Furthermore the mortgage rep. Attempted to 'bait' Plaintiff which confused Plaintiff. Lucy was not interested in selling the house on the open market as to not draw legal attention to the property. These convaluted and somewhat illegal measures formed the foundation for the Plaintiff's concern about the motives of everyone as neighbor's approached him with abject terror and worry daily. There was unstable and erratic behavior of everyone in the Plaintiff's ecosystem: personal and business as Plaintiff works full time at home. This shifting situation laid the groundwork for Plaintiff's current departure from CA in addition to the Rogue Startup's intense efforts. Starting Jan. 1, 2026 the entire town and neighborhood's behavior was electric and unstable. Prodding the Plaintiff daily to check their own legal risk and liability. Exhibits 84 and 90 showcase the massive quantity or participants. The situation is industrial scale, far from a simple domestic occurrence. 880 people were waiting for the Plaintiff to either purchase the house in a sham mortgage which would lead to default or waiting for the Plaintiff to wind up as another casualty on Exhibit 31? Instead of discussing real concerns about Cyber Stalking which the 83 exhibit binder exposes. The FBI in San Francisco and Portland, OR, without cause in the middle of a conversation with Plaintiff, brought up 'suicide', not to offer assistance or care which was not requested or needed. The topic was brought up instead of offering legitimate support to an innocent US Citizen for Cyber Stalking, but as a veiled suggestion to keep the lid on a massive Child safety concern in 9 states. Regardless of people's conflicting perspectives there is a raging Child Safety issue in present time, going on unabated. It is understandable that everyone can be confused, but the risks to Children are intense. Exhibit 84 reflects the risk and it is partial only.
Then the rogue startup executed immediate risk-mitigation countermeasures, systematically stripping away the Plaintiff's mobility assets and targeting him for total elimination to isolate her, enforce absolute information containment, and prevent the disclosure of their 33-year ledger.
Once the anchor Plaintiff discovered state-level, 360-degree complete control on April 3, 2026, the rogue startup's liability became exposed and the tracking accelerated. This discovery unlocked his systems-engineering internal capacity to unpack years of intentional stress events and align them with the intensive global business relations role he held alongside Rod Allen Beckstrom, in addition to his own international architectural work and consulting. This technical breakthrough unmasked nested surveillance payloads hidden inside legacy design folders and exposed a telemetry network exploitation.
To maintain this extrajudicial containment perimeter, the network has weaponized localized transit surveillance and physical vehicular interventions across multiple states, including:

- **California Transit Intimidation (March 8, 2026):** A targeted traffic stop on Highway 1 in Capitola engineered after an enterprise vehicle forced a passing node, resulting in advice to implement military-grade Faraday shielding against ongoing wireless penetration.
- **Northern California Border Containment (April 30, 2026):** A high-density state patrol front-containment boundary maintaining a rigid perimeter for over one hundred miles up to the Oregon border following the emergency abandonment of my primary vehicle due to an embedded, hard-wired auxiliary tracking device.
- **West Virginia High-Velocity Pursuit (May 7, 2026):** While Plaintiff was traveling to deliver forensic system evidence to U.S. Congressional representatives, an enterprise vehicle executed a high-velocity rolling pursuit on Interstate 70 through West Virginia, performing aggressive brake-checks and flashing-light flybys at speeds exceeding 120 mph to induce a physical casualty.

- **Pennsylvania Cabin Penetration (May 28, 2026):** A physical breach of my locked vehicle cabin at a highway rest area utilizing a cloned master key, leaving a distinct physical marker of continuous tracking.
- **Maine Boundary Saturation (May 28, 2026):** A massive density of state deployment mirroring tactical containment perimeters previously encountered near Watsonville and Palo Alto, California.
- **Local Institutional Capture:** State court records from the Knox County District Court (Exhibits E, F, and I) document that local police divisions were weaponized across a 3,000-mile distance to issue bad-faith criminal trespass notices against minor children (ages 13 and 17) who were physically located in California, serving solely to build a manufactured record of familial dysfunction and enforce witness containment. This local manipulation is further evidenced by a recurring pattern of extrajudicial interference with paternal contact in Rockport, Maine. Specifically, during an October 2014 transit attempt to interface with minor child Soren, local law enforcement leadership actively blocked access under the pretext of emergency containment. This operational node has since been forensically compromised by official state regulatory action; the handling official, former Rockport Police Chief Mark Kelley, subsequently separated from the department in May 2016 and accepted a total revocation of his law enforcement certification following an investigation by the Maine Criminal Justice Academy regarding the falsification of regulatory records.

To halt this operational network and protect vulnerable minors, I have independently issued approximately 2,550 certified litigation hold packages and institutional child safety alerts to an extensive grid across 9 states, +15 counties, +100 public school systems, +80 religious institutions, +20 major universities, and 70 government and law enforcement entities. These notifications, dispatched in systematic phases starting in mid-June and escalating through mid-July, have triggered active, independent regulatory reviews, safety audits, and data freezes across hundreds of public agencies.

Because this intergenerational network relies on complete technical asymmetry to insulate these liabilities, and because these outside institutions operate on their own mandatory schedules to secure registries and communications, a brief 28-day extension is legally compulsory to allow these incoming, verified third-party records to be integrated into the federal record.

**IV. CONCLUSION AND PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiff respectfully requests that this Court find good cause under FRCP 16(b)(4) and enter an order extending the discovery completion deadline by exactly 28 days.

Respectfully submitted,

Dated: July 31, 2026

By: ____________________________

Eric A. Beckstrom, Plaintiff, Pro Se
PO Box 10427, Eugene, OR 97440

**MASTER EXHIBIT INDEX**

- **Exhibit 6:** Forensic Chain of Custody & Persistent Tracking (1-page printout documenting the Berlin intercept files, Lenovo directory screenshots, Harbor Digital notes, and Rivian R1S telemetry data).
- **Exhibit 31:** The Casualty Record & Systemic Attrition updated July 31, 2026.
- **Exhibit 45:** Ghost User-2 Log (1-page sheet documenting the firmware-level guest user profile discovery, remote deletion events in Eugene, OR, and hardware isolation measures).
- **Exhibit 48:** Professional Curriculum Vitae and Project Chronology of Eric A. Beckstrom, Architect.
- **Exhibit 84:** Statutory Compliance Matrix & Master Property Directory dated July 31, 2026.
- **Exhibit 85:** Formal Emergency Public Health and Child Protection Alert to the California Department of Social Services dated July 31, 2026.
- **Exhibit 86:** Confidential Administrative Safety Attachment: Regional Environmental Exposure Index revised July 31, 2026.
- **Exhibit 87:** Supplemental Administrative Memorandum to the Maine Department of Health and Human Services dated July 31, 2026.
- **Exhibit 88:** Master Case Addendum: Statement of Systemic Tortious Liability dated July 30, 2026.
- **Exhibit 89:** Master Case Addendum: Photographic Record and Evidence Analysis updated July 28, 2026.
- **Exhibit 90:** MASTER EVIDENCE PRESERVATION INDEX AND CERTIFIED RANDOMLY-ORDERED NODE MATRIX, July 31, 2026.